1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2                      - - - - -

3
SLIPPERY ROCK AREA       )
4  SCHOOL DISTRICT,        )
                          )
5          Plaintiff,     )
                          )
6          vs.            ) Civil No. 15-1020-JFC
                          )
7  TREMCO, INC., et. al., )
                          )
8          Defendants.    )

9                   - - - - -

10                       U.S.P.O. and Courthouse
                         Judge Conti's Conference Room
11                       Fifth Floor
                         700 Grant Street
12                       Pittsburgh, PA  15219
                         Friday, February 5, 2016
13                       1:55 p.m.

14                    - - - - -

15  BEFORE:  CHIEF JUDGE JOY FLOWERS CONTI

16                    - - - - -

17  HEARING ON A MOTION TO DISMISS AND SCHEDULING CONFERENCE

18           TRANSCRIPT OF PROCEEDINGS

19                    - - - - -

20                   Reported by:

21                   Lina G. Hershberger
                     Court Reporter

22

23                   - - - - -

24
REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED WITHOUT
25  AUTHORIZATION FROM THE CERTIFYING AGENCY

```
 1   COUNSEL PRESENT:

 2   For the Plaintiff:

 3        Rebecca E. Bell-Stanton, Esq.
          Carpenter & Schumacher PC
 4        2701 N. Dallas Parkway, Suite 570
          Plano, TX  75093
 5              And
          N. Scott Carpenter, Esq.
 6        Carpenter & Schumacher PC
          2701 N. Dallas Parkway, Suite 570
 7        Plano, TX  75093
                And
 8        D. Aaron Rihn, Esq.
          Peirce Law Offices
 9        2500 Gulf Tower
          707 Grant Street
10        Pittsburgh, PA  15219

11   For the Defendants:

12        James M. Jones, Esq.
          Jones Day
13        500 Grant Street, Suite 4500
          Pittsburgh, PA  15219
14              And
          David Michael Belczyk, Esq.
15        Jones Day
          500 Grant Street, Suite 4500
16        Pittsburgh, PA  15219
                And
17        Katelyn M. Matscherz, Esq.
          Jones Day
18        500 Grant Street, Suite 4500
          Pittsburgh, PA  15219
19
     ALSO PRESENT:  Katie McGee
20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

- - - - -

1          CHIEF JUDGE JOY FLOWERS CONTI:  This is a hearing

2     on a Motion to Dismiss and also a scheduling conference in

3     Slippery Rock Area School District versus TREMCO, Inc.  It's

4     at Civil No. 15-1020.

5          Will counsel please enter your appearance for the

6     record.

7          MS. REBECCA E. BELL-STANTON:  Your Honor, Rebecca

8     Bell-Stanton, Scott Carpenter, and Aaron Rihn here on behalf

9     of Slippery Rock.

10         THE COURT:  Ms. Bell-Stanton, are you going to be

11    arguing?

12         MS. BELL-STANTON:  I am, Your Honor.

13         THE COURT:  Okay.

14         MR. JAMES M. JONES:  For the Defendants, Your

15    Honor, it's Jim Jones with Jones Day, and I'm joined by David

16    Belczyk and Katie Matscherz.

17         THE COURT:  Are you going to be arguing, Mr. Jones?

18         MR. JONES:  I am.

19         THE COURT:  All right.  It's a little long, as you

20    can see by the amount of work that we had to go through to

21    become ready for the hearing today.  There are a number of

22    issues that we need to go through that were raised by the

23    Motion to Dismiss.

1        Just as general background, the Plaintiff, the

2   Slippery Rock Area School District, and I can refer to the

3   Plaintiff as the School District, filed a Class Action

4   Complaint against three entities, three related entities, RPM

5   Technologies, Inc.; TREMCO, Inc.; and Weatherproofing

6   Technologies, Inc.

7        There was an Amended Complaint filed on

8   December 23, 2015, and the Amended Complaint raised

9   essentially five claims:  fraud under the Pennsylvania Common

10  Law, misrepresentation under Pennsylvania Common Law,

11  fraudulent concealment under Pennsylvania Common Law,

12  negligence under Pennsylvania Common Law, and unfair trade

13  practices under the Pennsylvania Unfair Trade Practices and

14  Consumer Protection Law.

15       Other allegations in the Complaint deal with civil

16  conspiracy, joint venture, concerted action, and there's also

17  relief sought for certification of a class and appointment of

18  a Plaintiff as a class representative.  And I know we're not

19  here today on any motion for certification, but there has been

20  a motion to strike those class allegations.

21       The Defendants have filed a Motion to Dismiss.  The

22  allegations in the Complaint, which the Court takes as true

23  for purposes of assessing the Motion to Dismiss, I'll review

24  those briefly.  I think we're all familiar with the standard

25  that the Court uses in assessing the motion to dismiss, but

1   one of the threshold issues is going to be whether there's

2   personal jurisdiction over the parent company here, RPM

3   Technologies, Inc.  So I'm going to address that issue first;

4   then I'll address the Motion to Dismiss; the state law claims;

5   and then I'll take up the class action, the class allegation

6   issues.

7            So, in a nutshell, this case is about roofing that

8   was installed in Pennsylvania for the School District.  The

9   School District is a class-three school district.  RPM, which

10  is the parent of the other two entities, is headquartered in

11  Ohio.  The allegation is that RPM has done business through

12  agents, employees, and alter ego subsidiaries.  The gist of

13  the argument with respect to whether there's personal

14  jurisdiction is whether or not the Plaintiff can make out some

15  type of alter ego basis for imposing personal liability.  As I

16  said, we'll deal with that issue first.

17           Now, TREMCO is an Ohio-based company, but has done

18  business in Pennsylvania and actually maintains a place of

19  business in Pennsylvania.  There's no question about the

20  personal jurisdiction over the TREMCO entity.

21           Weatherproofing is an Ohio-based company that does

22  business in Pennsylvania, roofing, construction, and providing

23  general contracting services.  The arguments here are that

24  TREMCO is a major manufacturer and supplier of roofing

25  materials and was the primary operator of RPM's building

1    solutions group, and was the leading presence of RPM in the

2    industrial segment of that business.  TREMCO supplies roofing

3    and weatherproofing services, such as roofing, restoration,

4    and repair services to the government and private sectors.

5          Weatherproofing is a service arm and does

6    contracting of TREMCO, supplying roofing, construction,

7    general contracting services to building owners and facility

8    managers.  So I'm not quite sure about what all of those

9    entities are doing separately as between TREMCO and

10   Weatherproofing, but it's sufficient I think to note that both

11   appear to be in the manufacturing, supplying of roofing

12   materials, and construction-related services and do business

13   in Pennsylvania.

14         The allegations in the Complaint is that RPM,

15   through TREMCO and Weatherproofing, manufactured, sold, and

16   serviced products with high failure rates, including BURmastic

17   roofing systems.  RPM, through TREMCO and Weatherproofing,

18   advertised, marketed, and sold products that were upcharged

19   from standard products, despite those products being

20   unnecessary under industry conditions or essentially identical

21   to the standard project; that RPM took steps to ensure that

22   the customers were not advised about the inferiority of these

23   procedures and oversaw proper bidding, pricing, and purchasing

24   procedures.  There are allegations that RPM directed TREMCO

25   and Weatherproofing with respect to those types of activities.

1          Specifically here as to Slippery Rock, the

2    allegations are that Slippery Rock was sold roofing materials

3    marked as superior or premium that were actually equal in

4    composition to the economy or generic products sold; that

5    these superior, the so-called superior, or premium materials

6    were otherwise unneeded materials and did not make the roof

7    safer or of measurably higher quality.  These materials were

8    installed on the buildings with high known rates of failure.

9          The roofing materials were over-specified resulting

10   in overcharges for roofing materials; there was improper

11   relationships in terms of using subsidiary as a general

12   contractor; and controlling the bidding process with detailed

13   bid specifications that excluded competitors, since they were

14   so specific that only the RPM entities would be in a position

15   to be a successful bidder.

16        The roofing project was commenced in 2004.  The

17   representations were made to the School District that there

18   were particular replacements or upgrades that were needed to

19   create a safer roof.  There was no information provided to the

20   School District representatives concerning the high-end

21   failure rate of the BURmastic roofing system.

22        Again, the argument is about they were being sold

23   superior, premium products which were not of that quality; and

24   that the project drawings provided that the sole acceptable

25   manufacturer for the roof system was TREMCO; and that TREMCO

1   materials were mandated for use for the roofing.

2           There were also roofing projects in 2010 and 2013.

3   And, again, there are allegations of misrepresentations made

4   by the bidding building solutions group that particular

5   upgrades or certain features would create a safer roof; these

6   were more costly and did not create a safer or high-

7   functioning roof.  There are representations that the

8   Defendants over-specified the roofing materials, and, again,

9   billed the Plaintiff for unnecessary higher-cost products.

10          The allegations are also specific as to the

11   Defendants' training of their representatives to ensure that

12   only RPM, TREMCO, or Weatherproofing products were available

13   for use; that the prices were inflated by these

14   interrelationships to eliminate competition and increase

15   costs.  There were, again, failure to inform about these

16   third-party relationships.

17          Now we'll take up the first, the question on

18   personal jurisdiction.  It's quite clear that a Federal

19   District Court may assert personal jurisdiction over a

20   non-resident of the state in which the Court sits to the

21   extent authorized by the law of that state, Federal Rule of

22   Civil Procedure 4(e).

23          It is a two-part inquiry.  First, there has to be a

24   statutory basis for exercising jurisdiction of the

25   non-resident defendant in accordance with the state law;

1    second, the non-resident must have minimum contact sufficient

2    to satisfy the Constitutional due process.

3         If there is not an evidentiary hearing, the

4    plaintiff need only establish a prima facie case of personal

5    jurisdiction, and you would have to look at the allegations in

6    the complaint and accept them as true to see if they are

7    sufficient for these purposes.

8         I just want to go back and review what these

9    allegations were with respect to the activities of RPM.

10        The allegations are essentially that, in addition

11   to what I have already put on the record, TREMCO and

12   Weatherproofing are openly promoted as designated departments

13   of RPM in the RPM's annual shareholder report and SEA filings

14   dated 2015; RPM owns all or most of TREMCO's stock; TREMCO

15   owns all of Weatherproofing's stock; all of the Defendants

16   share intellectual property rights, common marketing, images,

17   and use of trademarks and logos; and that the Defendants

18   represented that the employees of each Defendant are agents

19   for the other two Defendants.

20        Having reviewed the appropriate case law, you know,

21   when you're dealing with parent-subsidiary relationships,

22   there are expected to be some close relationships, and you

23   need to go beyond what would be set forth in the complaint if

24   you wanted to establish that there was, in fact, personal

25   jurisdiction.  In Bootay v. KBR Inc., Civil Action No. 09-1241,

1   2010 Westlaw 1257716 at *2, Western District, PA, March, 26,

2   2010, the Court noted that the separate existence of corporate

3   entities is generally respected for jurisdictional purposes,

4   and the activities of one entity are imputed to another only

5   if the plaintiff establishes that they should be regarded as

6   alter egos.

7           Essentially it's equivalent to piercing of the

8   corporate veil, and usually these things would be examined to

9   prevent fraud, illegality, or injustice, or when recognition

10  of a corporate entity would defeat the public purpose or

11  shield someone from liability for a crime, In re Kitchin,

12  445 Bankruptcy Reporter 472, Eastern District, PA, 2010.

13          Now, the alter ego test is, when you're dealing

14  with personal jurisdiction, less stringently viewed than the

15  test would be for liability purposes, Stuart v. Spademan, 772,

16  1185, 5th Circuit, 1985; Sugartown Worldwide LLC v. Shanks,

17  Civil No. 14-5063, 2015 Westlaw 5334273 at *2, Eastern

18  District, PA, September 14, 2015.  In Sugartown Worldwide, the

19  Court noted our jurisdictional analysis over an alleged alter

20  ego is a less onerous standard than we apply under Federal

21  Rule of Civil Procedure 12(b)(6) for piercing the corporate

22  veil for liability purposes.

23          In Ashley v. Ashley, 393 Atlantic 2d 637 out of

24  Pennsylvania, 1978, the Pennsylvania Supreme Court discussed

25  the legal fiction of a separate corporate entity and noted

1   that that will be disregarded whenever justice or public

2   policy demand and when the rights of innocent parties are not

3   prejudiced, nor the theory of the corporate entity rendered

4   useless.

5           The Pennsylvania Supreme Court went on to state, we

6   have said that whenever one in control of a corporation uses

7   that control or uses the corporate assets to further his or

8   her personal interest, the fiction of the separate corporate

9   entity may be appropriately disregarded.

10          Generally that's broken down into two tests:  One,

11  did the party exercise dominion and control over the entity;

12  and, two, whether injustice would result if the corporate

13  fiction is maintained, despite a unity of interest between the

14  entity and its principal.

15          The Court of Appeals for the Third Circuit has

16  examined these matters in a number of cases and looks to a

17  variety of factors.  In Ragan v. Tri-County Excavating, Inc.

18  62 Fed. 3d 501, Third Circuit, 1995, the Court looked at what

19  Pennsylvania law would consider in determining whether a

20  corporation is the alter ego of another.  They look at the

21  ignoring of corporate formalities, gross under-capitalization,

22  lack of capital records, non-functioning officers and

23  directors, non-arm's length transactions between the

24  corporations, and especially domination and day-to-day control

25  sufficient to deprive the alter ego of its corporate identity.

1   And they look at all of those to determine whether, based upon
2   the record, the justice or public policy demands the use of
3   such an extraordinary remedy.

4           In In re Chocolate Confectionary Antitrust
5   Litigation, the decision out of the Middle District of
6   Pennsylvania from 2009, the Court reflected on ten common
7   questions that are typically used in examining parent-
8   subsidiary relationships for the alter ego analysis.  They
9   look at the ownership of the stock, commonality of officers,
10  common marketing image, branding products, corporate
11  insignias, trademarks being uniform, sharing employees,
12  integrating sales and distribution systems, sharing managerial
13  personnel, performing business functions that would ordinarily
14  be handled by the parent, whether the subsidiary is used as a
15  marketing or an exclusive distributor, and whether there's
16  control or instructions being provided.

17          Now, at this stage, we have -- I'll just go
18  through looking at some of the Ragan factors.  So are there
19  any allegations pled with respect to the corporate
20  formalities, under-capitalization, lack of corporate records,
21  non-functioning officers or directors?  We have noted the
22  Court at this stage has no allegations that reflect that.

23          With respect to the non-arm's length transactions,
24  there are allegations, you know, that the structure of the
25  relationships here was to make only the TREMCO materials

1    acceptable for this service.  But, you know, it's, query, who

2    is directing that?  Is it TREMCO?  Is it Weatherproofing?  So

3    it's really the transaction between the School District and

4    the Defendants that's at issue there, as opposed to how they

5    deal with it internally.  Not surprisingly if they would be

6    agreeing with each other and they would be under common

7    control and it was likely to be non-arm's length, that might

8    be an inference that could be reached.

9         With respect to domination and day-to-day control,

10   you know, there are arguments about all the ownership of the

11   stock, there are sort of conclusory allegations about what RPM

12   was reporting to its shareholders, and using the same types of

13   things as to the other factors that a Court pointed out in the

14   Chocolate antitrust action.  We do have some allegations about

15   the ownership of the stock, the use of the trademarks, sharing

16   employees, integrating the marketing, sharing personnel, but

17   there's not a lot of detail that is flushed out with respect

18   to those.

19        So, at this stage, the question would be whether I

20   don't think on the face of the Complaint I could make a

21   determination that there is personal jurisdiction over RPM,

22   but the next part of the analysis would be whether it is

23   clearly frivolous that this allegation would be made.

24        If it's clearly frivolous, the Court would grant

25   the Motion to Dismiss; if it's not clearly frivolous, then the

1    Court has the ability to provide some period of discovery, and

2    then would permit there to be a more robust filing of a brief,

3    and the Court would make a decision based on a more developed

4    record with respect to this matter.

5            Now, the Courts consider -- you have to look at the

6    totality of the circumstances concerning this, and my

7    assessment would be that there's enough in the Complaint

8    itself that the Court could find it's not utterly frivolous,

9    that there will be a period of time granted for some discovery

10   with respect to personal jurisdiction, and then we'll set a

11   briefing schedule and a hearing with respect to this issue.

12           At this stage, I think it would be something where

13   I would deny without prejudice the Motion to Dismiss for lack

14   of personal jurisdiction; we'll have the discovery; and we'll

15   then, once that's concluded, we'll permit the renewal of the

16   Motion to Dismiss for lack of personal jurisdiction; and I'll

17   have, as I said, the briefing schedule set up; and we'll

18   schedule that for a hearing.

19           Now, there's some argument that is set forth by the

20   parties that you can have personal jurisdiction on the basis

21   of a conspiracy.  There's somewhat of a debate about what is

22   the state of that law.  I don't think I really need to get

23   into that.  Clearly a corporation cannot conspire with itself.

24   I mean, if there's a basis for the alter ego theory to be

25   applied here, then it's all the same entity, so there could

1   not be a conspiracy.  So that would be Heffernan v. Hunter,

2   189 Fed. 3d 403, Third Circuit, 1999.

3             I do see that you can plead in the alternative:  If

4   there's no alter ego theory, maybe you could proceed on the

5   basis of conspiracy.  I think it's noteworthy that the

6   Pennsylvania Supreme Court has not yet decided whether

7   personal jurisdiction may be based upon claims of conspiracy.

8   The Third Circuit Court of Appeals has not weighed in on this

9   issue, and there are a number of Courts within the Third

10  Circuit that hold you could find personal jurisdiction based

11  upon a conspiracy, as long as the minimum requirements of

12  personal jurisdiction are satisfied.

13            But you still have to establish some minimum

14  requirements for personal jurisdiction, and that really wasn't

15  flushed out in the arguments of the Plaintiff here in terms of

16  what would be necessary to satisfy those minimum requirements.

17  Because I think the position of the Defendant, RPM, is that

18  there's no allegations of any minimum contacts by RPM.  So

19  even if you could argue conspiracy to the extent that would be

20  recognized in Pennsylvania, you wouldn't have met that burden

21  at this stage in terms of showing any of those minimum

22  contacts.

23            So you still have to have the contacts within the

24  forum analysis, Santana Products, Inc. v. Bobrick Washroom

25  Equipment, 14 Fed. Supp. 2nd 710, Middle District, PA, 1998.

1   That would require substantial acts in furtherance of the
2   conspiracy occurring in Pennsylvania, and that the non-forum
3   co-conspirator was aware or should have been aware of those
4   acts.  We're lacking that link here.  Maybe it's easy to
5   provide, I don't know, but it was not set forth in the
6   Complaint.
7           In Morganroth & Morganroth v. Norris, McLaughlin,
8   and Marcus, P.C., 331 Fed. 3d 406, Third Circuit, 2003, the
9   Court of Appeals explained the four elements to the tort of
10  civil conspiracy under Pennsylvania law.  One, you need a
11  combination of two or more persons.  This is where it's
12  problematic if the alter ego theory would be in play.  Two, a
13  real agreement or confederation with a common design; three,
14  the existence of an unlawful purpose or of a lawful purpose to
15  be achieved by unlawful means; and, four, proof of damages.
16          So there are general allegations here, but, at this
17  stage, they are really not sufficient.  Merely belonging to a
18  civil conspiracy does not make a member subject to the
19  jurisdiction of every other member's forum, Massachusetts
20  School of Law at Andover, Inc., v. American Bar Association,
21  846 Fed. Supp. 377, Eastern District, PA, 1994.
22          So the Court is going to permit jurisdictional
23  discovery, and if there could be proof of a civil conspiracy
24  along the lines recognized by the other District Courts within
25  the Third Circuit applying Pennsylvania law, possibly there

1   could be a basis for it on that, as well as alter ego.

2          So, at this stage, I think that's where my analysis

3   would be favoring the period of time for jurisdictional

4   discovery and then setting appropriate motions and briefing

5   schedules.  So I'll hear from the Defendants at this stage.

6          MR. JONES:  Thank you, Your Honor.  I think I

7   understand the ruling and the reasons therefore.  I would ask

8   that we have some limit on both the duration and the amount of

9   jurisdictional discovery, in part, because too much is in

10  conflict with the actual assertion of the defense in the first

11  place, which is grounded on an out-of-state enterprise's right

12  not to be hailed into court elsewhere.

13         THE COURT:  There would be a limited period of

14  time.  My initial sense would be 60 days would be more than

15  sufficient to do this.  And I don't know what -- I'll hear

16  from the Plaintiff as to what extent of discovery you think

17  that you would need.  Typically it's not that difficult.  You

18  just ask for some documents, some of the corporate minutes and

19  that type of thing, to establish during the relevant time

20  frame what the relationships between the entities were.

21         MS. BELL-STANTON:  Your Honor, that's exactly where

22  our focus would be.  In our proposed Joint Rule 26 Report, we

23  had asked for 60 days for jurisdictional discovery to

24  have -- we proposed ten interrogatories so perhaps we wouldn't

25  have to subject a lot of depositions; and then the opportunity

1   to depose the person, Ms. Kastner, that provided the affidavit

2   that's attached to the Defendants'; and then document

3   production specific to the day-to-day operations and daily

4   control.  We don't see any reason why we would need more than

5   60 days.

6          MR. JONES:  I understand and appreciate the

7   request.

8          THE COURT:  I don't think that's too out of line

9   with what you were suggesting.

10         MR. JONES:  It is not, Your Honor.  Unless -- we

11   have to see the document request.

12         THE COURT:  If you have a problem with it -- yes,

13   you will see it when it comes back in.  So what the Court is

14   going to do, I'm going to deny this portion of the motion

15   without prejudice.  There will be 60 days for jurisdictional

16   discovery that will conclude on -- anyway so 60 days, today is

17   the 5th, how does April 7 sound?

18         MS. BELL-STANTON:  Great, Your Honor.

19         THE COURT:  That will be the close of that.  And,

20   at that stage, could you renew your motion by the 14th?

21         MR. JONES:  I believe so, Your Honor.  Thank you.

22         THE COURT:  April 14.

23         MR. JONES:  We will do so.

24         THE COURT:  I don't think that's going to be

25   difficult to do, motion to dismiss RPM for lack of personal

1  jurisdiction.  And so if that's filed by the 14th, then if you

2  could respond to that by the 28th.  I'll give you two weeks

3  for that.

4          MS. BELL-STANTON:  Thank you, Your Honor.

5          THE COURT:  We'll look at May to set a hearing.

6  Okay?

7          MS. BELL-STANTON:  Sounds good.

8          MR. JONES:  May we have a brief reply on that, Your

9  Honor?

10         THE COURT:  Oh, okay.  All right.

11         MR. JONES:  We can do it within a week.

12         THE COURT:  What was the day I finished up?

13         MR. JONES:  The 28th for the response.

14         THE COURT:  The 28th of April?

15         MR. JONES:  Yes.

16         THE COURT:  So if you could do it by the 5th of

17  May.

18         MR. JONES:  Thank you.

19         THE COURT:  Then we'll have a hearing on this at

20  4:30 p.m. on May 24, which is a Tuesday.  I have a trial

21  scheduled.  If something happens or if the trial is resolved,

22  I'll move you up earlier in the day.  For right now, we'll do

23  that in the evening.  Okay?  So we have that set.

24         Okay.  Now we're going to go on to the state law

25  claims, unless anybody wishes to be heard further on that?

 1          MS. BELL-STANTON:  No, Your Honor.  Thank you.

 2          MR. JONES:  No, thank you, Your Honor.

 3          THE COURT:  Okay.  So there are essentially

 4  Counts One and Two are fraudulent misrepresentation claims,

 5  and then we have the fraudulent concealment claim I believe is

 6  the third.  Yes, that's the third fraud claim.  So let's look

 7  at those.

 8          The Defendants are arguing that there's a failure

 9  to stay the claim because, one, there are group pleads in

10  violation of Federal Rules of Civil Procedure 8, specifically

11  the Plaintiff is not specifying which Defendant did what act.

12  Secondly, there are insufficient factual allegations

13  sufficient to meet the heightened pleading standards for

14  fraud.  Three, the fraud claims are barred by the Gist of the

15  Action Doctrine.

16          Now, with respect to the fraudulent

17  misrepresentation claims, these are in Counts One and Two,

18  there has to be clear and convincing evidence evidence to

19  establish six elements:  one, a representation; two, the

20  representation was material to the transaction at hand; three,

21  the representation was made falsely with knowledge of its

22  falsity or recklessness as to whether it is true or false;

23  four, the representation was made with the intent of

24  misleading another into relying on it; five, the plaintiff

25  justifiably relied on the misrepresentation; and, six, the

1    resulting injury was proximately caused by the reliance,

2    Youndt v. First National Bank, 868 Atlantic 2d 559, PA

3    Superior Court, 2005.

4            So let's look at each one of those elements to see

5    whether or not there are factual allegations in the Complaint

6    which would be sufficient for this to pass muster on a motion

7    to dismiss, in other words, for the Court to determine there's

8    a plausible claim.

9            So the first requirement is that there be a

10   representation.  The Plaintiff alleges that the Defendants

11   sales and field representatives, Kosuda, Jones, and

12   Manganello, represented that the Slippery Rock High School,

13   the School District, needed particular replacements or

14   upgrades to create a safe roof and promoted the superior

15   products as being more suitable, long-lasting, and higher

16   grade.

17           With respect to the elementary school -- so that

18   was with the high school, with respect to the elementary

19   school, there are allegations that were made that there were

20   particular upgrades or certain features in products that were

21   needed.  The argument that calling one's products "premium" or

22   "superior" or otherwise opining generally on quality is not

23   fraud.

24           The Plaintiff, however, states that it wasn't just

25   calling the products "premium" or "superior," but what was of

1   note here is the allegations that the Defendants told the

2   Plaintiff that the Plaintiff required premium product and

3   charged more for the premium than it would have for the

4   generic products which would have given the same results.

5          Here is the representation that these products were

6   needed that takes it out of just a general opining about

7   something being "premium" or "superior."  The Court in In re

8   Burlington Coat Factory Securities Litigation, 114 Fed. 3d

9   1410, Third Circuit, 1997, noted that a puffery defense does

10  not apply in that case because the expression of comfort was

11  not vague, it was an agreement with a specific forecast range.

12  So here the Court would find that the factual allegations are

13  sufficient to push it over the line to be -- for the Court to

14  plausibly infer that there is more than mere puffery involved

15  in this particular case.

16         The next element is that the representation was

17  material to the transaction at hand.  The Plaintiff's

18  allegations are that the Plaintiff relied on the

19  representations to purchase unnecessary goods, and that no

20  reasonable customer would purchase an unnecessary "premium" or

21  illusory "premium" product.  The Court would view these as

22  specific allegations sufficient to show that this

23  representation was material to the transaction.

24         The next element is that the representation was

25  made falsely with knowledge of its falsity or recklessness as

1   to whether it was true or not.  Plaintiff makes allegations

2   that the Defendants' enterprises resulted in costly repairs

3   that were publicly exposed, and that there were internal

4   documents demonstrating that the chemical compositions of the

5   so-called "premium" or "superior" products were essentially

6   identical to those of the less generic.  So these would be

7   representations that, at least in terms of the pled

8   allegations, could create a plausible inference that the

9   representations were false or at least reckless.

10          With respect to being made with the intent, this is

11  the next element of misleading, another is relying on it, the

12  Plaintiff is alleging that these products, the generic

13  products, cost 50 percent less than the allegedly "premium"

14  products, and that these over-specifications resulted in the

15  Plaintiffs being provided the higher-cost products, which were

16  unnecessary, and there were various excess charges made.  And

17  given all the other allegations that the Court has already

18  referred to, which the Court must take as true for purposes of

19  this analysis, the Court would find that that would be

20  sufficient for the Court to plausibly infer that that element

21  is present.

22          The next element is the Plaintiff justifiably

23  relied on the representations.  The allegations are that the

24  Plaintiff would not have made this purchase if the

25  representations had not been made; they would have bought the

1  lower-quality, lower-priced product.  So I think that's

2  sufficient.

3         And the final one is resulting injury was

4  proximately caused by the reliance.  And here the injury is

5  the cost difference to the products, and the Court would find

6  that if that is the injury, if the Plaintiff would have bought

7  the lower-cost product, the differential in price would be the

8  injury that was proximately caused.

9         So, based on all of that, the Court would say, at

10 least as to those allegations with respect to the specific

11 Plaintiff, they would be sufficient to pass muster on a motion

12 to dismiss.

13        Now, there are allegations that it's improper for

14 the Plaintiff to basically lump all of the Defendants

15 together.  But at this stage in the proceedings, you know,

16 when the Court has at issue whether or not there's an alter

17 ego that is being pled, it's probably sufficient at this stage

18 to pass muster, and the Court is not as troubled by the

19 referencing of all three.  But this would be something that

20 would come up in a -- we could have a request for some

21 particulars down the road if the Court would find that there

22 is not an alter ego relationship among the parties, and then

23 it would be -- the Plaintiff would need to have a more

24 definite statement provided with respect to exactly who was

25 engaged.

1          But I think a fair reading is clear, that RPM was

2     not directly involved in the transactions.  And they do

3     describe the relationship between TREMCO and Weatherproofing.

4     It appears from my reading of the Complaint that

5     Weatherproofing was doing the construction-related activities,

6     and TREMCO was the seller of the products and that type of

7     thing.  I think to the extent that that distinction is made,

8     one can understand how the relationships would be interwoven

9     with respect to the two issues.

10          And then, again, we have the issues on the civil

11     conspiracy that could come into play that could make them

12     co-conspirators with each other.

13          So to refer to the three together in the particular

14     circumstances of this case -- it's not a good pleading

15     process, and in other situations, if there were unrelated

16     defendants, I would not -- you know, I would find it

17     troublesome, as the Defendant has pointed out, and would

18     require it to be re-pled.

19          But when there are allegations of conspiracy among

20     the persons and specifics with respect to exactly what the

21     roles of the different parties were in this transaction at

22     issue or in the conduct at issue; and when there are the alter

23     ego issues at play, where they were essentially saying they

24     are one and the same, so it doesn't really matter whether you

25     lump them together or not.  I think at this stage, you know,

 1  that would be sufficient to pass muster.

 2          Do you want to be heard on that?

 3          MR. JONES:  Your Honor, I think, quickly the

 4  response, and I understand you have put a lot of work in this,

 5  and we appreciate that.  The allegations that I heard you

 6  summarize about the actual representations do not reflect, in

 7  our read of them, an affirmative misrepresentation rather of

 8  fact, but rather even the allegations that you mentioned about

 9  what might or might not be required or safer or better --

10          THE COURT:  "Needed."

11          MR. JONES:  Or needed.

12          THE COURT:  "Needed" is really the concern.  There

13  was a representation being made.

14          MR. JONES:  Right.  Because that was not the focus

15  of the response that we received to our Motion, it is

16  incumbent upon me to mention now that those kinds of

17  allegations, I believe, are generally thought of as matters of

18  not representations of fact, but of general opinion that are

19  not actionable.

20          We could revisit that for you if you like because

21  "better," "safer," "better," "good," words to that effect,

22  "what you may need," may be promotional.  I don't think they

23  are specific representations of fact, nor do I think that they

24  are pleaded with sufficient particularity under Rule 9.  So

25  that would be the very brief response to the representation

1    issues you mentioned.

2         MS. BELL-STANTON:  Your Honor, I think there

3    continues to be perhaps a little disconnect between what we're

4    calling "superior," "premium."  It's not "come buy our stuff,

5    it's superior to someone else's," it's a direct specific

6    allegation of this product is better, truly better, based upon

7    composition than our other economy product, when in actuality

8    the composition is the same, just change the sticker on the

9    front.

10        If you're representing that this product

11   specifically, when compared to content, composition, and

12   quality to another specific product, your own product, then

13   that's not puffing.  And puffery was -- the defense was raised

14   the first time in the reply.  As the Court's pointed out,

15   puffery is more global opinions, "you're in good hands with

16   Allstate."  But in Pennsylvania, those common elements of

17   intending for a consumer to purchase one certain good over

18   another certain good with specifications provided goes far

19   beyond puffery and actually into a factual representation.

20        MR. JONES:  Your Honor, if I may.  The

21   specifications are a good point.  There's no question that

22   there were specifications throughout the attachments to the

23   Amended Complaint.  Specifications are referred to, in fact,

24   something called the master spec.  I think it is one of the

25   first items in Exhibit C to the Amended Complaint.  There's no

1   question here, or it certainly hasn't been pleaded, that

2   Slippery Rock got what it specified and paid the price it

3   agreed to pay.  Nor are there in the Amended Complaint

4   allegations, at least specific allegations that I see, that

5   indicate that Slippery Rock was ever told by TREMCO or anyone

6   else that one product was not the same as another.

7          What I see in the Complaint are allegations that

8   these were "premium" products, these were represented as

9   "premium" products, when, in fact, they were the same

10  compositionally as generic products, not that there was a

11  representation made that these two products were different

12  somehow.

13         What I see the Complaint pleading is that Slippery

14  Rock paid for exactly what was specified at the price agreed

15  to, and now is pleading that it is fraud because somebody else

16  may have purchased something that was the same for a lesser

17  price.

18         THE COURT:  Well, that's why the Court had viewed

19  the allegations that these were representations -- that these

20  were -- the product was "needed" for this specific building

21  was compelling, in the sense that this was a representation

22  that goes beyond mere puffery.

23         MR. JONES:  My response to that, Your Honor, words

24  like "needed," "required," when you have got independent folks

25  involved here, including engineers in the construction

1  setting, these are not typically factual representations.

2          THE COURT:  See, but that gets to a defense --

3          MR. JONES:  I understand.

4          THE COURT:  -- beyond the Complaint.  I'm only

5  having to look at the Complaint itself.

6          MR. JONES:  I understand.

7          THE COURT:  If I want to go into those lines of

8  inquiry, I would be way beyond looking at the face of the

9  Complaint.  That's why I don't know that a further briefing is

10  going to be necessary.  I mean, it strikes me that that goes

11  to the facts of the case in terms of whether, you know,

12  statements like that were made.

13          And I don't know the sophistication of the people

14  at the School District that were dealing with the

15  representatives of the Defendants and whether, you know, you

16  can justifiably rely under those circumstances.  So all of

17  those issues would be fair game for an answer, and then to be

18  flushed out in the motion for summary judgment.

19          MR. JONES:  I understand, Your Honor.  And the

20  reason that I mentioned it at all is the specification and the

21  attachments to the Amended Complaint, which are made a part of

22  the Amended Complaint, deal with these issues of what was

23  specified and what was paid for.

24          THE COURT:  I'm not -- it doesn't -- in my

25  assessment, that doesn't really matter because you knew --

they knew what was being specified, they knew what they were
paying for.  The question was whether it was represented that
this was needed for these particular projects, and that's what
takes it over the line from mere puffery into plausible
inference that it might be -- for the Court to infer that
there could be a representation that would meet the requisites
of these two fraud claims.

So, at this stage, I'm sufficiently persuaded that
at the motion to dismiss stage, you know, that this would be
sufficient because the issues that you're raising go more into
the nature of a defense.  I think if it was just on the face I
could say it's pure puffery, then it would be appropriate for
a motion to dismiss.

I'm not bound by what the other party puts in their
briefing.  Unfortunately, I have to look at it, you know,
separately in terms of what the standards would be.

Now, the next fraud claim is a fraudulent
concealment claim, and I come out a little differently on this
one.  Under Pennsylvania law, a claim of fraudulent
concealment is grounded on Section 551 of the Restatement
(Second) of Torts.  And there are six elements:  an omission,
that's one; two, the omission was material to the transaction
at hand; three, the omission was made falsely with knowledge
of its falsity or recklessness as to whether it is true or
false; four, the omission was made with the intent of

1  misleading another into relying on it; five, the plaintiff

2  justifiably relied on the omission; and, six, the resulting

3  injury was proximately caused by the reliance, Gaines v.

4  Krawczyk, 354 Fed. Supp. 2d 573, Western District, PA, 2004.

5  Plaintiff must also prove the defendant had a duty

6  to speak, which arises when one party has information that the

7  other party is entitled to know because of the fiduciary or

8  other similar relation of trust and confidence between them,

9  Chiarella v. United States 445, U.S. 222, 1980.

10  In Morton's Restaurant Group, Inc., v. Charest,

11  Civil Action No. 91-7013, 1998, Westlaw 767444 at *4, Eastern

12  District, PA, November 4, 1998, the District Court explained

13  that where there is no fiduciary relationship, disclosure by a

14  seller is also required when it is the only reasonable way a

15  buyer could find out about a serious latent defect.  The

16  seller has a duty to disclose in those circumstances in which

17  it cannot be said fairly that by failing to disclose, the

18  seller is legitimately enhancing his or her bargain.

19  So let's look at the actual elements in the context

20  of the allegations in the Complaint.  First is the omission

21  issue.  The Plaintiff alleges Defendants concealed the

22  inherent inferiority in their products when installed under

23  certain known conditions and the rate and risk of failure

24  inherent in the roofing systems being sold specifically

25  identified in the Complaint.  In other words, the Plaintiff is

1 alleging that the products were not superior or premium to the

2 generic, and that there was a high failure rate.  So these are

3 the omissions, and this arguably would be sufficient.

4        Second, the omission was material to the

5 transaction at hand.  The Plaintiff alleges it relied upon

6 Defendants' representations to purchase unnecessary goods.

7 Actually they are arguing that the omitted and concealed facts

8 were material because they impacted the usefulness, quality,

9 and safety of the products that were installed.

10       This is a little closer call here because the

11 omissions are contrary to what the Plaintiff was saying were

12 the direct representations, but to the extent this is pled in

13 the alternative, it arguably would be sufficient.

14       Next is whether the information was intentionally

15 withheld.  The Plaintiff for the omission of the knowledge

16 that the products were not superior point to the qui tam

17 action that was pursued by the United States that brought this

18 information to light, that there are internal documents that

19 demonstrated that these chemical compositions of the products

20 were essentially the same, and that these were excessive costs

21 that the Plaintiff should not have borne.  This arguably could

22 be sufficient.

23       Then with respect to the high failure rates, the

24 Plaintiff is arguing that there were specific recommendations

25 made to the Defendants to change their products to improve

1   quality and reduce the failure rate, that there was knowledge

2   in the possession of the Defendants about the thermal

3   expansion and contraction that could cause ridges splitting

4   and water to enter the roofing systems, and other matters such

5   as that.  So I think it's sufficient allegations to infer that

6   the Defendants were aware of both of these matters.

7           The next is the omission was made with the intent

8   of misleading another into relying on it.  Here, again, you

9   know, the Court could plausibly infer that it would be

10  withheld in order to generate higher prices and more profits.

11          The justifiable reliance is the next aspect.  So

12  the question is if the Plaintiff had known the materials that

13  were provided, would they have made a different decision, and

14  they do argue that they would have.  They would not have

15  purchased the "superior," "premium" products; and if they had

16  known the limitations about the quality of the product, they

17  would have made different decisions as well.

18          And the final one is that -- then the next one is

19  whether there was a proximate injury caused by the reliance.

20  And, again, this would be similar to the other fraud actions

21  where the Court could find that if the Plaintiff had known

22  them, they would have saved the money, because the damages

23  being sought are the economic.

24          But, in this case, the most problematic matter for

25  the Plaintiff is the final one, and that's whether there was a

1   duty to speak with respect to the omitted information.  The

2   Court of Appeals for the Third Circuit in a decision, Duquesne

3   Light -- I don't have the full cite, I'll get it for you in a

4   minute -- but in that decision, the Court of Appeals for the

5   Third Circuit noted that Pennsylvania Courts analyzing whether

6   there was a duty to speak rely almost exclusively on the

7   nature of the contract between the parties and the scope of

8   one party's reliance on the other's representations.

9          They refer to -- Court looked at the termite

10  infestation cases which were latent defect problems that could

11  not be assessed otherwise.  There is a bank's representation

12  about one party offering a specific amount for the stock so

13  that parties could find that there was a duty to speak in that

14  situation.

15         When you look at this, you know, coming from the

16  Restatement (Second) of Tort Section 551, what the Court most

17  tellingly found is in the Comment 1, wherein the Restatement

18  the commentators noted:  It is extremely difficult to be

19  specific as to the factors that give rise to this known and

20  reasonable expectation of disclosure, in other words, the duty

21  to speak.

22         In general, the cases in which the rule stated in

23  Clause (e) has been applied have been those in which the

24  advantage taken of the plaintiff's ignorance is so shocking to

25  the ethical sense of the community, and is so extreme and

1  unfair as to amount to a form of swindling in which the

2  plaintiff is led by appearances into a bargain that is a trap,

3  of whose essence and substance he is unaware.

4       Here, you know, when there are the failure to

5  disclose that the products were not, in fact, "superior" or

6  "premium" which, in many instances, can be viewed as puffery,

7  or whether they are needed or not needed, that doesn't strike

8  the Court as being the level of something that would be so

9  shocking that it could fall within a duty to disclose,

10 particularly when you are talking about arm's-length

11 bargaining.  There's no fiduciary relationship in this

12 particular matter.

13      With respect to the high rate of failure here, you

14 know, talking about the cold conditions, freezing and thawing,

15 there's nothing in particular that relates to this specific

16 roofing system at issue here to show that these conditions, in

17 fact, occurred in the School District.  There's nothing about

18 the frequency of the failures or the results, so it's really

19 hard to tell that this could rise to the level of something

20 that would be so shocking that they could be held liable for

21 the admissions.

22      So, at this stage, you know, the Court's view would

23 be that this would be dismissed without prejudice.  If there

24 was something that arises to show that, oh, this would be so

25 shocking; that the Plaintiff's could be so ignorant; you know,

1  the nature of the people that were dealing with it, the total

2  reliance on these representations, you know, it really would

3  have to be something more for the Court to push it into this

4  fraudulent concealment level.

5           So, at this stage, I will hear from the Plaintiff

6  since I would be would ruling against you, but without

7  prejudice.

8           MS. BELL-STANTON:  Your Honor, because it is

9  without prejudice, and we understand the Court's view on that,

10  obviously it was very shocking when you're the consumer that

11  there would be information out there that wouldn't be provided

12  to you.

13           THE COURT:  It's more like a garden variety

14  fraudulent misrepresentation or failure to admit as opposed to

15  a level of fraudulent concealment.  Those cases, by the most

16  part, are ones where there is something that's latent and

17  nobody would know that there was a problem there, except the

18  person who is the seller, and they are really trying to

19  swindle the other side.  That didn't come across to the Court

20  that way even for me to make a plausible inference.

21           MS. BELL-STANTON:  Understood, Your Honor.  We can

22  see the Court's position on needing more before moving forward

23  with that.

24           THE COURT:  Okay.  Now we're going to argue about

25  the -- there's an argument raised about these issues in terms

1   of the Gist of the Action Doctrine.  I don't want to forget

2   about that.

3           The Defendant argues that these fraud claims are

4   barred by the Gist of the Action because they are just

5   discarded breach of contract and warranty claims that have

6   been somehow repackaged here.  They cite to the Plaintiff's

7   response that the Court should look at Bruno v. Erie,

8   106 Atlantic 3d 48, PA, 2014.  Essentially this would be like

9   a fraud in the inducement type of claim.

10          In Bruno v. Erie, the Brunoes had entered into a

11  homeowner's insurance contract with Erie Insurance Company,

12  pursuant to which Erie agreed to cover physical loss to the

13  Bruno's property caused by mold.  The defendants -- the

14  representatives of -- Erie had sent an adjuster and an

15  engineer, and there were representations made by those

16  individuals to the Brunoes that they could continue living in

17  their home, and that it was essentially all right to do so.

18  Unfortunately, that was not the case.  There were severe

19  health problems caused by the mold.

20          And so the Pennsylvania Supreme Court said this was

21  not covered by the Gist of the Action Doctrine because there

22  was a duty -- because, essentially, as I read the decision,

23  something beyond the contractual responsibilities were present

24  when these representations were made that it was safe to stay

25  there.  That wasn't a requirement of the contract, it was

1  outside of the contract, and there was arguably negligence

2  involved, and so there was no Gist of the Action that would

3  bar that claim.

4          I find these cases particularly difficult.  Any

5  time you deal with a Gist of the Action under Pennsylvania

6  law, it is very, very problematic.  But here there's been no

7  contract that was attached, you know, to the Complaint, so I

8  can't really look at terms of the contract, representations

9  that were made in the contract.

10          And when I read the allegations, it appears that

11  the representations that are being relied upon would be

12  representations to induce the Plaintiff to enter into the

13  contract.  Now, if those representations were repeated in the

14  contract, it would be different, but I don't have the contract

15  to look at at this stage.

16          So I think it's premature for me to find that it

17  would be barred by the Gist of the Action Doctrine.  That

18  would have to come up through the answer, and perhaps in a

19  different motion where I could consider it.  But if that

20  representation isn't in the Complaint, and it was just the

21  inducement, then I think even pre-Bruno that would been under

22  the eToll analysis.  That still would have been permissible

23  and would not have been covered by the Gist of the Action

24  Doctrine.

25          Does anybody want to be heard on that?

1          MR. JONES:  No, Your Honor.  I think I understand

2    the ruling.

3          THE COURT:  Okay.  So I will, you know, do that

4    without prejudice to it being re-raised on a developed record

5    for that purpose.

6          Count Three is negligence.  The Plaintiff in its

7    briefing is arguing that its claims for negligence arise

8    because of the Defendant's failure to disclose the true

9    composition of its product and the installation restrictions

10   to avoid failure and failure to disclose the high failure

11   rates and failure to train with the Defendants' employees with

12   respect to sales, inspection, management, et cetera.

13         Here the defense that was raised is that these are

14   all barred by the Economic Loss Doctrine, and the Court finds

15   that is well taken.  This, again, is another difficult

16   doctrine to apply under Pennsylvania law.  The Third Circuit

17   Court of Appeals in 2-J Corp., v. Tice, 126 Fed 3d 539, Third

18   Circuit, 1997, reviewed the Pennsylvania law with respect to

19   the economic loss doctrine and reflected that this, as

20   originally developed, the doctrine would be maintained where

21   the only injury was economic loss, that is, loss that is

22   neither physical injury or damage to tangible property.

23         But the Supreme Court of the United States in 1986

24   in East River Steamship Corp., v. Transamerica Delaval, Inc.,

25   476 U.S. 858, the Supreme Court had talked about a situation

1   where turbines were malfunctioning, and the only damage that

2   was alleged was to the turbines themselves.  And the Court

3   viewed the case as requiring it to determine whether a duty

4   should be imposed on manufacturers to protect against

5   commercial products injuring themselves, or whether instead

6   this was best left to the parties agreements and to contract

7   law.  And the Court decided that tort recovery should not be

8   available for harm a product causes to itself.  The East River

9   Court reaffirmed that a tort remedy remained available for

10  damage to all other property.

11          So it does not preclude recovery for this clearly

12  physical damage to property, i.e., damage to property itself.

13  But that is distinct from when you're just talking about sort

14  of like lost profits, or, as in here, the case where we're

15  talking about the differential between the price of a superior

16  product and the price of a lower-quality product.  And in this

17  Court's view that is, in terms of damages actually being

18  sought in this case, only the diminished value of the roof and

19  structure itself, whether due to the known failure rate or to

20  the difference in the superior versus ordinary product

21  pricing.

22          So this is really the benefit of the bargain at

23  issue, and I think that's what's encompassed in the Economic

24  Loss Doctrine.  The Court of Appeals, and here's the Duquesne

25  Light Company v. Westinghouse Electric Corp. cite, 66 Fed 3d

604, Third Circuit, 1995.  In that case, the Court of Appeals

explains that when loss of the benefit of the bargain is the

plaintiff's sole loss, the undesirable consequences of

affording a tort remedy in addition to a contract-based

recovery are sufficient to outweigh the limited interest of

the plaintiff and having relief beyond that provided by

warranty claims.

So, in this case, the Court would find that

Bilt-Rite is distinguishable because the Defendants, unlike

the defendants in Bilt-Rite, are not in the process of

supplying information; that was an architecture design

professional.  For most intents and purposes, that Bilt-Rite

exception is limited to those kinds of professionals or

providing of -- supplying of information that is going to be

relied upon.

Here the allegations in the Complaint I think are

pretty specific, that the Defendants were in the business of

manufacturing, marketing, and selling various specialty

products.  So under that circumstances I don't think the

Bilt-Rite -- this case would fall within that exception.

So those claims would be dismissed with prejudice,

unless there's a basis for another remedy that would be

sought, but, at this stage, I just have to look at the

Complaint itself.

MS. BELL-STANTON:  Just briefly, Your Honor.  In

1    looking at the Complaint itself, and in addition to the

2    Bilt-Rite, even the Duquesne Light case acknowledges that the

3    Economic Loss Doctrine would apply because you have a remedy

4    under the contract.  None of that is pleaded here.

5            We are only pleading not that it's a benefit of the

6    bargain from the contract, but that, instead, the negligence

7    in terms of the training, the negligence in terms of pre-

8    competed pricing in the purchasing cooperative, those caused

9    harms that would be an exception to the Economic Loss

10   Doctrine.

11           Your Honor, the Bilt-Rite case has been extended

12   beyond just architects and engineers.  As the Court is aware,

13   it's gone to surveyors, and one of the reasons --

14           THE COURT:  More professional.  I have had an

15   occasion to look at it.  You're usually looking at people

16   where there's some kind of a licensing requirement so that

17   there's some kind of a reliance by the party in the

18   information that's being supplied by those individuals.

19           MS. BELL-STANTON:  Your Honor, in that regard, in

20   terms of it being dismissed with prejudice, because of the

21   services that were provided that are attached, those

22   specifications were developed not by Slippery Rock, but these

23   are specifications that were developed by TREMCO and WTI.

24   Although in 2004, as pleaded, there was a separate

25   architectural firm reviewing it, all that was rolled in

1   together with the TREMCO and WTI services, as we have pleaded.

2   Again, that's why we attached those specifications.

3          There is something a little bit more here because

4   they developed, here's what you need, here's what the

5   contractor needs to follow, here's why you need it.  That goes

6   into the realm of designers, surveyors.  In fact, they

7   performed inspections on the roof; that's why we included the

8   chief inspectors in the pleadings.  They came out and

9   inspected, they provided the bidding services, they provided

10  the proprietary specifications.  That goes beyond a benefit of

11  the bargain situation and puts it in that exception under

12  Bilt-Rite.

13         MR. JONES:  Your Honor, the cases you referred to

14  are the cases that obviously are the focus of the analysis,

15  and the East River case is the one that describes that there

16  needs to be a break on liability in these circumstances.

17         The specification, again, that's attached to the

18  Amended Complaint refers to warranties and a contract by

19  number to be executed.  We aren't in the Bilt-Rite scenario

20  where there is no contract in the neighborhood of this

21  transaction.  We have warranties referred to in the

22  attachments to the Amended Complaint, and we have contracts

23  referred to in the attachments to the Amended Complaint.

24         So in Bilt-Rite there was no contract, and it was a

25  professional licensed architect or design professional and

1  putatively making representations reasonably relied on by

2  third parties, and, therefore, distinguishable.

3          MS. BELL-STANTON:  Just, again, if the current face

4  of the pleadings supports dismissal on the uncertainty of the

5  Bilt-Rite application, we would ask for an opportunity to

6  clarify for the Court the scope of the specifications, who did

7  what, because it seems to me that's what the Court is missing,

8  what we did not give to the Court in the pleadings.

9          THE COURT:  I will do it without prejudice.  I

10  think you have a pretty high hurdle there, and I think I would

11  have to be somewhat blind not to note that there was a

12  contract here.  I mean, it's clear you were purchasing

13  materials; they were in the business of doing it.  There's all

14  the references to, you know -- they were put off to the

15  bidding process.  You know, all of that connotes that there

16  were contracts being entered into in connection with this

17  matter.  So I would be hard pressed not to see that there

18  aren't contractual relationships that are in play in this

19  matter.

20          MS. BELL-STANTON:  Understood, Your Honor.

21          THE COURT:  Okay?  I will do that without

22  prejudice.

23          Now, the last one is the Pennsylvania Unfair Trade

24  Practices Law, Count Four.  That law provides private right of

25  action to any person who purchases or leases goods or services

1    primarily for personal, family, or household purposes.

2              Here the Defendants are arguing that the School

3    District did not purchase construction project or services

4    primarily for personal, family, or household purposes.  The

5    Plaintiffs are arguing that they are non-profit and these

6    would be used for students and educators.

7              But the Court has been persuaded by the analysis of

8    Cumberland Valley School District v. Hall-Kimbrell

9    Environmental Services, Inc., 639 Atlantic 2d 1199, PA

10   Superior Court, 1994.  In that case, the plaintiff school

11   district had hired the defendant contractor to remove asbestos

12   from the school buildings, and the school district later sued

13   the contractor under the Pennsylvania Unfair Trade Practices

14   Law arguing that this purchase of this asbestos abatement was

15   benefitting the school districts, taxpayers, and students, and

16   there was a public purpose here in doing this.

17             The Court rejected the school district arguments

18   for two reasons:  First, the decision cited by the school

19   district of Valley Forge Towers South Condominium

20   Association v. Ron-Ike Foam Insulators, Inc., 574 Atlantic 2d

21   641, PA Superior Court, 1990, was distinguishable.  In Valley

22   Forge, the plaintiff was a condominium association which acted

23   as a legal representative of the tenants.  The school district

24   did not have a similar authority to maintain a lawsuit as a

25   legal representative for the taxpayers or the students.

1              And, second, in Cumberland, the Court explained

2    that it would be a far stretch for the Court to accept the

3    school district's arguments that asbestos abatement services

4    were purchased for personal, family, or household benefit of

5    its taxpayers, and rejected the argument of the plaintiff

6    school district in that particular case.

7              So these are essentially the same kind of arguments

8    that are being raised here, and the Court finds that the

9    decision, as in Cumberland, is persuasive, but I'll hear from

10   you on that.

11             MS. BELL-STANTON:  Just in brief, Your Honor.  It

12   being a 1994 case from the Superior Court, the Pennsylvania

13   Supreme Court hasn't commented directly on this situation nor

14   has it --

15             THE COURT:  I understand that.  I have to predict

16   they would do so.  I would be hard pressed to find that the

17   school district in and of itself, you know, stands in the

18   shoes of its students in bringing these types of claims.  It's

19   not like the condominium association which is representing

20   tenants, which would be for personal living, et cetera.

21             MS. BELL-STANTON:  The only other comment then,

22   Your Honor, is that since the time of the Cumberland opinion,

23   governmental entities have been permitted to bring suit on

24   behalf of their constituencies, for example, the TAP

25   Pharmaceuticals.  In that case, it wasn't the state that had

 1  done the purchasing for the general public, it was

 2  individuals, but the Court said that the governmental entity

 3  was permitted to bring suit on behalf of those constituents as

 4  a matter of social policy.

 5          We would say that this situation 20 years

 6  post-Cumberland, that public policy should be what's taken

 7  into account.  Since the statute should be liberally

 8  construed, we would ask that the Court view the more modern

 9  trend of allowing governments to stand in the shoes of their

10  constituents.

11          THE COURT:  But, see, in the TAP Pharmaceutical

12  case, it was the Commonwealth itself that was being able to

13  assert the claim, and it was directly because the citizens

14  were paying inflated costs for the pharmaceuticals.  So there

15  was a direct impact in terms of the citizenry paying it, just

16  like in the condominium association where it was the tenants

17  that would have to pay, you know, the costs here.

18          Now, I think you could maybe argue that somehow if

19  it's the taxpayers paying taxes for the school, there's some

20  indirect way.  But it's a lot more indirect because, you know,

21  you could make that kind of argument that if it was the roof

22  of a pharmacy, it's not a government agency, that if they have

23  to repair the roof or pay extra, then their customers who come

24  in and are buying products have to pay higher prices.  You

25  know, I think it makes it a little more convoluted.

1          MS. BELL-STANTON:  Yes.  I just think because of

2     there being a specific bond that was taken out for these

3     projects for these exact same constituents to pay for it, it

4     is a little more direct.  We understand the Court's ruling on

5     it, but since there is a specific bond to conduct this work,

6     then the taxpayers are the ones that are paying.

7          THE COURT:  You have taxpayers who are not persons

8     who are making payments.

9          MS. BELL-STANTON:  Sure.

10          THE COURT:  You have businesses that are making the

11     payments.  So, you know, it would be a little -- I just think

12     it goes a little too, too afar when you're talking about a

13     person buying a drug, in the pharmaceutical case, a business

14     isn't going to buy the drug to inject it.  The drugs are

15     manufactured for persons to take.  So that's -- there's not a

16     business taking drugs, it's for personal use.  So I think it's

17     a little more understandable and distinguishable.

18          MS. BELL-STANTON:  Understood, Your Honor.

19          THE COURT:  Okay.  Now, the final aspect has to do

20     with the class action allegations.  Now, we have really

21     winnowed it down to what's remaining in the Complaint, which

22     are those fraud allegations, with the exception of the

23     fraudulent concealment.  For me, that becomes a little easier

24     to say that this class allegation, if that's the only

25     remaining claim, they would have to be stricken.  Because, you

know, I have had several cases before this Court where the
question of a fraud claim is in play, and the issue is whether
or not a fraud claim is amenable to class certification.

You know, we can go through a lot of arguments with
respect to what you would have to show for Rule 23, of 23(a),
all of those issues that can come up, but really the rub of
this all is whether or not the individual issues will so
predominate that it would make a class appropriate under these
circumstances.

That's because there has to be justifiable
reliance, and that's one of the elements.  That element does
require an individual inquiry into the circumstances
surrounding each putative class member's transactions, and
it's ill-suited for class treatment.

This Court in Slapikas v. American Title Insurance
Company, 250 Federal Rules Decision 232, Western District, PA,
2008, noted that fraud in general, because of the issuance of
reliance, is seldom amenable to class certification.  In
Rule 23, the Advisory Committee Notes to the 1966 Amendments
stated, in pertinent part with respect to a fraud case, that
although having some common core -- that fraud case having
some common core, may be unsuited for treatment as a class
action if there was a material variation in the
representations made or in the kinds of degrees of reliance by
the persons to whom they were addressed.  Of course, there's

1  an exception if there's a fiduciary relationship between the

2  parties, Debbs v. Chrysler Corp., 810 Atlantic 2d 137, PA

3  Superior Court, 2002.

4        Recently this Court in Walney v. SWEPI, LP, Civil

5  Action No. 13-102, 2015 Westlaw 5333541 at *17, Western

6  District, PA, September 14, 2015, explained that -- and this

7  was on a motion to certify the class, it really reflected that

8  there were material misrepresentations and whether there

9  were -- reliance could be shown with something that showed

10 that there were individual inquiries that had to be made.

11       So here the Plaintiff would have to prove that the

12 Defendants made to each Plaintiff the representation that the

13 products were necessary for that member of the putative class,

14 that the representation was false, and then you would have to

15 show that there was a justifiable reliance on those.

16       These issues are specific to parties.  You would

17 have to have an individual inquiry of each member of the class

18 with respect to that.  Now, the Plaintiff is arguing in this

19 case that justifiable reliance can be presumed in pricing

20 schemes, such as the one at bar where the fraud at issue

21 involves omissions or fabrications of objectively material

22 information.  It relied on Toth v. Northwest Savings Bank,

23 Civil Action No. 12-8014, 2013 Westlaw 8538695, PA, Common

24 Pleas, March 1, 2013.  But Toth is really indistinguishable.

25 In Toth, the plaintiff was a passive party who was subject to

1   internal banking procedures implemented by Northwest Savings

2   Bank.  The loss flowed directly from Northwest Bank's

3   unilateral act of reordering withdrawals at the end of the day

4   which resulted in increased overdraft fees.

5           In this case, there had to be an agreement by each

6   member of the class to purchase certain products, so there was

7   a participation in the process.  This was not a passive

8   situation, and so the ascertainable loss is one that would

9   have to be drawn among the conduct of the parties.

10           In Zwiercan, which is the second decision relied

11   upon, there has to be proven that the defect that was argued

12   that would cause serious bodily harm or injury, that was the

13   situation where General Motors had produced vehicles with

14   front seat designs that would be prone to collapsing during

15   moderate rear end collisions, the Court reasons that they

16   would not have to prove justifiable reliance because of the

17   severity of the consequences.

18           The Court of Appeals for the Third Circuit in

19   Hunt v. U.S. Tobacco, 538 Fed. 3d 217, Third Circuit, 2008,

20   held that a presumption of reliance under the Pennsylvania

21   Unfair Trade Practices Law was inconsistent with Pennsylvania

22   law.  The Court explained that Pennsylvania cannot enjoy a

23   presumption of what he must prove affirmatively, that is,

24   under the Consumer Protection Law, the plaintiff must prove

25   justifiable reliance affirmatively.

1        So that's the standard of the law presently with

2    fraud.  You know, that makes it very problematic for class

3    actions, you know.  So without some type of allegation that

4    there would be the same representations, you know, I just

5    can't see that the class action allegations would go forward.

6            MS. BELL-STANTON:  Your Honor, if I may, because

7    there are several aspects to that.  The first of which being

8    because we have also pleaded, as the Court may recall, in the

9    misrepresentation, we have both negligent misrepresentation,

10   as well as intentional and reckless.  Well, that doesn't have

11   that justifiable reliance element, not negligent

12   misrepresentation.

13           THE COURT:  Those claims are out because of the

14   Economic Loss Doctrine.

15           MS. BELL-STANTON:  But negligent misrepresentation,

16   Your Honor, is an exception even separate from Bilt-Rite.

17           THE COURT:  Okay.

18           MS. BELL-STANTON:  It is an exception to the

19   Economic Loss Doctrine.  It doesn't apply to the negligence,

20   just like a misrepresentation case.  That's what we cited to

21   in our response.

22           So as far as the negligent misrepresentation, the

23   only response by the defense to that was that we didn't plead

24   it, but in actuality it is pleaded.  I have it in the --

25           THE COURT:  Go back over that for me.

 1              MS. BELL-STANTON:  Sure.  The response by the

 2     defense to the negligent misrepresentation argument is that it

 3     wasn't pleaded.  But we pleaded both in Paragraphs -- I think

 4     it is in Paragraph 23, as well as in Paragraphs 67, 68, and

 5     69, that all of these representations, either intentionally,

 6     recklessly, or negligently made, that takes us out of the

 7     reliance element, at least for those representations, which we

 8     wouldn't run into the problem that the Court is concerned

 9     about.

10              THE COURT:  Okay.

11              MS. BELL-STANTON:  On a secondary level, just

12     looking at fraud, the mere fact that it is a fraud claim

13     doesn't mean that there can be no class action.  It's not that

14     uniform.  In fact, Your Honor, in your opinion in the Cole's

15     Wexford case just last year in its citing to the Landsman and

16     Funk case said that typically discovery would be permitted

17     even on a fraud claim.  In the Landsman and Funk case, that

18     one was the issue of consent, 10,000 faxes, and there was an

19     issue of consent as to each one of those 10,000 individuals.

20              But the Third Circuit in 2011 had said that, and I

21     want to make sure I use the exact language, that sound

22     judicial administration would allow for discovery before

23     ruling on those Rule 23, even in a consent, individual

24     consent, because there are mechanisms by which we can find

25     out.

1           Also in this context, going back to the improper

2  representations, there's still an inferred presumption of

3  reliance.  It's like the In re Milo Dog Treat case that was

4  out of the Western District in 2015.  In that case, class

5  action, a consumer said, I relied on this being an all-natural

6  dog product, dog treat, and so I should be allowed to bring

7  the claim and bring the class along with me.  In that case,

8  the Western District recognizes that in Pennsylvania it's akin

9  to a false advertising claim, and that there can be a

10  presumption of reliance sufficient to get past the rare case,

11  because it's supposed to be a very rare case, when no

12  discovery could ever lead to --

13           THE COURT:  That is true.

14           MS. BELL-STANTON:  Because of the negligent

15  misrepresentation claim, because of the false advertising --

16           THE COURT:  This wasn't really argued in the

17  briefing.

18           MR. JONES:  No, Your Honor.  If I may, please,

19  whenever you're done.

20           MS. BELL-STANTON:  Sure.  In our response we

21  asserted that the Economic Loss Doctrine didn't apply because

22  of negligent misrepresentation, and the response by the

23  defense was that negligent misrepresentation wasn't pleaded,

24  and then the discussion went straight into the Bilt-Rite.

25  Then they also kind of connected it to the reliance elements

1  with the puffing.

2          Well, the Court has already stricken the statutory

3  claim.  The cases that the Court has just cited to all had

4  discovery before, it was a motion for certification hearings,

5  and discovery was permitted.

6          I mean, to close down the question before any

7  discovery has occurred in this case at all, we believe, would

8  be in violation of the Third Circuit, as this Court recognized

9  just last year.

10          MR. JONES:  Your Honor, if I may.  Negligent

11  misrepresentation is not pleaded as a count.  You have the

12  5 counts covered.  There were only 5 counts.  There were 14 in

13  the first Complaint; they were narrowed to 5.  There is an

14  allegation about intentional representation followed by I

15  think a catchall of, if not intentional, then negligent and/or

16  gross, I believe, "reckless" I think was the word that was

17  used, representations in the misrepresentation count, not in

18  the negligence count.  The negligence count was a failure of

19  the duty to warn was the allegation.

20          That said, the cases that I think I have just heard

21  about involved standard uniform representations, not what we

22  have here, which is face-to-face engagement, which is directly

23  what's pleaded.

24          Moreover, justifiable reliance is an element of the

25  Restatement version of negligent misrepresentation.  The

1   elements are one who is in the course of a business,

2   professional employment, or in any other transaction in which

3   he has pecuniary interest, supplies false information for the

4   guidance of others in their business transactions, is subject

5   to liability for pecuniary loss caused to them by their

6   justifiable reliance upon the information if he fails to

7   exercise reasonable care or confidence in obtaining or

8   communicating the information.  So justifiable reliance is a

9   part of the Restatement section.

10          And when you get to our position on economic loss

11  and such a claim, we do in our reply at Page 7, Your Honor,

12  say that even if pleaded, even if a negligent

13  misrepresentation claim was pleaded, the Duquesne Light case

14  that you just mentioned and was cited to the Court by

15  Plaintiff would bar it under the Economic Loss Doctrine

16  because that case holds there is no negligent

17  misrepresentation exception to the Economic Loss Doctrine and

18  affirms summary judgment on the Doctrine's bar.

19          This is an appropriate time.  The pleadings

20  themselves establish this is not a uniform representation

21  case, and the justifiable reliance is an element of any claims

22  that remain.  I think it's Section 552 of the Restatement that

23  I was reading.  I said that sideways before.

24          THE COURT:  What would you hope to get in terms of

25  the type of discovery that you would be looking at to show

1   that you could prove this reliance?  Because the defense is

2   correct, that Duquesne Light case does say, although it was on

3   the summary judgment context, that negligent misrepresentation

4   claim in that case was barred by the Economic Loss Doctrine.

5        MS. BELL-STANTON:  Well, a couple of things, Your

6   Honor.  First, we would expect to obtain the actual pricing

7   information of these products.  Because, we believe, since

8   it's asserted that it's been pre-competed and is uniform, then

9   that would be uniform that if you buy Product A, it's going to

10  cost X; and if you buy Product B, it's going to cost Y, and

11  those products being exactly the same.  That's step one.  That

12  would be uniformity.  It's a clear damage model.  It's a clear

13  who purchased these products.  So who purchased which of the

14  designated products is step one.

15       And that pricing model that was submitted to the

16  purchasing cooperative for pre-competing purposes, that is a

17  single representation that would be uniform.  And to not

18  permit -- the rare cases that are typically discussed are

19  immunity cases, when there's just you can't reach because

20  there's an Army -- the ones I have reviewed are military.  But

21  to have no discovery on an issue that is uniform, because

22  common answers to whether these products are the same, common

23  answers, not questions but common answers, as to whether it

24  truly was uniform pricing; common answers as to whether the

25  use of the purchasing co-op changes the pricing schedule,

1    those are uniform, and we can only obtain that through

2    discovery.  And that's actually what we have outlined in our

3    proposed discovery in the joint report.

4            The limitations on those, the pricing schedules,

5    the product composition and content -- because, again, just

6    like in the false advertising cases, like in In re Milo or in

7    the Landsman and Funk case, which had a consent requirement,

8    the Third Circuit in that one said that it's nothing but

9    conclusion and speculation to know where the class is going to

10   end up before any discovery happens.

11           I mean, even the Duquesne case, as the Court

12   pointed out, summary judgment case where discovery has

13   occurred, we haven't filed a motion for certification, we

14   haven't conducted a single deposition, received a single

15   document, and to end the entire inquiry at this stage, we

16   believe would be inappropriate.

17           MR. JONES:  Your Honor, if I may.  The Complaint

18   itself, the Amended Complaint, doesn't even allege the same

19   representations between the two installations within the same

20   school district at Slippery Rock.  They say different things

21   were said to different people with respect to the high school

22   than they were with respect to the Moraine Elementary School.

23           These representations are not uniform as pleaded.

24   There is no reason to believe that the Complaint is plain on

25   its face in that way.  They talk about representations made to

1  school boards or school districts across the 50 states, there

2  was no allegation of uniformity and representation in the

3  Amended Complaint anywhere, nor is it plausible.

4        Moreover, in cases that you have dealt with, both

5  Walney and Slapikas, we dealt with oil and gas lease

6  negotiations, which were more simplistic than that alleged

7  here, and refinancing of loans or mortgages, that were more

8  simplistic than alleged here.  And in both circumstances,

9  certification was not a question because not so much perhaps

10  about the representations issue, but still the justifiable

11  reliance, which is a part of a negligent misrepresentation

12  claim as is it is a part of a fraud or a misrepresentation

13  claim.

14        Each individual class member would have to be

15  polled about reliance, what mattered to that individual class

16  member, or whether what was allegedly spoken; and the

17  Complaint alleges it would be a varying, not uniform, matter

18  to that individual class member, school districts and school

19  boards across the country.

20        We know now this is at most, as of today's rulings,

21  a fraud case, and it requires justifiable reliance just like

22  every fraud case.  And there's no reason to put anyone through

23  the burden and expense of this enterprise on a class basis at

24  this juncture when we know what we know from the face of the

25  Amended Complaint.

1          Now, we have briefed lots of other reasons why this
2    isn't suitable for class treatment, including why would the
3    Court take on the burden with installations that the
4    attachments to the Amended Complaint budget at or estimate at
5    $860,000 to $900,000 for a single installation.  These are not
6    negative-value claims like might have been alleged in Walney
7    and Slapikas.  These are positive-value claims.  If any school
8    district has one of these claims, there's no disincentive for
9    them to pursuing it if it were legitimate.
10         So we have fraud claims with varying
11   representations made; we have reliance as an element of any
12   claim putatively claimed; and we have lack of superiority,
13   because of the allegation of a 50-state or more potentially,
14   because they talk about international installations, trying to
15   sum these claims up for administration of one place when the
16   claims are not negative value.
17         MS. BELL-STANTON:  In regards to the negative value
18   argument, Your Honor, in the superiority argument, I think the
19   Defendants are missing the point.  In the absence of
20   discovery, the difference between one product and another
21   product, it could be $5, it could be $100.  We're not talking
22   about the entire scope of the installations on all of these
23   claims.
24         If the Court, when we get to class certification
25   and begin to define classes or subclasses, maybe what the

1   Defendant's complaint is would be true.  But the difference

2   between the purchasing of one kind of adhesive versus another

3   kind of adhesive is not 800,000, and that is easily calculable

4   because it's one price versus another.  But it, again,

5   arguably is very small.  But until we have discovery on it,

6   there's no way to answer the question, there's no way this

7   Court can conduct the rigorous analysis that's required by

8   Rule 23.

9           To just throw up, you know, as the Defendant's say,

10  it's fraud, therefore, no class, no Court has ever said that.

11  It may be difficult, it may have unique characteristics, but

12  no Court has ever said because it's fraud, as a matter of law,

13  it cannot move forward as a class action, certainly not before

14  a certification hearing or discovery has occurred.

15          MR. JONES:  Your Honor, justifiable reliance is

16  justifiable reliance.  It has to be established on an

17  individual, class member-by-class member basis.  It cannot be

18  done here in a way that's consistent with Rule 23 practice.

19          MS. BELL-STANTON:  My final answer to that, Your

20  Honor, would be consent is consent is consent.  And that's

21  what the Landsman and Funk case said, the mere fact that

22  individual consent may be at issue cannot be addressed prior

23  to discovery or the certification hearing.

24          MR. JONES:  I would only send yourself back to

25  yourself, Your Honor, at this point.

1            THE COURT:  The problem, though, is those cases

2    came, you know, in a motion for class certification, which

3    makes it a little different.

4            This is what I'm going to do in this case.  I won't

5    strike them at this stage, but I'm going to only permit

6    some -- the discovery to go forward.  First we'll have some

7    staged discovery, and it will be with respect to this

8    individualized inquiry on justifiable reliance.  So you can be

9    looking at things that would be relevant to that issue in

10   discovery.  If you feel that -- I'm going to deny this without

11   prejudice, so if you feel -- no, I won't say that.  I think we

12   could just have an -- let's see how this could be teed up.

13           I just think it's wasteful, you know, for the

14   parties, both for the Plaintiff and the Defendants, if there's

15   no way this case is going to pass muster for class

16   certification because of the justifiable reliance.  And having

17   seen these cases developed -- and in those cases there were

18   other issues as well besides the fraud claims that were at

19   play, so it really wasn't a big issue at the pleading stages.

20           But here, if this is the only claim that is going

21   to go forward --

22           MR. JONES:  Your Honor, may I make a proposal?

23           THE COURT:  Yes.

24           MR. JONES:  We have to do some limited

25   jurisdictional discovery.

1           THE COURT:  Yes.

2           MR. JONES:  I would propose that you grant the

3     motion to strike the class allegations.  Slippery Rock's

4     individual claims will go forward on fraud.

5           THE COURT:  Yes.  But they want to move forward

6     with a class action.

7           MR. JONES:  I understand.

8           THE COURT:  And the only reason I would strike it

9     at this stage would be because of the justifiable reliance

10    issues.

11          MR. JONES:  I don't understand how discovery from

12    any of the Defendants can change the fact that justifiable

13    reliance on the part of the class members will be a required

14    element of the proof.

15          MS. BELL-STANTON:  Well, Your Honor, if what's

16    advertised -- it goes back to that pricing schedule and the

17    mysterious pre-competed pricing.  If that is uniform, then

18    we're looking at an In re Milo situation, where a class action

19    is permitted because the advertising has represented one item,

20    but you're receiving --

21          THE COURT:  But that's not the claim that you have

22    pled here.

23          MS. BELL-STANTON:  Your Honor, I'm using it by

24    example for the individual reliance --

25          THE COURT:  The problem is in a fraud case you have

1    a misrepresentation.

2              MS. BELL-STANTON:  Correct.

3              THE COURT:  And a misrepresentation here, you know,

4    the Court's view was it wasn't enough to plead there was they

5    called it premium when it was really just the same as the

6    regular, because you could argue that would fall within sort

7    of the puffery type of argument or some other type of breach

8    of contract in terms of what was actually warranted in the

9    warranty.

10             So, at this stage -- I think it would be different

11   too if they were saying that the premium -- if there was some

12   representation that the premium differed from the regular, and

13   they had various specifications that they said this is what

14   the real differences were, and, in fact, it was not that, then

15   that would be something that arguably would be beyond mere

16   puffery.  But I didn't have enough of that in the Complaint to

17   say that the mere use of the word this was "premium" product

18   versus a "regular" product would be sufficient.  It was really

19   the fact that there was a representation being made that you

20   need the premium versus the regular because of your particular

21   building.

22             That's such a particularized inquiry, and I don't

23   know whether that representation was made uniformly to every

24   putative class member.  Now, how you would identify those

25   class members to which that particular representation was

1 made, it's different if you had a pharmaceutical product where
2 there was advertising that said, you know, this product does
3 X, Y, or Z.  But if it's an individual oral representation, as
4 opposed to written materials being handed out, I mean, you
5 could have discovery to see if there was special -- if this
6 was all memorialized in writing, but you don't even have any
7 allegations along these lines.  That's where I'm having
8 difficulty.

9        MS. BELL-STANTON:  But, Your Honor, we do, and I
10 want to be sure that I give you --

11        THE COURT:  We have to be mindful as Courts that we
12 cannot have litigation that just opens the door to huge
13 expenses for defendants.  It has to be limited to the claims
14 and defenses that are raised.  And if I can't see a basis for
15 a class action for fraud claims where there isn't any
16 fiduciary relationship shown, it's not a passive situation, if
17 there's actually representations that the fraud occurred
18 because of oral representations that were being made by
19 specific representatives, you know, it's just so farfetched at
20 this stage I'm really struggling.

21        I don't want to cut off, you know, viable claims at
22 an early stage, and I'm mindful that it's a very rare case
23 that doesn't pass muster at this stage, but just to open a
24 door to massive discovery is problematic.

25        MR. JONES:  Your Honor, that's why, if I may, I was

 1   proposing that the case in its current posture will proceed.

 2   If they have facts to seek leave from Your Honor for leave to

 3   re-plead class allegations at some later time, you know, that

 4   would be a matter of the Federal Rules and Your Honor's

 5   judgment, but right now on the face of the Amended Complaint

 6   reliance is reliance.

 7          MS. BELL-STANTON:  Your Honor noted in the Cole's

 8   Wexford opinion that it would be the final word in class when

 9   you make these kinds of rulings.

10          THE COURT:  That's right.

11          MS. BELL-STANTON:  So we would have limited

12   remedies, limited to just having a review of those, not -- I

13   mean, as opposed to, well, they can just raise them again

14   later on, that's not really --

15          THE COURT:  I guess what my problem is that in the

16   pleading stages, there has to be more than, well, we want to

17   go out and find something to prove this.  There has to be --

18   you have to tell me something that these other members of the

19   class would have received the same representations.  Where is

20   that?

21          MS. BELL-STANTON:  Your Honor, we believe that we

22   can.  If we start at Paragraph 22 of our petition where we

23   talk about the composition, the composition of the products --

24          THE COURT:  It's not enough.

25          MS. BELL-STANTON:  But, Your Honor, those are

1   written.   Those are written.   Those are posted on the website.

2           MR. JONES:   This isn't pleaded, Your Honor.

3   Website information, nothing about a website was pleaded.

4           MS. BELL-STANTON:   Your Honor, now we're definitely

5   getting into the fact whether something about the website was

6   pleaded.   What we have pleaded was that we believe there are

7   internal documents, we know there are external documents

8   because we have attached some of them, but we believe that

9   there are internal documents that are going to show us that

10  the composition that's been provided to everyone that

11  purchased the product, these are written documents, they are

12  not going to be isolated to oral representations.

13          We believe that we are entitled to, at a minimum,

14  pursue the actual composition materials to match them up with

15  the written documents that they distribute.   Those aren't

16  going to be dependent upon individual oral representations,

17  those are going to be in writing.   So if the Court wants to

18  limit it, even beyond the BURmastic, even beyond the

19  contracting services, we can limit it to the pricing of these

20  products and the composition of these products.   At least that

21  gives us someplace -- allows us to start this process.

22          I mean, that is -- it is pleaded about the

23  composition of the product is what is in question and that

24  there are internal documents that we believe are going to show

25  the uniformity of the misrepresentations of the composition of

1  these products, but they have to give them to us.

2          MR. JONES:  Your Honor, in response.  It's not the

3  composition that matters, it's what's said about the

4  composition in a fraud case.  Even if you look at

5  Paragraphs 33 through 37 of the Complaint, you will see with

6  respect to Slippery Rock, the Amended Complaint, we aren't

7  talking about an identity of alleged representations.

8  In the end, what was said about any of the foregoing --

9          THE COURT:  I have a criminal case.  I have to go.

10 I have to go out and take -- he's in custody, and they have to

11 get him back to the jail.  I'm going to have to ask you to

12 hang around unfortunately.  This hearing went a little longer

13 than we anticipated it.  He was supposed to be here at 3, and

14 it's already 10 to 4, and they have to get him back by 4:30.

15 This is their due date.  So I have got to quickly leave.  So

16 if you could just go back out to the waiting room and then

17 come back.

18          (At 3:50 p.m., a short recess was taken.)

19          (At 4:41 p.m., the hearing resumed.)

20          THE COURT:  I have given some thought to this, and

21 I think what the best thing to do at this stage is I think my

22 initial assessment is based on the way the Complaint is

23 presently worded.  If you have other allegations you think,

24 factual allegations, that would be appropriate for the Court

25 to consider in connection with class allegations, then you

1   will be given leave to file an Amended Complaint along those

2   lines.

3          You know, there was a lot of discussion here where

4   you're raising about the standard specifications and how they

5   differed and numbers of other things that were not really

6   directly set forth, at least in my reading of the Complaint.

7   So if there's some basis for it for me to consider it based on

8   a differently worded Complaint that's more specific, I will

9   consider it.

10          But at this stage I think it would have to be

11   denied with a -- it would be granted but without prejudice for

12   you to file an Amended Complaint that would be more specific

13   along those lines.  I think you have indicated you may want to

14   re-plead some of the other counts that were dismissed.

15          In any event, I think that's the best way to

16   proceed further, and it will make it clearer.  At that this

17   stage, I know it's a very rare case where this is granted, but

18   when the only claim left is a claim of fraudulent

19   misrepresentation and the allegations in the Complaint refer

20   to what would be specific oral allegations being --

21   representations being made, and there's no allegation that

22   those same representations were made to other class members,

23   you know, it would be even hard pressed to find commonality on

24   the representation issue, let alone an individualized inquiry

25   wouldn't be required.  So, at this stage, that's the best way

1   to move forward.

2          MS. BELL-STANTON:  Your Honor, I guess I'm trying

3   to place it in context of the other discovery that needs to

4   occur, as well as the fact that --

5          THE COURT:  We're going to get started.  First of

6   all, you're going to have the 60 days to do the jurisdictional

7   discovery.

8          Then you're going to be able to do discovery on the

9   Plaintiff's separate claim, and you will probably gather a

10  number of information that might be helpful to you for your

11  re-pleading purposes, I don't know.  But we'll get started on

12  that.  And then you will have a period of time if you want to

13  amend your Complaint, you know, you will have an opportunity

14  to do that.

15         MS. BELL-STANTON:  So because, again, I was

16  thinking in terms of the timing, would we be able to I guess

17  get a hearing pretty quickly after we amend our pleadings

18  regarding --

19         THE COURT:  They will file a -- they will have an

20  opportunity to file a renewed motion to dismiss or a different

21  motion to dismiss, and I'll have to take that up in due

22  course.

23         MS. BELL-STANTON:  Okay.

24         THE COURT:  I would imagine the sooner you file an

25  Amended Complaint, the sooner -- they only have so many days

1    to respond.  I'm pretty quick once the briefing is done, and

2    I'll set up a hearing.  You can contact my chambers if you

3    want.  We'll try to move it as quickly as possible.  That

4    would be the goal here.  Okay?

5              MS. BELL-STANTON:  Yes, Your Honor.  Thank you.

6              THE COURT:  All right.  So we have already

7    addressed the issues on jurisdictional discovery, and we have

8    set the time frame for that.  We also have the -- I'm sorry,

9    have you all gone to ADR?

10             MR. JONES:  We have not, Your Honor.  The parties

11   have thought that it would be most prudent -- I don't know if

12   we agreed on this or not, so don't let me misspeak.  At least

13   our position was that it would be most prudent to do that

14   after rulings today and we understood --

15             THE COURT:  Okay.  You said you were going to go --

16             MS. BELL-STANTON:  Yes, Your Honor.  I don't know,

17   until we kind of resolve the class action situation, I'm not

18   sure it would be productive.

19             THE COURT:  So you want to defer that?

20             MS. BELL-STANTON:  We do.

21             MR. JONES:  We do.

22             THE COURT:  We'll defer that until after the

23   Plaintiff has an opportunity to file an Amended Complaint and

24   the Court has resolved whether or not there is going to be a

25   class action allegation in the Complaint going forward.  Okay?

1   All right.  So that will be deferred.

2           MS. BELL-STANTON:  I'm sorry.  Just for

3   clarification, Your Honor, we don't necessarily know if we

4   have to wait through the certification hearing?

5           THE COURT:  No, you don't.  Right now the class

6   allegations are stricken.  So if there's a Complaint filed and

7   the class action allegations move forward, I'll set a time

8   frame for class discovery, and then we'll set the time and

9   date for the motion for class certification.  That's the way I

10  typically do it.

11          MS. BELL-STANTON:  Yes.  I wasn't sure if I was

12  clear about the ADR.

13          THE COURT:  A lot of times there's -- it's just to

14  come up with the individual named plaintiff anyway.  We'll get

15  started with that discovery because that has to go forward in

16  any event, and by the time we get together the next time, you

17  will let me know if there's going to be summary judgments on

18  that.  Sometimes that happens in these class action cases and

19  the issues are raised that you can't be the named plaintiff

20  because you don't have a claim.  I don't know if that's likely

21  to happen here or not, but at least we'll be making progress

22  through that discovery period.

23          Okay.  So, at this stage, it is a little hard to

24  tell, and I don't really see anything in your 26(f) report

25  about electronic discovery or anything like that, so I'm going

1    to have a Case Management Order here.  How long are you going

2    to need for the discovery period for just this particular

3    Plaintiff?

4              MS. BELL-STANTON:  Including experts?

5              THE COURT:  No.  Just the fact discovery period.

6              MS. BELL-STANTON:  120.

7              THE COURT:  Okay.  So that would be about early

8    July.

9              MR. JONES:  That's pretty rapid, but we can work

10   towards that goal.

11             THE COURT:  I think that would be helpful.  Why

12   don't we work towards -- gives you the rest of February, all

13   of March, April, May, and June, you know, that should be more

14   than enough time hopefully.  Why don't we say by July 6.  Any

15   form of discovery for which the Civil Rules provide the 30-day

16   response period, that would be production of documents,

17   interrogatories, request for admission, those should be served

18   no later than let's say May 23.  That gives you a month for

19   the responses to come in and then a couple weeks to try to

20   work out any problems.

21             When do you think you will be in a position to

22   amend pleadings?

23             MS. BELL-STANTON:  Your Honor, we'll do it rapidly.

24   In the next 30 days I would imagine.

25             THE COURT:  So if we say by March 18, do you think

 1   that's sufficient?

 2           MS. BELL-STANTON:  Yes, Your Honor.

 3           THE COURT:  Tell me if there's a different date.

 4           MS. BELL-STANTON:  No, Your Honor.  I'm sorry.  I'm

 5   just looking at my calender as we go.  March 18 is fine, Your

 6   Honor.

 7           THE COURT:  Okay.  We'll have a status conference

 8   at the close of fact discovery.  We will do that, say, July 14

 9   at 4:30 p.m.

10           MR. RIHN:  Your Honor, 60 days for jurisdictional

11   discovery running concurrently with --

12           THE COURT:  Yes, it is.  Did I not give you a

13   specific date on which that would end?

14           MR. JONES:  Yes.

15           MS. BELL-STANTON:  Yes.

16           THE COURT:  That will be in a text entry.  Okay?

17   It's running during that period.  During the same period you

18   will be doing this discovery, and I have a hearing date set

19   for you on that.  By that time, you will give me an update on

20   where everything stands.  If you file the motion to the

21   amended complaint and we get other motions, maybe those can be

22   coordinated at the same time.

23           MR. JONES:  That makes sense.

24           MS. BELL-STANTON:  Thank you.

25           MR. JONES:  Thanks to everyone for the late

1    afternoon and for staying.

2            THE COURT:   Thank you all.  Have a nice weekend,

3    everybody.

4            (Whereupon, the above-entitled matter was concluded

5    at 4:51 p.m., this date.)

6                    - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

            I hereby certify that the
3

4       proceedings and evidence are contained

5

6       fully and accurately in the

7       stenographic notes taken by me on the

8

        hearing of the within cause and that
9

10      this is a correct transcript of the

11

        same.
12

13

14         S/Lina G. Hershberger
           ---------------------------------
15

16         ---------------------------------

17

18

19

20

21

22

23

24

25

1

## $

**$100** [1] - 60:21
**$860,000** [1] - 60:5
**$900,000** [1] - 60:5

## 0

**09-1241** [1] - 9:25

## 1

**1** [2] - 34:17, 50:24
**10** [1] - 68:14
**10,000** [2] - 53:18, 53:19
**106** [1] - 37:8
**114** [1] - 22:8
**1185** [1] - 10:16
**1199** [1] - 45:9
**12(b)(6** [1] - 12:17
**12-8014** [1] - 50:23
**120** [1] - 73:6
**1257716** [1] - 10:1
**126** [1] - 39:17
**13-102** [1] - 50:5
**137** [1] - 50:2
**14** [6] - 10:18, 15:25, 18:22, 50:6, 55:12, 74:8
**14-5063** [1] - 10:17
**1410** [1] - 22:9
**14th** [2] - 18:20, 19:1
**15-1020** [1] - 3:6
**15-1020-JFC** [1] - 1:6
**15219** [5] - 1:12, 2:10, 2:13, 2:16, 2:18
**17** [1] - 50:5
**18** [2] - 73:25, 74:5
**189** [1] - 15:2
**1966** [1] - 49:19
**1978** [1] - 10:24
**1980** [1] - 31:9
**1985** [1] - 10:16
**1986** [1] - 39:23
**1990** [1] - 45:21
**1994** [3] - 16:21, 45:10, 46:12
**1995** [2] - 11:18, 41:1
**1997** [2] - 22:9, 39:18
**1998** [3] - 15:25, 31:11, 31:12
**1999** [1] - 15:2
**1:55** [1] - 1:13

## 2

**2** [2] - 10:1, 10:17
**2-J** [1] - 39:17
**20** [1] - 47:5
**2002** [1] - 50:3
**2003** [1] - 16:8
**2004** [3] - 7:16, 31:4, 42:24
**2005** [1] - 21:3
**2008** [2] - 49:17, 51:19
**2009** [1] - 12:6
**2010** [4] - 8:2, 10:1, 10:2, 10:12
**2011** [1] - 53:20
**2013** [3] - 8:2, 50:23, 50:24
**2014** [1] - 37:8
**2015** [7] - 4:8, 9:14, 10:17, 10:18, 50:5, 50:6, 54:4
**2016** [1] - 1:12
**217** [1] - 51:19
**22** [1] - 66:22
**222** [1] - 31:9
**23** [8] - 4:8, 49:5, 49:19, 53:4, 53:23, 61:8, 61:18, 73:18
**23(a** [1] - 49:5
**232** [1] - 49:16
**24** [1] - 19:20
**250** [1] - 49:16
**2500** [1] - 2:9
**26** [2] - 10:1, 17:22
**26(f** [1] - 72:24
**2701** [2] - 2:4, 2:6
**28th** [3] - 19:2, 19:13, 19:14
**2d** [6] - 10:23, 21:2, 31:4, 45:9, 45:20, 50:2
**2nd** [1] - 15:25

## 3

**3** [1] - 68:13
**30** [1] - 73:24
**30-day** [1] - 73:15
**33** [1] - 68:5
**331** [1] - 16:8
**354** [1] - 31:4
**37** [1] - 68:5
**377** [1] - 16:21
**393** [1] - 10:23
**3:50** [1] - 68:18
**3d** [8] - 11:18, 15:2, 16:8, 22:8, 37:8, 39:17, 40:25, 51:19

## 4

**4** [3] - 31:11, 31:12, 68:14
**4(e)** [1] - 8:22
**403** [1] - 15:2
**406** [1] - 16:8
**445** [2] - 10:12, 31:9
**4500** [3] - 2:13, 2:15, 2:18
**472** [1] - 10:12
**476** [1] - 39:25

## 5

**5** [5] - 1:12, 55:12, 55:13, 60:21
**50** [2] - 23:13, 59:1
**50-state** [1] - 60:13
**500** [2] - 2:13, 2:15, 2:18
**501** [1] - 11:18
**5333541** [1] - 50:5
**5334273** [1] - 10:17
**538** [1] - 51:19
**539** [1] - 39:17
**551** [2] - 30:20, 34:16
**552** [1] - 56:22
**559** [1] - 21:2
**570** [2] - 2:4, 2:6
**573** [1] - 31:4
**574** [1] - 45:20
**5th** [3] - 10:16, 18:17, 19:16

## 6

**6** [1] - 73:14
**60** [7] - 17:14, 17:23, 18:5, 18:15, 18:16, 70:6, 74:10
**604** [1] - 41:1
**62** [1] - 11:18
**637** [1] - 10:23
**639** [1] - 45:9
**641** [1] - 45:21
**66** [1] - 40:25
**67** [1] - 53:4
**68** [1] - 53:4
**69** [1] - 53:5

## 7

**7** [2] - 18:17, 56:11
**700** [1] - 1:11
**707** [1] - 2:9
**710** [1] - 15:25
**75093** [2] - 2:4, 2:7
**767444** [1] - 31:11
**772** [1] - 10:15

## 8

**8** [1] - 20:10
**800,000** [1] - 61:3
**810** [1] - 50:2
**846** [1] - 16:21
**8538695** [1] - 50:23
**858** [1] - 39:23
**868** [1] - 21:2

## 9

**9** [1] - 26:24
**91-7013** [1] - 31:11

## A

**Aaron** [2] - 2:8, 3:10
**abatement** [2] - 45:14, 46:3
**ability** [1] - 14:1
**able** [3] - 47:12, 70:8, 70:16
**above-entitled** [1] - 75:4
**absence** [1] - 60:19
**accept** [2] - 9:6, 46:2
**acceptable** [2] - 7:24, 13:1
**accordance** [1] - 8:25
**account** [1] - 47:7
**accurately** [1] - 76:5
**achieved** [1] - 16:15
**acknowledges** [1] - 42:2
**act** [2] - 20:11, 51:3
**acted** [1] - 45:22
**action** [18] - 4:16, 5:5, 13:14, 32:17, 44:25, 48:20, 49:23, 52:5, 53:13, 54:5, 61:13, 63:6, 63:18, 65:15, 71:7, 71:25, 72:7, 72:18
**Action** [13] - 4:3, 9:25, 20:15, 31:11, 37:1, 37:4, 37:21, 38:2, 38:5, 38:17, 38:23, 50:5, 50:23
**actionable** [1] - 26:19
**actions** [2] - 33:20, 52:3
**activities** [4] - 6:25, 9:9, 10:4, 25:5
**acts** [2] - 16:1, 16:4
**actual** [5] - 17:10, 26:6, 31:19, 57:6, 67:14
**actuality** [1] - 27:7, 52:24
**addition** [3] - 9:10, 41:4, 42:1
**address** [2] - 5:3, 5:4
**addressed** [4] - 49:25, 61:22, 71:7
**adhesive** [2] - 61:2, 61:3
**adjuster** [1] - 37:14
**administration** [2] - 53:22, 60:15
**admission** [1] - 73:17
**admissions** [1] - 35:21
**admit** [1] - 36:14
**ADR** [2] - 71:9, 72:12
**advantage** [1] - 34:24
**advertised** [2] - 6:18, 63:16
**advertising** [5] - 54:9, 54:15, 58:6, 63:19, 65:2
**advised** [1] - 6:22
**Advisory** [1] - 49:19
**afar** [1] - 48:12
**affidavit** [1] - 18:1
**affirmatively** [2] - 51:23, 51:25
**affirms** [1] - 56:18
**affording** [1] - 41:4
**afternoon** [1] - 75:22
**agency** [1] - 47:22
**AGENCY** [1] - 1:25
**agents** [2] - 5:12, 9:18
**agreed** [4] - 28:3, 28:14, 37:12, 71:12
**agreeing** [1] - 13:6
**agreement** [3] - 16:13, 72:11, 51:5
**agreements** [1] - 40:6
**akin** [1] - 54:8
**al** [1] - 1:7
**all-natural** [1] - 54:5
**allegation** [12] - 5:5, 5:11, 13:23, 27:6, 48:24, 52:3, 55:14, 55:19, 59:2, 60:13, 69:21, 71:25
**allegations** [56] - 4:15, 4:20, 4:22, 6:14, 6:24, 7:2, 8:3, 8:10, 9:5, 9:9, 9:10, 12:19, 12:22, 12:24, 13:11, 13:14, 15:18, 16:16, 20:12, 21:5, 21:19, 22:1, 22:12, 22:18, 22:22, 23:1, 23:8, 23:17, 23:23, 24:10, 24:13, 25:19, 26:5, 26:8, 26:17, 28:4, 28:7, 28:19, 31:20, 33:5, 38:10, 41:16, 48:20, 48:22, 52:5, 63:3, 65:7, 66:3, 68:23, 68:24, 68:25, 69:19, 69:20, 72:6, 72:7
**allege** [1] - 58:18
**alleged** [6] - 10:19, 40:2, 59:6, 59:8, 60:6, 68:7
**allegedly** [2] - 23:13, 59:16
**alleges** [4] - 21:10, 31:21, 32:5, 59:17
**alleging** [2] - 23:12, 32:1
**allow** [1] - 53:22
**allowed** [1] - 54:6
**allowing** [1] - 47:9
**allows** [1] - 67:21

**Allstate** [1] - 27:16
**almost** [1] - 34:6
**alone** [1] - 69:24
**ALSO** [1] - 2:19
**alter** [15] - 5:12, 5:15, 10:6, 10:13, 10:19, 11:20, 11:25, 12:8, 14:24, 15:4, 16:12, 17:1, 24:16, 24:22, 25:22
**alternative** [2] - 15:3, 32:13
**amenable** [2] - 49:3, 49:18
**amend** [3] - 70:13, 70:17, 73:22
**Amended** [20] - 4:7, 4:8, 27:23, 27:25, 28:3, 29:21, 29:22, 43:18, 43:22, 43:23, 58:18, 59:3, 59:25, 60:4, 66:5, 68:6, 69:1, 69:12, 70:25, 71:23
**amended** [1] - 74:21
**Amendments** [1] - 49:19
**American** [2] - 16:20, 49:15
**amount** [4] - 3:22, 17:8, 34:12, 35:1
**analysis** [10] - 10:19, 12:8, 13:22, 15:24, 17:2, 23:19, 38:22, 43:14, 45:7, 61:7
**analyzing** [1] - 34:5
**AND** [1] - 1:17
**Andover** [1] - 16:20
**annual** [1] - 9:13
**answer** [4] - 29:17, 38:18, 61:6, 61:19
**answers** [4] - 57:22, 57:23, 57:24
**anticipated** [1] - 68:13
**Antitrust** [1] - 12:4
**antitrust** [1] - 13:14
**anyway** [2] - 18:16, 72:14
**Appeals** [9] - 11:15, 15:8, 16:9, 34:2, 34:4, 39:17, 40:24, 41:1, 51:18
**appear** [1] - 6:11
**appearance** [1] - 3:7
**appearances** [1] - 35:2
**application** [1] - 44:5
**applied** [2] - 14:25, 34:23
**apply** [6] - 10:20, 22:10, 39:16, 42:3, 52:19, 54:21
**applying** [1] - 16:25
**appointment** [1] - 4:17
**appreciate** [2] - 18:6,
26:5
**appropriate** [6] - 9:20, 17:4, 30:12, 49:8, 56:19, 68:24
**appropriately** [1] - 11:9
**April** [3] - 18:17, 19:14, 73:13
**april** [1] - 18:22
**architect** [1] - 43:25
**architects** [1] - 42:12
**architectural** [1] - 42:25
**architecture** [1] - 41:11
**AREA** [1] - 1:3
**Area** [2] - 3:5, 4:2
**arguably** [6] - 32:3, 32:13, 32:21, 38:1, 61:5, 64:15
**argue** [5] - 15:19, 33:14, 36:24, 47:18, 64:6
**argued** [2] - 51:11, 54:16
**argues** [1] - 37:3
**arguing** [10] - 3:13, 12:9, 20:8, 32:7, 32:24, 39:7, 45:2, 45:5, 45:14, 50:18
**argument** [11] - 5:13, 7:22, 14:19, 21:21, 36:25, 46:5, 47:21, 53:2, 60:18, 64:7
**arguments** [7] - 5:23, 13:10, 15:15, 45:17, 46:3, 46:7, 49:4
**arise** [1] - 39:7
**arises** [2] - 31:6, 35:24
**arm** [1] - 6:5
**arm's** [4] - 11:23, 12:23, 13:7, 35:10
**arm's-length** [1] - 35:10
**Army** [1] - 57:20
**asbestos** [3] - 45:11, 45:14, 46:3
**ascertainable** [1] - 51:8
**Ashley** [2] - 10:23
**aspect** [2] - 33:11, 48:19
**aspects** [1] - 52:7
**assert** [2] - 8:19, 47:13
**asserted** [2] - 54:21, 57:8
**assertion** [1] - 17:10
**assessed** [1] - 34:11
**assessing** [2] - 4:23, 4:25
**assessment** [3] - 14:7, 29:25, 68:22
**assets** [1] - 11:7
**Association** [2] - 16:20, 45:20

**association** [3] - 45:22, 46:19, 47:16
**Atlantic** [6] - 10:23, 21:2, 37:8, 45:9, 45:20, 50:2
**attached** [6] - 18:2, 38:7, 42:21, 43:2, 43:17, 67:8
**attachments** [5] - 27:22, 29:21, 43:22, 43:23, 60:4
**authority** [1] - 45:24
**AUTHORIZATION** [1] - 1:25
**authorized** [1] - 8:21
**available** [3] - 8:12, 40:8, 40:9
**avoid** [1] - 39:10
**aware** [4] - 16:3, 33:6, 42:12

**B**

**background** [1] - 4:1
**Bank** [3] - 21:2, 50:22, 51:2
**Bank's** [1] - 51:2
**bank's** [1] - 34:11
**banking** [1] - 51:1
**Bankruptcy** [1] - 10:12
**bar** [4] - 38:3, 50:20, 56:15, 56:18
**Bar** [1] - 16:20
**bargain** [6] - 31:18, 35:2, 40:22, 41:2, 42:6, 43:11
**bargaining** [1] - 35:11
**barred** [5] - 20:14, 37:4, 38:17, 39:14, 57:4
**based** [11] - 5:17, 5:21, 12:1, 14:3, 15:7, 15:10, 24:9, 27:6, 41:4, 68:22, 69:7
**basis** [11] - 5:15, 8:24, 14:20, 14:24, 15:5, 17:1, 41:22, 59:23, 61:17, 65:14, 69:7
**become** [1] - 3:23
**becomes** [1] - 48:23
**BEFORE** [1] - 1:15
**begin** [1] - 60:25
**behalf** [3] - 3:10, 46:24, 47:3
**Belczyk** [2] - 2:14, 3:18
**BELL** [53] - 3:9, 3:14, 17:21, 18:18, 19:4, 19:7, 20:1, 27:2, 36:8, 36:21, 41:25, 42:19, 44:3, 44:20, 46:11, 46:21, 48:1, 48:9, 48:18, 52:6,

52:15, 52:18, 53:1, 53:11, 54:14, 54:20, 57:5, 60:17, 61:19, 63:15, 63:23, 64:2, 65:9, 66:7, 66:11, 66:21, 66:25, 67:4, 70:2, 70:15, 70:23, 71:5, 71:16, 71:20, 72:2, 72:11, 73:4, 73:6, 73:23, 74:2, 74:4, 74:15, 74:24
**Bell** [2] - 2:3, 3:10
**bell** [1] - 3:12
**Bell-Stanton** [2] - 2:3, 3:10
**BELL-STANTON** [53] - 3:9, 3:14, 17:21, 18:18, 19:4, 19:7, 20:1, 27:2, 36:8, 36:21, 41:25, 42:19, 44:3, 44:20, 46:11, 46:21, 48:1, 48:9, 48:18, 52:6, 52:15, 52:18, 53:1, 53:11, 54:14, 54:20, 57:5, 60:17, 61:19, 63:15, 63:23, 64:2, 65:9, 66:7, 66:11, 66:25, 67:4, 70:2, 70:15, 70:23, 71:5, 71:16, 71:20, 72:2, 72:11, 73:4, 73:6, 73:23, 74:2, 74:4, 74:15, 74:24
**bell-Stanton** [1] - 3:12
**belonging** [1] - 16:17
**benefit** [5] - 40:22, 41:2, 42:5, 43:10, 46:4
**benefitting** [1] - 45:15
**best** [4] - 40:6, 68:21, 69:15, 69:25
**better** [5] - 26:9, 26:21, 27:6
**between** [14] - 6:9, 11:13, 11:23, 13:3, 17:20, 25:3, 27:3, 31:8, 34:7, 40:15, 50:1, 58:19, 60:20, 61:2
**beyond** [12] - 9:23, 27:19, 28:22, 29:4, 29:8, 37:23, 41:6, 42:12, 43:10, 64:15, 67:18
**bid** [1] - 7:13
**bidder** [1] - 7:15
**bidding** [5] - 6:23, 7:12, 8:4, 43:9, 44:15
**big** [1] - 62:19
**billed** [1] - 8:9
**Bilt** [12] - 41:9, 41:10, 41:12, 41:20, 42:2, 42:11, 43:12, 43:19, 43:24, 44:5, 52:16,

54:24
**Bilt-Rite** [12] - 41:9, 41:10, 41:12, 41:20, 42:2, 42:11, 43:12, 43:19, 43:24, 44:5, 52:16, 54:24
**bit** [1] - 43:3
**blind** [1] - 44:11
**boards** [2] - 59:1, 59:19
**Bobrick** [1] - 15:24
**bodily** [1] - 51:12
**bond** [2] - 48:2, 48:5
**Bootay** [1] - 9:25
**borne** [1] - 32:21
**bought** [2] - 23:25, 24:6
**bound** [1] - 30:14
**branding** [1] - 12:10
**breach** [2] - 37:5, 64:7
**break** [1] - 43:16
**brief** [4] - 14:2, 19:8, 26:25, 46:11
**briefed** [1] - 60:1
**briefing** [8] - 14:11, 14:17, 17:4, 29:9, 30:15, 39:7, 54:17, 71:1
**briefly** [2] - 4:24, 41:25
**bring** [4] - 46:23, 47:3, 54:6, 54:7
**bringing** [1] - 46:18
**broken** [1] - 11:10
**brought** [1] - 32:17
**Bruno** [3] - 37:7, 37:10, 38:21
**Bruno's** [1] - 37:13
**Brunoes** [2] - 37:10, 37:16
**budget** [1] - 60:4
**building** [5] - 5:25, 6:7, 8:4, 28:20, 64:21
**buildings** [2] - 7:8, 45:12
**burden** [3] - 15:20, 59:23, 60:3
**Burlington** [1] - 22:8
**BURmastic** [3] - 6:16, 7:21, 67:18
**business** [13] - 5:11, 5:18, 5:19, 5:22, 6:2, 6:12, 12:13, 41:17, 44:13, 48:13, 48:16, 56:1, 56:4
**businesses** [1] - 48:10
**buy** [4] - 27:4, 48:14, 57:9, 57:10
**buyer** [1] - 31:15
**buying** [2] - 47:24, 48:13

# C

calculable [1] - 61:3
calender [1] - 74:5
cannot [7] - 14:23, 31:17, 51:22, 61:13, 61:17, 61:22, 65:12
capital [1] - 11:22
capitalization [2] - 11:21, 12:20
care [1] - 56:7
Carpenter [4] - 2:3, 2:5, 2:6, 3:10
case [57] - 5:7, 9:4, 9:20, 22:10, 22:15, 25:14, 29:11, 33:24, 37:18, 40:3, 40:14, 40:18, 41:1, 41:8, 41:20, 42:2, 42:11, 43:15, 45:10, 46:6, 46:12, 46:25, 47:12, 48:13, 49:20, 49:21, 50:19, 51:5, 52:20, 53:15, 53:16, 53:17, 54:3, 54:4, 54:7, 54:10, 54:11, 55:7, 56:13, 56:16, 56:21, 57:2, 57:4, 58:7, 58:11, 58:12, 59:21, 59:22, 61:21, 62:4, 62:15, 63:25, 65:22, 66:1, 68:4, 68:9, 69:17
Case [1] - 73:1
cases [18] - 11:16, 34:10, 34:22, 36:15, 38:4, 43:13, 43:14, 49:1, 55:3, 55:20, 57:18, 57:19, 58:6, 59:4, 62:1, 62:17, 72:18
catchall [1] - 55:15
caused [9] - 21:1, 24:4, 24:8, 31:3, 33:19, 37:13, 37:19, 42:8, 56:5
causes [1] - 40:8
certain [6] - 8:5, 21:20, 27:17, 27:18, 31:23, 51:6
certainly [2] - 28:1, 61:13
certification [14] - 4:17, 4:19, 49:3, 49:18, 55:4, 58:13, 59:9, 60:24, 61:14, 61:23, 62:2, 62:16, 72:4, 72:9
certify [2] - 50:7, 76:2
CERTIFYING [1] - 1:25
cetera [2] - 39:12, 46:20
chambers [1] - 71:2
change [3] - 27:8,

32:25, 63:12
changes [1] - 57:25
characteristics [1] - 61:11
Charest [1] - 31:10
charged [1] - 22:3
charges [1] - 23:16
chemical [2] - 23:4, 32:19
Chiarella [1] - 31:9
CHIEF [2] - 1:15, 3:3
chief [1] - 43:8
Chocolate [2] - 12:4, 13:14
Chrysler [1] - 50:2
Circuit [19] - 10:16, 11:15, 11:18, 15:2, 15:8, 15:10, 16:8, 16:25, 22:9, 34:2, 34:5, 39:16, 39:18, 41:1, 51:18, 51:19, 53:20, 55:8, 58:8
circumstances [9] - 14:6, 25:14, 29:16, 31:16, 41:19, 43:16, 49:9, 49:12, 59:8
cite [3] - 34:3, 37:6, 40:25
cited [4] - 45:18, 52:20, 55:3, 56:14
citing [1] - 53:15
citizenry [1] - 47:15
citizens [1] - 47:13
civil [5] - 4:15, 16:10, 16:18, 16:23, 25:10
Civil [11] - 1:6, 3:6, 8:22, 9:25, 10:17, 10:21, 20:10, 31:11, 50:4, 50:23, 73:15
claim [31] - 20:5, 20:6, 20:9, 21:8, 30:17, 30:18, 30:19, 37:9, 38:3, 47:13, 48:25, 49:2, 49:3, 53:12, 53:17, 54:7, 54:9, 54:15, 55:3, 56:11, 56:13, 57:4, 59:12, 59:13, 60:12, 62:20, 63:21, 69:18, 70:9, 72:20
claimed [1] - 60:12
claims [28] - 4:9, 5:4, 15:7, 19:25, 20:4, 20:14, 20:17, 30:7, 37:3, 37:5, 39:7, 41:7, 41:21, 46:18, 52:13, 56:21, 60:6, 60:7, 60:8, 60:10, 60:15, 60:16, 60:23, 62:18, 63:4, 65:13, 65:15, 65:21
clarification [1] - 72:3
clarify [1] - 44:6
class [55] - 4:17, 4:18, 4:20, 5:5, 5:9, 48:20, 48:24, 49:3, 49:8,

49:13, 49:14, 49:18, 49:22, 50:7, 50:13, 50:17, 51:6, 52:2, 52:5, 53:13, 54:4, 54:7, 58:9, 59:14, 59:15, 59:18, 59:23, 60:2, 60:24, 61:10, 61:13, 61:17, 62:2, 62:15, 63:3, 63:6, 63:13, 63:18, 64:24, 64:25, 65:15, 66:3, 66:8, 66:19, 68:25, 69:22, 71:17, 71:25, 72:5, 72:7, 72:8, 72:9, 72:18
Class [1] - 4:3
class-three [1] - 5:9
classes [1] - 60:25
Clause [1] - 34:23
clear [7] - 8:18, 20:18, 25:1, 44:12, 57:12, 72:12
clearer [1] - 69:16
clearly [5] - 13:23, 13:24, 13:25, 14:23, 40:11
close [4] - 9:22, 18:19, 55:6, 74:8
closer [1] - 32:10
co [3] - 16:3, 25:12, 57:25
co-conspirator [1] - 16:3
co-conspirators [1] - 25:12
co-op [1] - 57:25
Coat [1] - 22:8
cold [1] - 35:14
Cole's [2] - 53:14, 66:7
collapsing [1] - 51:14
collisions [1] - 51:15
combination [1] - 16:11
comfort [1] - 22:10
coming [1] - 34:15
commenced [1] - 7:16
comment [1] - 46:21
Comment [1] - 34:17
commentators [1] - 34:18
commented [1] - 46:13
commercial [1] - 40:5
Committee [1] - 49:19
common [12] - 9:16, 12:6, 12:10, 13:6, 16:13, 27:16, 49:21, 49:22, 57:22, 57:23, 57:24
Common [5] - 4:9, 4:10, 4:11, 4:12, 50:23
commonality [2] - 12:9, 69:23
Commonwealth [1] -

47:12
communicating [1] - 56:8
community [1] - 34:25
Company [3] - 37:11, 40:25, 49:16
company [3] - 5:2, 5:17, 5:21
compared [1] - 27:11
compelling [1] - 28:21
competed [2] - 42:8, 57:8, 63:17
competing [1] - 57:16
competition [1] - 8:14
competitors [1] - 7:13
complaint [4] - 9:6, 9:23, 61:1, 74:21
Complaint [5] - 4:4, 4:7, 4:8, 4:15, 4:22, 6:14, 13:20, 14:7, 16:6, 21:5, 25:4, 27:23, 27:25, 28:3, 28:7, 28:13, 29:4, 29:5, 29:9, 29:21, 29:22, 31:20, 31:25, 38:7, 38:20, 41:16, 41:24, 42:1, 43:18, 43:22, 43:23, 48:21, 55:13, 58:17, 58:18, 58:24, 59:3, 59:17, 59:25, 60:4, 64:16, 66:5, 68:5, 68:6, 68:22, 69:1, 69:6, 69:8, 69:12, 69:19, 70:13, 70:25, 71:23, 71:25, 72:6
composition [15] - 7:4, 27:7, 27:8, 27:11, 39:9, 58:5, 66:23, 67:10, 67:14, 67:20, 67:23, 67:25, 68:3, 68:4
compositionally [1] - 28:10
compositions [2] - 23:4, 32:19
concealed [2] - 31:21, 32:7
concealment [7] - 4:11, 20:5, 30:18, 30:20, 36:4, 36:15, 48:23
concern [1] - 26:12
concerned [1] - 53:8
concerning [2] - 7:20, 14:6
concerted [1] - 4:16
conclude [1] - 18:16
concluded [2] - 14:15, 75:4
conclusion [1] - 58:9
conclusory [1] - 13:11
concurrently [1] - 74:11
conditions [4] - 6:20, 31:23, 35:14, 35:16

Condominium [1] - 45:19
condominium [3] - 45:22, 46:19, 47:16
conduct [4] - 25:22, 48:5, 51:9, 61:7
conducted [1] - 58:14
Confectionary [1] - 12:4
confederation [1] - 16:13
conference [2] - 3:4, 74:7
Conference [1] - 1:10
CONFERENCE [1] - 1:17
confidence [2] - 31:8, 56:7
conflict [1] - 17:10
connected [1] - 54:25
connection [2] - 44:16, 68:25
connotes [1] - 44:15
consent [9] - 53:18, 53:19, 53:23, 53:24, 58:7, 61:20, 61:22
consequences [2] - 41:3, 51:17
consider [6] - 11:19, 14:5, 38:19, 68:25, 69:7, 69:9
consistent [1] - 61:18
conspiracy [13] - 4:16, 14:21, 15:1, 15:5, 15:7, 15:11, 15:19, 16:2, 16:10, 16:18, 16:23, 25:11, 25:19
conspirator [1] - 16:3
conspirators [1] - 25:12
conspire [1] - 14:23
constituencies [1] - 46:24
constituents [3] - 47:3, 47:10, 48:3
Constitutional [1] - 9:2
construction [6] - 5:22, 6:6, 6:12, 25:5, 28:25, 45:3
construction-related [2] - 6:12, 25:5
construed [1] - 47:8
Consumer [2] - 4:14, 51:24
consumer [3] - 27:17, 36:10, 54:5
contact [2] - 9:1, 71:2
contacts [3] - 15:18, 15:22, 15:23
contained [1] - 76:4
content [2] - 27:11, 58:5
context [4] - 31:19, 54:1, 57:3, 70:3
CONTI [2] - 1:15, 3:3

**Conti's** [1] - 1:10
**continue** [1] - 37:16
**continues** [1] - 27:3
**contract** [20] - 34:7, 37:5, 37:11, 37:25, 38:1, 38:7, 38:8, 38:9, 38:13, 38:14, 40:6, 41:4, 42:4, 42:6, 43:18, 43:20, 43:24, 44:12, 64:8
**contract-based** [1] - 41:4
**contracting** [4] - 5:23, 6:6, 6:7, 67:19
**contraction** [1] - 33:3
**contractor** [4] - 7:12, 43:5, 45:11, 45:13
**contracts** [2] - 43:22, 44:16
**contractual** [2] - 37:23, 44:18
**contrary** [1] - 32:11
**control** [8] - 11:6, 11:7, 11:11, 11:24, 12:16, 13:7, 13:9, 18:4
**controlling** [1] - 7:12
**convincing** [1] - 20:18
**convoluted** [1] - 47:25
**cooperative** [2] - 42:8, 57:16
**coordinated** [1] - 74:22
**core** [2] - 49:21, 49:22
**Corp** [4] - 39:17, 39:24, 40:25, 50:2
**corporate** [15] - 10:2, 10:8, 10:10, 10:21, 10:25, 11:3, 11:7, 11:8, 11:12, 11:21, 11:25, 12:10, 12:19, 12:20, 17:18
**corporation** [3] - 11:6, 11:20, 14:23
**corporations** [1] - 11:24
**correct** [3] - 57:2, 64:2, 76:10
**cost** [7] - 8:9, 23:13, 23:15, 24:5, 24:7, 57:10
**costly** [2] - 8:6, 23:2
**costs** [4] - 8:15, 32:20, 47:14, 47:17
**COUNSEL** [1] - 2:1
**counsel** [1] - 3:7
**Count** [1] - 44:24
**count** [5] - 39:6, 55:11, 55:17, 55:18
**country** [1] - 59:19
**counts** [2] - 55:12, 69:14
**Counts** [2] - 20:4, 20:17
**County** [1] - 11:17
**couple** [2] - 57:5,

73:19
**course** [3] - 49:25, 56:1, 70:22
**court** [1] - 17:12
**COURT** [75] - 1:1, 3:12, 3:15, 3:19, 3:21, 17:13, 18:8, 18:12, 18:19, 18:22, 18:24, 19:5, 19:10, 19:12, 19:14, 19:16, 19:19, 20:3, 26:10, 26:12, 28:18, 29:2, 29:4, 29:7, 29:24, 36:13, 36:24, 39:3, 42:14, 44:9, 44:21, 46:15, 47:11, 48:7, 48:10, 48:19, 52:13, 52:17, 52:25, 53:10, 54:13, 54:16, 56:24, 62:1, 62:23, 63:1, 63:5, 63:8, 63:21, 63:25, 64:3, 65:11, 66:10, 66:15, 66:24, 68:9, 68:20, 70:5, 70:19, 70:24, 71:6, 71:15, 71:19, 71:22, 72:5, 72:13, 73:5, 73:7, 73:11, 73:25, 74:3, 74:7, 74:12, 74:16, 75:2
**Court** [99] - 1:21, 4:22, 4:25, 8:19, 8:20, 10:2, 10:19, 10:24, 11:5, 11:15, 11:18, 12:6, 12:22, 13:13, 13:24, 14:1, 14:3, 14:8, 15:6, 15:8, 16:9, 16:22, 18:13, 21:3, 21:7, 22:7, 22:12, 22:13, 22:21, 23:17, 23:18, 23:19, 23:20, 24:5, 24:9, 24:16, 24:18, 24:21, 28:18, 30:5, 31:12, 33:9, 33:21, 34:2, 34:4, 34:9, 34:16, 35:8, 36:3, 36:19, 37:7, 37:20, 39:14, 39:17, 39:23, 39:25, 40:2, 40:7, 40:9, 40:24, 41:1, 41:8, 42:12, 44:6, 44:7, 44:8, 45:7, 45:10, 45:17, 45:21, 46:1, 46:2, 46:8, 46:12, 46:13, 47:2, 47:8, 49:1, 49:15, 50:3, 50:4, 51:15, 51:18, 51:22, 52:8, 53:8, 55:2, 55:3, 55:8, 56:14, 58:11, 60:3, 60:24, 61:7, 61:10, 61:12, 67:17, 68:24, 71:24
**Court's** [7] - 27:14, 35:22, 36:9, 36:22,

40:17, 48:4, 64:4
**Courthouse** [1] - 1:10
**Courts** [5] - 14:5, 15:9, 16:24, 34:5, 65:11
**cover** [1] - 37:12
**covered** [3] - 37:21, 38:23, 55:12
**create** [5] - 7:19, 8:5, 8:6, 21:14, 23:8
**crime** [1] - 10:11
**criminal** [1] - 68:9
**Cumberland** [5] - 45:8, 46:1, 46:9, 46:22, 47:6
**current** [2] - 44:3, 66:1
**custody** [1] - 68:10
**customer** [1] - 22:20
**customers** [2] - 6:22, 47:23
**cut** [1] - 65:21

# D

**daily** [1] - 18:3
**Dallas** [2] - 2:4, 2:6
**damage** [6] - 39:22, 40:1, 40:10, 40:12, 57:12
**damages** [3] - 16:15, 33:22, 40:17
**date** [6] - 68:15, 72:9, 74:3, 74:13, 74:18, 75:5
**dated** [1] - 9:14
**David** [2] - 2:14, 3:17
**day-to-day** [3] - 11:24, 13:9, 18:3
**days** [9] - 17:14, 17:23, 18:5, 18:15, 18:16, 70:6, 70:25, 73:24, 74:10
**deal** [5] - 4:15, 5:16, 13:5, 29:22, 38:5
**dealing** [4] - 9:21, 10:13, 29:14, 36:1
**dealt** [2] - 59:4, 59:5
**debate** [1] - 14:21
**Debbs** [1] - 50:2
**December** [1] - 4:8
**decided** [2] - 15:6, 40:7
**Decision** [1] - 49:16
**decision** [7] - 12:5, 14:3, 33:13, 34:2, 34:4, 37:22, 45:18, 46:9, 51:10
**decisions** [1] - 33:17
**defeat** [1] - 10:10
**defect** [3] - 31:15, 34:10, 51:11
**Defendant** [5] - 9:18, 15:17, 20:11, 25:17, 37:3
**defendant** [8] - 8:25,

31:5, 45:11
**Defendant's** [3] - 39:8, 61:1, 61:9
**Defendants** [26] - 1:8, 2:11, 3:16, 4:21, 8:8, 9:15, 9:17, 9:19, 13:4, 17:5, 20:8, 21:10, 22:1, 24:14, 29:15, 31:21, 32:25, 33:2, 33:6, 41:9, 41:17, 45:2, 50:12, 60:19, 62:14, 63:12
**defendants** [4] - 25:16, 37:13, 41:10, 65:13
**Defendants'** [5] - 8:11, 18:2, 23:2, 32:6, 39:11
**defense** [10] - 17:10, 22:9, 27:13, 29:2, 30:11, 39:13, 52:23, 53:2, 54:23, 57:1
**defenses** [1] - 65:14
**defer** [2] - 71:19, 71:22
**deferred** [1] - 72:1
**define** [1] - 60:25
**definite** [1] - 24:24
**definitely** [1] - 67:4
**degrees** [1] - 49:24
**Delaval** [1] - 39:24
**demand** [1] - 11:2
**demands** [1] - 12:2
**demonstrated** [1] - 32:19
**demonstrating** [1] - 23:4
**denied** [1] - 69:11
**deny** [3] - 14:13, 18:14, 62:10
**departments** [1] - 9:12
**dependent** [1] - 67:16
**depose** [1] - 18:1
**deposition** [1] - 58:14
**depositions** [1] - 17:25
**deprive** [1] - 11:25
**describe** [1] - 25:3
**describes** [1] - 43:15
**design** [3] - 16:13, 41:11, 43:25
**designated** [2] - 9:12, 57:14
**designers** [1] - 43:6
**designs** [1] - 51:14
**despite** [2] - 6:19, 11:13
**detail** [1] - 13:17
**detailed** [1] - 7:12
**determination** [1] - 13:21
**determine** [3] - 12:1, 21:7, 40:3
**determining** [1] - 11:19

**developed** [7] - 14:3, 39:4, 39:20, 42:22, 42:23, 43:4, 62:17
**differed** [2] - 64:12, 69:5
**difference** [4] - 24:5, 40:20, 60:20, 61:1
**differences** [1] - 64:14
**different** [13] - 25:21, 28:11, 33:13, 33:17, 38:14, 38:19, 58:20, 58:21, 62:3, 64:10, 65:1, 70:20, 74:3
**differential** [2] - 24:7, 40:15
**differently** [2] - 30:18, 69:8
**difficult** [6] - 17:17, 18:25, 34:18, 38:4, 39:15, 61:11
**difficulty** [1] - 65:8
**diminished** [1] - 40:18
**direct** [4] - 27:5, 32:12, 47:15, 48:4
**directed** [1] - 6:24
**directing** [1] - 13:2
**directly** [6] - 25:2, 46:13, 47:13, 51:2, 55:22, 69:6
**directors** [2] - 11:23, 12:21
**discarded** [1] - 37:5
**disclose** [6] - 31:16, 31:17, 35:5, 35:9, 39:8, 39:10
**disclosure** [2] - 31:13, 34:20
**disconnect** [1] - 27:3
**discovery** [46] - 14:1, 14:9, 14:14, 16:23, 17:4, 17:9, 17:16, 17:23, 18:16, 53:16, 53:22, 54:12, 55:4, 55:5, 55:7, 56:25, 57:21, 58:2, 58:3, 58:10, 58:12, 60:20, 61:5, 61:14, 61:23, 62:6, 62:7, 62:10, 62:25, 63:11, 65:5, 65:24, 70:3, 70:7, 70:8, 71:7, 72:8, 72:15, 72:22, 72:25, 73:2, 73:5, 73:15, 74:8, 74:11, 74:18
**discussed** [2] - 10:24, 57:18
**discussion** [2] - 54:24, 69:3
**disincentive** [1] - 60:8
**DISMISS** [1] - 1:17
**Dismiss** [8] - 3:4, 3:25, 4:21, 4:23, 5:4, 13:25, 14:13, 14:16
**dismiss** [8] - 4:25, 18:25, 21:7, 24:12, 30:9, 30:13, 70:20,

70:21
dismissal [1] - 44:4
dismissed [4] - 35:23,
41:21, 42:20, 69:14
disregarded [2] -
11:1, 11:9
distinct [1] - 40:13
distinction [1] - 25:7
distinguishable [4] -
41:9, 44:2, 45:21,
48:17
distribute [1] - 67:15
distribution [1] -
12:12
distributor [1] - 12:15
District [28] - 3:5, 4:2,
4:3, 5:8, 5:9, 7:17,
7:20, 8:19, 10:1,
10:12, 10:18, 12:5,
13:3, 15:25, 16:21,
16:24, 21:13, 29:14,
31:4, 31:12, 35:17,
45:3, 45:8, 49:16,
50:6, 54:4, 54:8
DISTRICT [3] - 1:1,
1:1, 1:4
district [10] - 5:9,
45:11, 45:12, 45:17,
45:19, 45:23, 46:6,
46:17, 58:20, 60:8
district's [1] - 46:3
districts [3] - 45:15,
59:1, 59:18
Doctrine [15] - 20:15,
37:1, 37:21, 38:17,
38:24, 39:14, 40:24,
42:3, 42:10, 52:14,
52:19, 54:21, 56:15,
56:17, 57:4
doctrine [3] - 39:16,
39:19, 39:20
Doctrine's [1] - 56:18
document [3] - 18:2,
18:11, 58:15
documents [10] -
17:18, 23:4, 32:18,
67:7, 67:9, 67:11,
67:15, 67:24, 73:16
Dog [1] - 54:3
dog [2] - 54:6
domination [2] -
11:24, 13:9
dominion [1] - 11:11
done [6] - 5:11, 5:17,
47:1, 54:19, 61:18,
71:1
door [2] - 65:12, 65:24
down [4] - 11:10,
24:21, 48:21, 55:6
drawings [1] - 7:24
drawn [1] - 51:9
drug [2] - 48:13, 48:14
drugs [2] - 48:14,
48:16
due [4] - 9:2, 40:19,
68:15, 70:21

Duquesne [6] - 34:2,
40:24, 42:2, 56:13,
57:2, 58:11
duration [1] - 17:8
during [4] - 17:19,
51:14, 74:17
duty [10] - 31:5, 31:16,
34:1, 34:6, 34:13,
34:20, 35:9, 42:22,
40:3, 55:19

**E**

early [2] - 65:22, 73:7
easier [1] - 48:23
easily [1] - 61:3
East [3] - 39:24, 40:8,
43:15
Eastern [4] - 10:12,
10:17, 16:21, 31:11
easy [1] - 16:4
economic [4] - 33:23,
39:19, 39:21, 56:10
Economic [10] -
39:14, 40:23, 42:3,
42:9, 52:14, 52:19,
54:21, 56:15, 56:17,
57:4
economy [2] - 7:4,
27:7
educators [1] - 45:6
effect [1] - 26:21
ego [14] - 5:12, 5:15,
10:13, 10:20, 11:20,
11:25, 12:8, 14:24,
15:4, 16:12, 17:1,
24:17, 24:22, 25:23
egos [1] - 10:6
either [1] - 53:5
Electric [1] - 40:25
electronic [1] - 72:25
element [12] - 22:16,
22:24, 23:11, 23:20,
23:22, 49:11, 52:11,
53:7, 55:24, 56:21,
60:11, 63:14
elementary [2] -
21:17, 21:18
Elementary [1] - 58:22
elements [9] - 16:9,
20:19, 21:4, 27:16,
30:21, 31:19, 49:11,
54:25, 56:1
eliminate [1] - 8:14
elsewhere [1] - 17:12
employees [5] - 5:12,
9:18, 12:11, 13:16,
39:11
employment [1] - 56:2
encompassed [1] -
40:23
end [7] - 7:20, 51:3,
51:15, 58:10, 58:15,
68:8, 74:13
engaged [1] - 24:25

engagement [1] -
55:22
engineer [1] - 37:15
engineers [2] - 28:25,
42:12
enhancing [1] - 31:18
enjoy [1] - 51:22
ensure [2] - 6:21, 8:11
enter [3] - 3:7, 33:4,
38:12
entered [2] - 37:10,
44:16
enterprise [1] - 59:23
enterprise's [1] -
17:11
enterprises [1] - 23:2
entire [2] - 58:15,
60:22
entities [8] - 4:4, 5:10,
6:9, 7:14, 10:3,
17:20, 46:23
entitled [3] - 31:7,
67:13, 75:4
entity [10] - 5:20, 10:4,
10:10, 10:25, 11:3,
11:9, 11:11, 11:14,
14:25, 47:2
entry [1] - 74:16
Environmental [1] -
45:9
equal [1] - 7:3
Equipment [1] - 15:25
equivalent [1] - 10:7
Erie [4] - 37:7, 37:11,
37:12, 37:14
erie [1] - 37:10
especially [1] - 11:24
Esq [6] - 2:3, 2:5, 2:8,
2:12, 2:14, 2:17
essence [1] - 35:3
essentially [12] - 4:9,
6:20, 9:10, 10:7,
20:3, 23:5, 25:23,
32:20, 37:8, 37:17,
37:22, 46:7
establish [6] - 9:4,
9:24, 15:13, 17:19,
20:19, 56:20
established [1] -
61:16
establishes [1] - 10:5
estimate [1] - 60:4
et [3] - 1:7, 39:12,
46:20
ethical [1] - 34:25
eToll [1] - 38:22
evening [1] - 19:23
event [2] - 69:15,
72:16
evidence [3] - 20:18,
76:4
evidentiary [1] - 9:3
exact [2] - 48:3, 53:21
exactly [5] - 17:21,
24:24, 25:20, 28:14,

57:11
examined [2] - 10:8,
11:16
examining [1] - 12:7
example [2] - 46:24,
63:24
Excavating [1] - 11:17
except [1] - 36:17
exception [9] - 41:13,
41:20, 42:9, 43:11,
48:22, 50:1, 52:16,
52:18, 56:17
excess [1] - 23:16
excessive [1] - 32:20
excluded [1] - 7:13
exclusive [1] - 12:15
exclusively [1] - 34:6
executed [1] - 43:19
exercise [2] - 11:11,
56:7
exercising [1] - 8:24
Exhibit [1] - 27:25
existence [2] - 10:2,
16:14
expansion [1] - 33:3
expect [1] - 57:6
expectation [1] -
34:20
expected [1] - 9:22
expense [1] - 59:23
expenses [1] - 65:13
experts [1] - 73:4
explained [5] - 16:9,
31:12, 46:1, 50:6,
51:22
explains [1] - 41:2
exposed [1] - 23:3
expression [1] - 22:10
extended [1] - 42:11
extent [5] - 8:21,
15:19, 17:16, 25:7,
32:12
external [1] - 67:7
extra [1] - 47:23
extraordinary [1] -
12:3
extreme [1] - 34:25
extremely [1] - 34:18

**F**

fabrications [1] -
50:21
face [9] - 13:20, 29:8,
30:11, 44:3, 55:22,
58:25, 59:24, 66:5
face-to-face [1] -
55:22
facie [1] - 9:4
facility [1] - 6:7
fact [19] - 9:24, 26:8,
26:18, 26:23, 27:23,
28:9, 35:5, 35:17,
43:6, 53:12, 53:14,
61:21, 63:12, 64:14,

64:19, 67:5, 70:4,
73:5, 74:8
factors [4] - 11:17,
12:18, 13:13, 34:19
Factory [1] - 22:8
facts [3] - 29:11, 32:7,
66:2
factual [6] - 20:12,
21:5, 22:12, 27:19,
29:1, 68:24
failing [1] - 31:17
fails [1] - 56:6
failure [19] - 6:16, 7:8,
7:21, 8:15, 20:8,
31:23, 32:2, 32:23,
33:1, 35:4, 35:13,
36:14, 39:8, 39:10,
39:11, 40:19, 55:18
failures [1] - 35:18
fair [2] - 25:1, 29:17
fairly [1] - 31:17
fall [3] - 35:9, 41:20,
64:6
false [8] - 20:22, 23:9,
30:25, 50:14, 54:9,
54:15, 56:3, 58:6
falsely [1] - 20:21,
22:25, 30:23
falsity [7] - 20:22,
22:25, 30:24
familiar [1] - 4:24
family [3] - 45:1, 45:4,
46:4
far [2] - 27:18, 46:2,
52:22
farfetched [1] - 65:19
favoring [1] - 17:3
faxes [1] - 53:18
features [2] - 8:5,
21:20
February [2] - 1:12,
73:12
Fed [10] - 11:18, 15:2,
15:25, 16:8, 16:21,
22:8, 31:4, 39:17,
40:25, 51:19
Federal [6] - 8:18,
8:21, 10:20, 20:10,
49:16, 66:4
fees [1] - 51:4
fiction [3] - 10:25,
11:8, 11:13
fiduciary [5] - 31:7,
31:13, 35:11, 50:1,
65:16
field [1] - 21:11
Fifth [1] - 1:11
file [7] - 69:1, 69:12,
70:19, 70:20, 70:24,
71:23, 74:20
filed [6] - 4:3, 4:7,
4:21, 19:1, 58:13,
72:6
filing [1] - 14:2
filings [1] - 9:13
final [1] - 24:3, 33:18,

33:25, 48:19, 61:19, 66:8
**fine** [1] - 74:5
**finished** [1] - 19:12
**firm** [1] - 42:25
**first** [15] - 5:3, 5:16, 8:17, 8:23, 17:10, 21:9, 27:14, 27:25, 31:20, 45:18, 52:7, 55:13, 57:6, 62:6, 70:5
**First** [1] - 21:2
**five** [3] - 4:9, 20:24, 31:1
**Floor** [1] - 1:11
**flowed** [1] - 51:2
**FLOWERS** [2] - 1:15, 3:3
**flushed** [3] - 13:17, 15:15, 29:18
**Foam** [1] - 45:20
**focus** [3] - 17:22, 26:14, 43:14
**folks** [1] - 28:24
**follow** [1] - 43:5
**followed** [1] - 55:14
**FOR** [1] - 1:1
**forecast** [1] - 22:11
**foregoing** [1] - 68:8
**Forge** [2] - 45:19, 45:22
**forget** [1] - 37:1
**form** [2] - 35:1, 73:15
**formalities** [2] - 11:21, 12:20
**forth** [4] - 9:23, 14:19, 16:5, 69:6
**forum** [3] - 15:24, 16:2, 16:19
**forward** [11] - 36:22, 52:5, 61:13, 62:6, 62:21, 63:4, 63:5, 70:1, 71:25, 72:7, 72:15
**four** [4] - 16:9, 16:15, 20:23, 30:25
**Four** [1] - 44:24
**frame** [3] - 17:20, 71:8, 72:8
**fraud** [35] - 4:9, 10:9, 20:6, 20:14, 21:23, 28:15, 30:7, 30:17, 33:20, 37:3, 37:9, 48:22, 49:2, 49:3, 49:17, 49:20, 49:21, 50:20, 52:2, 53:12, 53:17, 59:12, 59:21, 59:22, 60:10, 61:10, 61:12, 62:18, 63:4, 63:25, 65:15, 65:17, 68:4
**fraudulent** [11] - 4:11, 20:4, 20:5, 20:16, 30:17, 30:19, 36:4, 36:14, 36:15, 48:23, 69:18

**freezing** [1] - 35:14
**frequency** [1] - 35:18
**Friday** [1] - 1:12
**frivolous** [4] - 13:23, 13:24, 13:25, 14:8
**FROM** [1] - 1:25
**front** [2] - 27:9, 51:14
**full** [1] - 34:3
**fully** [1] - 76:5
**functioning** [3] - 8:7, 11:22, 12:21
**functions** [1] - 12:13
**Funk** [4] - 53:16, 53:17, 58:7, 61:21
**furtherance** [1] - 16:1

## G

**Gaines** [1] - 31:3
**game** [1] - 29:17
**garden** [1] - 36:13
**gas** [1] - 59:5
**gather** [1] - 70:9
**general** [10] - 4:1, 5:23, 6:7, 7:11, 16:16, 22:6, 26:18, 34:22, 47:1, 49:17
**General** [1] - 51:13
**generally** [4] - 10:3, 11:10, 21:22, 26:17
**generate** [1] - 33:10
**generic** [6] - 7:4, 22:4, 23:6, 23:12, 28:10, 32:2
**gist** [1] - 5:12
**Gist** [8] - 20:14, 37:1, 37:4, 37:21, 38:2, 38:5, 38:17, 38:23
**given** [4] - 22:4, 23:17, 68:20, 69:1
**global** [1] - 27:15
**goal** [2] - 71:4, 73:10
**goods** [3] - 22:19, 32:6, 44:25
**government** [2] - 6:4, 47:22
**governmental** [2] - 46:23, 47:2
**governments** [1] - 47:9
**grade** [1] - 21:16
**grant** [2] - 13:24, 63:2
**Grant** [5] - 1:11, 2:9, 2:13, 2:15, 2:18
**granted** [2] - 14:9, 69:11, 69:17
**great** [1] - 18:18
**gross** [2] - 11:21, 55:16
**grounded** [2] - 17:11, 30:20
**group** [3] - 6:1, 8:4, 20:9
**Group** [1] - 31:10
**guess** [1] - 66:15,

70:2, 70:16
**guidance** [1] - 56:4
**Gulf** [1] - 2:9

## H

**hailed** [1] - 17:12
**Hall** [1] - 45:8
**Hall-Kimbrell** [1] - 45:8
**hand** [4] - 20:20, 22:17, 30:23, 32:5
**handed** [1] - 65:4
**handled** [1] - 12:14
**hands** [1] - 27:15
**hang** [1] - 68:12
**hard** [5] - 35:19, 44:17, 46:16, 69:23, 72:23
**harm** [2] - 40:8, 51:12
**harms** [1] - 42:9
**headquartered** [1] - 5:10
**health** [1] - 37:19
**hear** [4] - 17:5, 17:15, 36:5, 46:9
**heard** [5] - 19:25, 26:2, 26:5, 38:25, 55:20
**hearing** [17] - 1:17, 3:3, 3:23, 9:3, 14:11, 14:18, 19:5, 19:19, 61:14, 61:23, 68:12, 68:19, 70:17, 71:2, 72:4, 74:18, 76:8
**hearings** [1] - 55:4
**Heffernan** [1] - 15:1
**heightened** [1] - 20:13
**held** [2] - 35:20, 51:20
**helpful** [2] - 70:10, 73:11
**hereby** [1] - 76:2
**Hershberger** [2] - 1:21, 76:14
**high** [11] - 6:16, 7:8, 7:20, 8:6, 21:18, 32:2, 32:23, 35:13, 39:10, 44:10, 58:21
**High** [1] - 21:12
**high-end** [1] - 7:20
**higher** [6] - 7:7, 8:9, 21:15, 23:15, 33:10, 47:24
**higher-cost** [2] - 8:9, 23:15
**hired** [1] - 45:11
**hold** [1] - 15:10
**holds** [1] - 56:16
**home** [1] - 37:11
**homeowner's** [1] - 37:11
**Honor** [62] - 3:9, 3:14, 3:17, 17:6, 17:21, 18:10, 18:18, 18:21, 19:4, 19:9, 20:1,

20:2, 26:3, 27:2, 27:20, 28:23, 29:19, 36:8, 36:21, 39:1, 41:25, 42:11, 42:19, 43:13, 44:20, 46:11, 46:22, 48:18, 52:6, 52:16, 53:14, 54:18, 55:10, 56:11, 57:6, 58:17, 60:18, 61:15, 61:20, 61:25, 62:22, 63:15, 63:23, 65:9, 65:25, 66:2, 66:7, 66:21, 66:25, 67:2, 67:4, 68:2, 70:2, 71:5, 71:10, 71:16, 72:3, 73:23, 74:2, 74:4, 74:6, 74:10
**Honor's** [1] - 66:4
**hope** [1] - 56:24
**hopefully** [1] - 73:14
**household** [3] - 45:1, 45:4, 46:4
**huge** [1] - 65:12
**Hunt** [1] - 51:19
**hunter** [1] - 15:1
**hurdle** [1] - 44:10

## I

**i.e** [1] - 40:12
**identical** [2] - 6:20, 23:6
**identified** [1] - 31:25
**identify** [1] - 64:24
**identity** [2] - 11:25, 68:7
**ignorance** [1] - 34:24
**ignorant** [1] - 35:25
**ignoring** [1] - 11:21
**Ike** [1] - 45:20
**ill** [1] - 49:14
**ill-suited** [1] - 49:14
**illegality** [1] - 10:9
**illusory** [1] - 22:21
**image** [1] - 12:10
**images** [1] - 9:16
**imagine** [2] - 70:24, 73:24
**immunity** [1] - 57:19
**impact** [1] - 47:15
**impacted** [1] - 32:8
**implemented** [1] - 51:1
**imposed** [1] - 40:4
**imposing** [1] - 5:15
**improper** [3] - 7:10, 24:13, 54:1
**improve** [1] - 32:25
**imputed** [1] - 10:4
**IN** [1] - 1:1
**inappropriate** [1] - 58:16
**INC** [1] - 1:7
**Inc** [13] - 3:5, 4:5, 4:6, 5:3, 9:25, 11:17,

15:24, 16:20, 31:10, 39:24, 45:9, 45:20
**included** [1] - 43:7
**including** [4] - 6:16, 28:25, 60:2, 73:4
**inconsistent** [1] - 51:21
**increase** [1] - 8:14
**increased** [1] - 51:4
**incumbent** [1] - 26:16
**independent** [1] - 28:24
**indicate** [1] - 28:5
**indicated** [1] - 69:13
**indirect** [2] - 47:20
**indistinguishable** [1] - 50:24
**individual** [15] - 49:7, 49:12, 50:10, 50:17, 53:23, 59:14, 59:15, 59:18, 61:17, 61:22, 63:4, 63:24, 65:3, 67:16, 72:14
**individualized** [2] - 62:8, 69:24
**individuals** [4] - 37:16, 42:18, 47:2, 53:19
**induce** [1] - 38:12
**inducement** [2] - 37:9, 38:21
**industrial** [1] - 6:2
**industry** [1] - 6:20
**infer** [5] - 22:14, 23:20, 30:5, 33:5, 33:9
**inference** [4] - 13:8, 23:8, 30:5, 36:20
**inferiority** [2] - 6:22, 31:22
**inferred** [1] - 54:2
**infestation** [1] - 34:10
**inflated** [2] - 8:13, 47:14
**inform** [1] - 8:15
**information** [16] - 7:19, 31:6, 32:14, 32:18, 34:1, 36:11, 41:11, 41:14, 42:18, 50:22, 56:3, 56:6, 56:8, 57:7, 67:3, 70:10
**inherent** [2] - 31:22, 31:24
**initial** [2] - 17:14, 68:22
**inject** [1] - 48:14
**injuring** [1] - 40:5
**injury** [10] - 21:1, 24:3, 24:4, 24:6, 24:8, 31:3, 33:19, 39:21, 39:22, 51:12
**injustice** [2] - 10:9, 11:12
**innocent** [1] - 11:2
**inquiries** [1] - 50:10

**inquiry** [8] - 8:23,
29:8, 49:12, 50:17,
58:15, 62:8, 64:22,
69:24
**insignias** [1] - 12:11
**inspected** [1] - 43:9
**inspection** [1] - 39:12
**inspections** [1] - 43:7
**inspectors** [1] - 43:8
**installation** [2] - 39:9,
60:5
**installations** [4] -
58:19, 60:3, 60:14,
60:22
**installed** [4] - 5:8, 7:8,
31:22, 32:9
**instances** [1] - 35:6
**instead** [2] - 40:5,
42:6
**instructions** [1] -
12:16
**insufficient** [1] - 20:12
**Insulators** [1] - 45:20
**insurance** [1] - 37:11
**Insurance** [2] - 37:11,
49:15
**integrating** [2] -
12:12, 13:16
**intellectual** [1] - 9:16
**intending** [1] - 27:17
**intent** [4] - 20:23,
23:10, 30:25, 33:7
**intentional** [3] - 52:10,
55:14, 55:15
**intentionally** [2] -
32:14, 53:5
**intents** [1] - 41:12
**interest** [4] - 11:8,
11:13, 41:5, 56:3
**internal** [6] - 23:3,
32:18, 51:1, 67:7,
67:9, 67:24
**internally** [1] - 13:5
**international** [1] -
60:14
**interrelationships** [1]
- 8:14
**interrogatories** [2] -
17:24, 73:17
**interwoven** [1] - 25:8
**involved** [5] - 22:14,
25:2, 28:25, 38:2,
55:21
**involves** [1] - 50:21
**IS** [1] - 1:24
**isolated** [1] - 67:12
**issuance** [1] - 49:17
**issue** [21] - 5:3, 5:16,
13:4, 14:11, 15:9,
24:16, 25:22, 31:21,
35:16, 40:23, 49:2,
50:20, 53:18, 53:19,
57:21, 59:10, 61:22,
62:9, 62:19, 69:24
**issues** [18] - 3:24, 5:1,

5:6, 25:9, 25:10,
25:23, 27:1, 29:17,
29:22, 30:10, 36:25,
49:6, 49:7, 50:16,
62:18, 63:10, 71:7,
72:19
**item** [1] - 63:19
**items** [1] - 27:25
**itself** [11] - 14:8,
14:23, 29:5, 40:8,
40:12, 40:19, 41:24,
42:1, 46:17, 47:12,
58:18

**J**

**jail** [1] - 68:11
**James** [1] - 2:12
**JAMES** [1] - 3:16
**Jim** [1] - 3:17
**joined** [1] - 3:17
**Joint** [1] - 17:22
**joint** [2] - 4:16, 58:3
**Jones** [8] - 2:12, 2:12,
2:15, 2:17, 3:17,
3:19, 21:11
**JONES** [42] - 3:16,
3:20, 17:6, 18:6,
18:10, 18:21, 18:23,
19:8, 19:11, 19:13,
19:15, 19:18, 20:2,
26:3, 26:11, 26:14,
27:20, 28:23, 29:3,
29:6, 29:19, 39:1,
43:13, 54:18, 55:10,
58:17, 61:15, 61:24,
62:22, 62:24, 63:2,
63:7, 63:11, 65:25,
67:2, 68:2, 71:10,
71:21, 73:9, 74:14,
74:23, 74:25
**JOY** [1] - 1:15, 3:3
**Judge** [1] - 1:10
**JUDGE** [2] - 1:15, 3:3
**judgment** [5] - 29:18,
56:18, 57:3, 58:12,
66:5
**judgments** [1] - 72:17
**judicial** [1] - 53:22
**July** [3] - 73:8, 73:14,
74:8
**juncture** [1] - 59:24
**June** [1] - 73:13
**jurisdiction** [20] - 5:2,
5:14, 5:20, 8:18,
8:19, 8:24, 9:5, 9:25,
10:14, 13:21, 14:10,
14:14, 14:16, 14:20,
15:7, 15:10, 15:12,
15:14, 16:19, 19:1
**jurisdictional** [11] -
10:3, 10:19, 16:22,
17:3, 17:9, 17:23,
18:15, 62:25, 70:6,
71:7, 74:10

**justice** [2] - 11:1, 12:2
**justifiable** [19] - 33:11,
49:10, 50:15, 50:19,
51:16, 51:25, 52:11,
55:24, 56:6, 56:8,
56:21, 59:10, 59:21,
61:15, 61:16, 62:8,
62:16, 63:9, 63:12
**justifiably** [4] - 20:25,
23:22, 29:16, 31:2

**K**

**Kastner** [1] - 18:1
**Katelyn** [1] - 2:17
**Katie** [2] - 2:19, 3:18
**KBR** [1] - 9:25
**Kimbrell** [1] - 45:8
**kind** [8] - 42:16, 42:17,
46:7, 47:21, 54:25,
61:2, 61:3, 71:17
**kinds** [4] - 26:16,
41:13, 49:24, 66:9
**Kitchin** [1] - 10:11
**knowledge** [5] -
20:21, 22:25, 30:23,
32:15, 33:1
**known** [7] - 7:8, 31:23,
33:12, 33:16, 33:21,
34:19, 40:19
**Kosuda** [1] - 21:11
**Krawczyk** [1] - 31:4

**L**

**lack** [6] - 11:22, 12:20,
14:13, 14:16, 18:25,
60:12
**lacking** [1] - 16:4
**Landsman** [4] - 53:15,
53:17, 58:7, 61:21
**language** [1] - 53:21
**last** [3] - 44:23, 53:15,
55:9
**lasting** [1] - 21:15
**late** [1] - 74:25
**latent** [3] - 31:15,
34:10, 36:16
**law** [18] - 5:4, 8:21,
8:25, 9:20, 11:19,
14:22, 16:10, 16:25,
19:24, 30:19, 38:6,
39:16, 39:18, 40:7,
44:24, 51:22, 52:1,
61:12
**Law** [11] - 2:8, 4:10,
4:11, 4:12, 4:14,
16:20, 44:24, 45:14,
51:21, 51:24
**lawful** [1] - 16:14
**lawsuit** [1] - 45:24
**lead** [1] - 54:12
**leading** [1] - 6:1
**lease** [1] - 59:5

**leases** [1] - 44:25
**least** [9] - 23:7, 23:9,
24:10, 28:4, 53:7,
67:20, 69:6, 71:12,
72:21
**leave** [4] - 66:2, 68:15,
69:1
**led** [1] - 35:2
**left** [4] - 40:6, 69:18
**legal** [3] - 10:25,
45:23, 45:25
**legitimate** [1] - 60:9
**legitimately** [1] -
31:18
**length** [4] - 11:23,
12:23, 13:7, 35:10
**less** [4] - 10:14, 10:20,
23:6, 23:13
**lesser** [1] - 28:16
**level** [5] - 35:8, 35:19,
36:4, 36:15, 53:11
**liability** [6] - 5:15,
10:11, 10:15, 10:22,
43:16, 56:5
**liable** [1] - 35:20
**liberally** [1] - 47:7
**licensed** [1] - 43:25
**licensing** [1] - 42:16
**light** [1] - 32:18
**Light** [5] - 34:3, 40:25,
42:2, 56:13, 57:2
**likely** [2] - 13:7, 72:20
**limit** [3] - 17:8, 67:18,
67:19
**limitations** [2] - 33:16,
58:4
**limited** [7] - 17:13,
41:5, 41:13, 62:24,
65:13, 66:11, 66:12
**Lina** [1] - 1:21
**line** [3] - 18:8, 22:13,
30:4
**lines** [5] - 16:24, 29:7,
65:7, 69:2, 69:13
**link** [1] - 16:4
**litigation** [1] - 65:12
**Litigation** [2] - 12:5,
22:8
**living** [2] - 37:16,
46:20
**LLC** [1] - 10:16
**loans** [1] - 59:7
**logos** [1] - 9:17
**long-lasting** [1] -
21:15
**look** [18] - 9:5, 11:20,
12:1, 12:9, 14:5,
19:5, 20:6, 21:4,
29:5, 30:15, 31:19,
34:15, 37:7, 38:8,
38:15, 41:23, 42:15,
68:4
**looked** [2] - 11:18,
34:9
**looking** [9] - 12:18,

29:8, 42:1, 42:15,
53:12, 56:25, 62:9,
63:18, 74:5
**looks** [1] - 11:16
**Loss** [10] - 39:14,
40:24, 42:3, 42:9,
52:14, 52:19, 54:21,
56:15, 56:17, 57:4
**loss** [10] - 37:12,
39:19, 39:21, 41:2,
41:3, 51:2, 51:8,
56:5, 56:10
**lost** [1] - 40:14
**lower** [4] - 24:1, 24:7,
40:16
**lower-cost** [1] - 24:7
**lower-priced** [1] - 24:1
**lower-quality** [2] -
24:1, 40:16
**LP** [1] - 50:4
**lump** [2] - 24:14,
25:25

**M**

**maintain** [1] - 45:24
**maintained** [2] -
11:13, 39:20
**maintains** [1] - 5:18
**major** [1] - 5:24
**malfunctioning** [1] -
40:1
**Management** [1] -
73:1
**management** [1] -
39:12
**managerial** [1] - 12:12
**managers** [1] - 6:8
**mandated** [1] - 8:1
**Manganello** [1] -
21:12
**manufactured** [2] -
6:15, 48:15
**manufacturer** [2] -
5:24, 7:25
**manufacturers** [1] -
40:4
**manufacturing** [2] -
6:11, 41:18
**March** [5] - 10:1,
50:24, 73:13, 73:25,
74:5
**Marcus** [1] - 16:8
**marked** [1] - 7:3
**marketed** [1] - 6:18
**marketing** [5] - 9:16,
12:10, 12:15, 13:16,
41:18
**Massachusetts** [1] -
16:19
**massive** [1] - 65:24
**master** [1] - 27:24
**match** [1] - 67:14
**material** [9] - 20:20,
22:17, 22:23, 30:22,

32:4, 32:8, 49:23, 50:8, 50:21

**materials** [1] - 5:25, 6:12, 7:2, 7:5, 7:6, 7:7, 7:9, 7:10, 8:1, 8:8, 12:25, 33:12, 44:13, 65:4, 67:14

**Matscherz** [2] - 2:17, 3:18

**matter** [12] - 14:4, 25:24, 29:25, 33:24, 35:12, 44:17, 44:19, 47:4, 59:17, 61:12, 66:4, 75:4

**mattered** [1] - 59:15

**matters** [5] - 11:16, 26:17, 33:4, 33:6, 68:3

**McGee** [1] - 2:19

**McLaughlin** [1] - 16:7

**mean** [9] - 14:24, 29:10, 44:12, 53:13, 55:6, 58:11, 65:4, 66:13, 67:22

**means** [1] - 16:15

**measurably** [1] - 7:7

**mechanisms** [1] - 53:24

**meet** [2] - 20:13, 30:6

**member** [10] - 16:18, 50:13, 50:17, 51:6, 59:14, 59:16, 59:18, 61:17, 64:24

**member's** [2] - 16:19, 49:13

**member-by-class** [1] - 61:17

**members** [4] - 63:13, 64:25, 66:18, 69:22

**memorialized** [1] - 65:6

**mention** [1] - 26:16

**mentioned** [4] - 26:8, 27:1, 29:20, 56:14

**mere** [7] - 22:14, 28:22, 30:4, 53:12, 61:21, 64:15, 64:17

**merely** [1] - 16:17

**met** [1] - 15:20

**Michael** [1] - 2:14

**Middle** [2] - 12:5, 15:25

**might** [6] - 13:7, 26:9, 30:5, 60:6, 70:10

**military** [1] - 57:20

**Milo** [3] - 54:3, 58:6, 63:18

**mindful** [2] - 65:11, 65:22

**minimum** [7] - 9:1, 15:11, 15:13, 15:16, 15:18, 15:21, 67:13

**minute** [1] - 34:4

**minutes** [1] - 17:18

**misleading** [4] - 20:24, 23:11, 31:1,

33:8

**misrepresentation** [27] - 4:10, 20:4, 20:17, 20:25, 26:7, 36:14, 52:9, 52:12, 52:15, 52:20, 52:22, 53:2, 54:15, 54:22, 54:23, 55:11, 55:17, 55:25, 56:13, 56:17, 57:3, 59:11, 59:12, 64:1, 64:3, 69:19

**misrepresentations** [3] - 8:3, 50:8, 67:25

**missing** [1] - 44:7, 60:19

**misspeak** [1] - 71:12

**model** [2] - 57:12, 57:15

**moderate** [1] - 51:15

**modern** [1] - 47:8

**mold** [2] - 37:13, 37:19

**money** [1] - 33:22

**month** [1] - 73:18

**Moraine** [1] - 58:22

**moreover** [2] - 55:24, 59:4

**Morganroth** [1] - 16:7

**mortgages** [1] - 59:7

**Morton's** [1] - 31:10

**most** [8] - 9:14, 33:24, 34:16, 36:15, 41:12, 59:20, 71:11, 71:13

**MOTION** [1] - 1:17

**Motion** [9] - 3:4, 3:25, 4:21, 4:23, 5:4, 13:25, 14:13, 14:16, 26:15

**motion** [4] - 4:19, 4:20, 4:25, 18:14, 18:20, 18:25, 21:6, 24:11, 29:18, 30:9, 30:13, 38:19, 50:7, 55:4, 58:13, 62:2, 63:3, 70:20, 70:21, 72:9, 74:20

**motions** [2] - 17:4, 74:21

**Motors** [1] - 51:13

**move** [6] - 19:22, 61:13, 63:5, 70:1, 71:3, 72:7

**moving** [1] - 36:22

**MR** [43] - 3:16, 3:20, 17:6, 18:6, 18:10, 18:21, 18:23, 19:8, 19:11, 19:13, 19:15, 19:18, 20:2, 26:3, 26:11, 26:14, 27:20, 28:23, 29:3, 29:6, 29:19, 39:1, 43:13, 54:18, 55:10, 58:17, 61:15, 61:24, 62:22, 62:24, 63:2, 63:7, 63:11, 65:25, 67:2, 68:2, 71:10, 71:21,

73:9, 74:10, 74:14, 74:23, 74:25

**MS** [52] - 3:9, 3:14, 17:21, 18:18, 19:4, 19:7, 20:1, 27:2, 36:8, 36:21, 41:25, 42:19, 44:3, 44:20, 46:11, 46:21, 48:1, 48:9, 48:18, 52:6, 52:15, 52:18, 53:1, 53:11, 54:14, 54:20, 57:5, 60:17, 61:19, 63:15, 63:23, 64:2, 65:9, 66:7, 66:11, 66:21, 66:25, 67:4, 70:2, 70:15, 70:23, 71:5, 71:16, 71:20, 72:2, 72:11, 73:4, 73:6, 73:23, 74:2, 74:4, 74:24

**must** [5] - 9:1, 23:18, 31:5, 51:23, 51:24

**muster** [6] - 21:6, 24:11, 24:18, 26:1, 62:15, 65:23

**mysterious** [1] - 63:17

## N

**named** [2] - 72:14, 72:19

**narrowed** [1] - 55:13

**National** [1] - 21:2

**natural** [1] - 54:5

**nature** [3] - 30:11, 34:7, 36:1

**necessarily** [1] - 72:3

**necessary** [3] - 15:16, 29:10, 50:13

**need** [13] - 3:24, 9:4, 9:23, 14:22, 16:10, 10:17, 18:4, 24:23, 26:22, 43:4, 43:5, 64:20, 73:2

**needed** [12] - 7:18, 21:13, 21:21, 22:6, 26:10, 26:11, 26:12, 28:20, 28:24, 30:3, 35:7

**needing** [1] - 36:22

**needs** [3] - 43:5, 43:16, 70:3

**negative** [2] - 60:6, 60:16, 60:17

**negative-value** [1] - 60:6

**negligence** [9] - 4:12, 38:1, 39:6, 39:7, 42:6, 42:7, 52:19, 55:18

**negligent** [15] - 52:9, 52:11, 52:15, 52:22, 53:2, 54:14, 54:22, 54:23, 55:10, 55:15, 55:25, 56:12, 56:16,

57:3, 59:11

**negligently** [1] - 53:6

**negotiations** [1] - 59:6

**neighborhood** [1] - 43:20

**next** [12] - 13:22, 22:16, 22:24, 23:11, 23:22, 30:17, 32:14, 33:7, 33:11, 33:18, 72:16, 73:24

**nice** [1] - 75:2

**nobody** [1] - 36:17

**non** [10] - 8:20, 8:25, 9:1, 11:22, 11:23, 12:21, 12:23, 13:7, 16:2, 45:5

**non-arm's** [3] - 11:23, 12:23, 13:7

**non-forum** [1] - 16:2

**non-functioning** [2] - 11:22, 12:21

**non-profit** [1] - 45:5

**non-resident** [3] - 8:20, 8:25, 9:1

**none** [1] - 42:4

**Norris** [1] - 16:7

**Northwest** [3] - 50:22, 51:1, 51:2

**note** [3] - 6:10, 22:1, 44:11

**noted** [9] - 10:2, 10:19, 10:25, 12:21, 22:9, 34:5, 34:18, 49:17, 66:7

**notes** [1] - 76:7

**Notes** [1] - 49:19

**noteworthy** [1] - 15:5

**nothing** [4] - 35:15, 35:17, 58:8, 67:3

**November** [1] - 31:12

**number** [5] - 3:23, 11:16, 15:9, 43:19, 70:10

**numbers** [1] - 69:5

**nutshell** [1] - 5:7

## O

**objectively** [1] - 50:21

**obtain** [2] - 57:6, 58:1

**obtaining** [1] - 56:7

**obviously** [2] - 36:10, 43:14

**occasion** [1] - 42:15

**occur** [1] - 70:4

**occurred** [5] - 35:17, 55:7, 58:13, 61:14, 65:17

**occurring** [1] - 16:2

**OF** [3] - 1:1, 1:18, 1:24

**offering** [1] - 34:12

**officers** [3] - 11:22, 12:9, 12:21

**Offices** [1] - 2:8

**Ohio** [3] - 5:11, 5:17,

5:21

**Ohio-based** [2] - 5:17, 5:21

**oil** [1] - 59:5

**omission** [9] - 30:21, 30:22, 30:23, 30:25, 31:2, 31:20, 32:4, 32:15, 33:7

**omissions** [3] - 32:3, 32:11, 50:21

**omitted** [2] - 32:7, 34:1

**ON** [1] - 1:17

**once** [2] - 14:15, 71:1

**One** [2] - 20:4, 20:17

**one** [40] - 5:1, 10:4, 11:6, 11:10, 16:10, 20:9, 20:19, 21:4, 24:3, 25:8, 25:24, 27:17, 27:24, 28:6, 30:19, 30:22, 31:6, 33:18, 33:25, 34:8, 34:12, 42:13, 43:15, 44:23, 49:11, 50:20, 51:8, 53:18, 53:19, 56:1, 57:11, 57:14, 58:8, 60:8, 60:15, 60:20, 61:2, 61:4, 63:19

**one's** [1] - 21:21

**onerous** [1] - 10:20

**ones** [3] - 36:16, 48:6, 57:20

**op** [1] - 57:25

**open** [1] - 65:23

**openly** [1] - 9:12

**opens** [1] - 65:12

**operations** [1] - 18:3

**operator** [1] - 5:25

**opining** [2] - 21:22, 22:6

**opinion** [4] - 26:18, 46:22, 53:14, 66:8

**opinions** [1] - 27:15

**opportunity** [5] - 17:25, 44:5, 70:13, 70:20, 71:23

**opposed** [4] - 13:4, 36:14, 65:4, 66:13

**oral** [6] - 65:3, 65:18, 67:12, 67:16, 69:20

**order** [1] - 33:10

**Order** [1] - 73:1

**ordinarily** [1] - 12:13

**ordinary** [1] - 40:20

**originally** [1] - 39:20

**otherwise** [3] - 7:6, 21:22, 34:11

**out-of-state** [1] - 17:11

**outlined** [1] - 58:2

**outside** [1] - 38:1

**outweigh** [1] - 41:5

**over-specifications** [1] - 23:14

**over-specified** [2] -

7:9, 8:8
**overcharges** [1] - 7:10
**overdraft** [1] - 51:4
**oversaw** [1] - 6:23
**own** [1] - 27:12
**owners** [1] - 6:7
**ownership** [3] - 12:9, 13:10, 13:15
**owns** [2] - 9:14, 9:15

## P

**P.C** [1] - 16:8
**p.m** [6] - 1:13, 19:20, 68:18, 68:19, 74:9, 75:5
**PA** [20] - 1:12, 2:10, 2:13, 2:16, 2:18, 10:1, 10:12, 10:18, 15:25, 16:21, 21:2, 31:4, 31:12, 37:8, 45:9, 45:21, 49:16, 50:2, 50:6, 50:23
**Page** [1] - 56:11
**paid** [3] - 28:2, 28:14, 29:23
**Paragraph** [2] - 53:4, 66:22
**Paragraphs** [3] - 53:3, 53:4, 68:5
**parent** [5] - 5:2, 5:10, 9:21, 12:7, 12:7, 12:14
**parent-subsidiary** [1] - 9:21
**Parkway** [2] - 2:4, 2:6
**part** [10] - 8:23, 13:22, 17:9, 29:21, 36:16, 49:20, 56:9, 59:11, 59:12, 63:13
**participation** [1] - 51:7
**particular** [13] - 7:18, 8:4, 21:13, 21:20, 22:15, 25:13, 30:3, 35:12, 35:15, 46:6, 64:20, 64:25, 73:2
**particularity** [1] - 26:24
**particularized** [1] - 64:22
**particularly** [2] - 35:10, 38:4
**particulars** [1] - 24:21
**parties** [13] - 11:2, 14:20, 24:22, 25:21, 34:7, 34:13, 40:6, 44:2, 50:2, 50:16, 51:9, 62:14, 71:10
**party** [8] - 8:16, 11:11, 30:14, 31:6, 31:7, 34:12, 42:17, 50:25
**party's** [1] - 34:8
**pass** [6] - 21:6, 24:11, 24:18, 26:1, 62:15, 65:23

**passive** [3] - 50:25, 51:7, 65:16
**past** [1] - 54:10
**pay** [5] - 28:3, 47:17, 47:23, 47:24, 48:3
**paying** [5] - 30:2, 47:14, 47:15, 47:19, 48:6
**payments** [2] - 48:8, 48:11
**PC** [2] - 2:3, 2:6
**pecuniary** [2] - 56:3, 56:5
**Peirce** [1] - 2:8
**Pennsylvania** [34] - 4:9, 4:10, 4:11, 4:12, 4:13, 5:8, 5:18, 5:19, 5:22, 6:13, 10:24, 11:5, 11:19, 12:6, 15:6, 15:20, 16:2, 16:10, 16:25, 27:16, 30:19, 34:5, 37:20, 38:5, 39:16, 39:18, 44:23, 45:13, 46:12, 51:20, 51:21, 51:22, 54:8
**PENNSYLVANIA** [1] - 1:1
**people** [4] - 29:13, 36:1, 42:15, 58:21
**percent** [1] - 23:13
**performed** [1] - 43:7
**performing** [1] - 12:13
**perhaps** [4] - 17:24, 27:3, 38:18, 59:9
**period** [11] - 14:1, 14:9, 17:3, 17:13, 70:12, 72:22, 73:2, 73:5, 73:16, 74:17
**permissible** [1] - 38:22
**permit** [5] - 14:2, 14:15, 16:22, 57:18, 62:5
**permitted** [5] - 46:23, 47:3, 53:16, 55:5, 63:19
**person** [4] - 18:1, 36:18, 44:25, 48:13
**personal** [25] - 5:2, 5:13, 5:15, 5:20, 8:18, 8:19, 9:4, 9:24, 10:14, 11:8, 13:21, 14:10, 14:14, 14:16, 14:20, 15:7, 15:10, 15:12, 15:14, 18:25, 45:1, 45:4, 46:4, 46:20, 48:16
**personnel** [2] - 12:13, 13:16
**persons** [5] - 16:11, 25:20, 48:7, 48:15, 49:25
**persuaded** [2] - 30:8, 45:7
**persuasive** [1] - 46:9

**pertinent** [1] - 49:20
**petition** [1] - 66:22
**Pharmaceutical** [1] - 47:11
**pharmaceutical** [2] - 48:13, 65:1
**Pharmaceuticals** [1] - 46:25
**pharmaceuticals** [1] - 47:14
**pharmacy** [1] - 47:22
**physical** [3] - 37:12, 39:22, 40:12
**piercing** [2] - 10:7, 10:21
**Pittsburgh** [5] - 1:12, 2:10, 2:13, 2:16, 2:18
**place** [4] - 5:18, 17:11, 60:15, 70:3
**plain** [1] - 58:24
**plaintiff** [15] - 9:4, 10:5, 20:24, 23:1, 31:1, 31:5, 35:2, 41:6, 45:10, 45:22, 46:5, 50:25, 51:24, 72:14, 72:19
**Plaintiff** [42] - 1:5, 2:2, 4:1, 4:3, 4:18, 5:14, 8:9, 15:15, 17:16, 20:11, 21:10, 21:24, 22:2, 22:18, 23:12, 23:22, 23:24, 24:6, 24:11, 24:14, 24:23, 31:21, 31:25, 32:5, 32:11, 32:15, 32:21, 32:24, 33:12, 33:21, 33:25, 36:5, 38:12, 39:6, 50:11, 50:12, 50:18, 56:15, 62:14, 71:23, 73:3
**plaintiff's** [1] - 34:24, 41:3
**Plaintiff's** [4] - 22:17, 35:25, 37:6, 70:9
**Plaintiffs** [2] - 23:15, 45:5
**Plano** [2] - 2:4, 2:7
**plausible** [5] - 21:8, 23:8, 30:4, 36:20, 59:3
**plausibly** [3] - 22:14, 23:20, 33:9
**play** [6] - 16:12, 25:11, 25:23, 44:18, 49:2, 62:19
**plead** [5] - 15:3, 52:23, 64:4, 66:3, 69:14
**pleaded** [20] - 26:24, 28:1, 42:4, 42:24, 43:1, 52:8, 52:24, 53:3, 54:23, 55:11, 55:23, 56:12, 56:13, 58:23, 67:2, 67:3, 67:6, 67:22
**pleading** [8] - 20:13,

25:14, 28:13, 28:15, 42:5, 62:19, 66:16, 70:11
**pleadings** [6] - 43:8, 44:4, 44:8, 56:19, 70:17, 73:22
**pleads** [1] - 20:9
**Pleas** [1] - 50:24
**pled** [6] - 12:19, 23:7, 24:17, 25:18, 32:12, 63:22
**point** [4] - 27:21, 32:16, 60:19, 61:25
**pointed** [4] - 13:13, 25:17, 27:14, 58:12
**policy** [4] - 11:2, 12:2, 47:4, 47:6
**polled** [1] - 59:15
**portion** [1] - 18:14
**position** [6] - 7:14, 15:17, 36:22, 56:10, 71:13, 73:21
**positive** [1] - 60:7
**positive-value** [1] - 60:7
**possession** [1] - 33:2
**possible** [1] - 71:3
**possibly** [1] - 16:25
**post** [1] - 47:6
**post-Cumberland** [1] - 47:6
**posted** [1] - 67:1
**posture** [1] - 66:1
**potentially** [1] - 60:13
**practice** [1] - 61:18
**practices** [1] - 4:13
**Practices** [4] - 4:13, 44:24, 45:13, 51:21
**pre** [5] - 38:21, 42:7, 57:8, 57:16, 63:17
**pre-Bruno** [1] - 38:21
**pre-competed** [2] - 57:8, 63:17
**pre-competing** [1] - 57:16
**preclude** [1] - 40:11
**predict** [1] - 46:15
**predominate** [1] - 49:8
**prejudice** [12] - 14:13, 18:15, 35:23, 36:7, 36:9, 39:4, 41:21, 42:20, 44:9, 44:22, 62:11, 69:11
**prejudiced** [1] - 11:3
**premature** [1] - 38:16
**premium** [23] - 7:3, 7:5, 7:23, 21:21, 21:25, 22:2, 22:3, 22:7, 22:20, 22:21, 23:5, 23:13, 27:4, 28:8, 28:9, 32:1, 33:15, 35:6, 64:5, 64:11, 64:12, 64:17, 64:20
**presence** [1] - 6:1

**PRESENT** [2] - 2:1, 2:19
**present** [2] - 23:21, 37:23
**presently** [2] - 52:1, 68:23
**pressed** [3] - 44:17, 46:16, 69:23
**presumed** [1] - 50:19
**presumption** [4] - 51:20, 51:23, 54:2, 54:10
**pretty** [5] - 41:17, 44:10, 70:17, 71:1, 73:9
**prevent** [1] - 10:9
**price** [7] - 24:7, 28:2, 28:14, 28:17, 40:15, 40:16, 61:4
**priced** [1] - 24:1
**prices** [3] - 8:13, 33:10, 47:24
**pricing** [12] - 6:23, 40:21, 42:8, 50:19, 57:6, 57:15, 57:24, 57:25, 58:4, 63:16, 63:17, 67:19
**prima** [1] - 9:4
**primarily** [2] - 45:1, 45:4
**primary** [1] - 5:25
**principal** [1] - 11:14
**private** [2] - 6:4, 44:24
**problem** [6] - 18:12, 36:17, 53:8, 62:1, 63:25, 66:15
**problematic** [5] - 16:12, 33:24, 38:6, 52:2, 65:24
**problems** [3] - 34:10, 37:19, 73:20
**Procedure** [3] - 8:22, 10:21, 20:10
**procedures** [3] - 6:23, 6:24, 51:1
**proceed** [3] - 15:4, 66:1, 69:16
**proceedings** [2] - 24:15, 76:4
**PROCEEDINGS** [1] - 1:18
**process** [7] - 7:12, 9:2, 25:15, 41:10, 44:15, 51:7, 67:21
**produced** [1] - 51:13
**product** [27] - 22:2, 22:21, 24:1, 24:7, 27:6, 27:7, 27:10, 27:12, 28:6, 28:20, 33:16, 39:9, 40:8, 40:16, 40:20, 54:6, 58:5, 60:20, 60:21, 64:17, 64:18, 65:1, 65:2, 67:11, 67:23
**Product** [2] - 57:9, 57:10

10

**production** [2] - 18:3, 73:16
**productive** [1] - 71:18
**Products** [1] - 15:24
**products** [48] - 6:16, 6:18, 6:19, 7:4, 7:23, 8:9, 8:12, 12:10, 21:15, 21:20, 21:21, 21:25, 22:4, 22:5, 23:5, 23:12, 23:13, 23:14, 23:15, 24:5, 25:6, 28:8, 28:9, 28:10, 28:11, 31:22, 32:1, 32:9, 32:16, 32:19, 32:25, 33:15, 35:5, 40:5, 41:19, 47:24, 50:13, 51:6, 57:7, 57:11, 57:13, 57:14, 57:22, 66:23, 67:20, 68:1
**professional** [5] - 41:12, 42:14, 43:25, 56:2
**professionals** [1] - 41:13
**profit** [1] - 45:5
**profits** [2] - 33:10, 40:14
**progress** [1] - 72:21
**PROHIBITED** [1] - 1:24
**project** [4] - 6:21, 7:16, 7:24, 45:3
**projects** [3] - 8:2, 30:3, 48:3
**promoted** [2] - 9:12, 21:14
**promotional** [1] - 26:22
**prone** [1] - 51:14
**proof** [3] - 16:15, 16:23, 63:14
**proper** [1] - 6:23
**property** [9] - 9:16, 37:13, 39:22, 40:10, 40:12
**proposal** [1] - 62:22
**propose** [1] - 63:2
**proposed** [3] - 17:22, 17:24, 58:3
**proposing** [1] - 66:1
**proprietary** [1] - 43:10
**protect** [1] - 40:4
**Protection** [2] - 4:14, 51:24
**prove** [7] - 31:5, 50:11, 51:16, 51:23, 51:24, 57:1, 66:17
**proven** [1] - 51:11
**provide** [3] - 14:1, 16:5, 73:15
**provided** [14] - 7:19, 7:24, 12:16, 18:1, 23:15, 24:24, 27:18, 33:13, 36:11, 41:6, 42:21, 43:9, 67:10

**provides** [1] - 44:24
**providing** [2] - 5:22, 41:14
**proximate** [1] - 33:19
**proximately** [4] - 21:1, 24:4, 24:8, 31:3
**prudent** [2] - 71:11, 71:13
**public** [6] - 10:10, 11:1, 12:2, 45:16, 47:1, 47:6
**publicly** [1] - 23:3
**puffery** [2] - 22:9, 22:14, 27:13, 27:15, 27:19, 28:22, 30:4, 30:12, 35:6, 64:7, 64:16
**puffing** [2] - 27:13, 55:1
**purchase** [8] - 22:19, 22:20, 23:24, 27:17, 32:6, 45:3, 45:14, 51:6
**purchased** [6] - 28:16, 33:15, 46:4, 57:13, 67:11
**purchases** [1] - 44:25
**purchasing** [7] - 6:23, 42:8, 44:12, 47:1, 57:16, 57:25, 61:2
**pure** [1] - 30:12
**purpose** [5] - 10:10, 16:14, 39:5, 45:16
**purposes** [14] - 4:23, 9:7, 10:3, 10:15, 10:22, 23:18, 41:12, 45:1, 45:4, 57:16, 70:11
**pursuant** [1] - 37:12
**pursue** [1] - 67:14
**pursued** [1] - 32:17
**pursuing** [1] - 60:9
**push** [2] - 22:13, 36:3
**put** [4] - 9:11, 26:4, 44:14, 59:22
**putative** [3] - 49:13, 50:13, 64:24
**putatively** [2] - 44:1, 60:12
**puts** [2] - 30:14, 43:11

## Q

**quality** [9] - 7:7, 7:23, 21:22, 24:1, 27:12, 32:8, 33:1, 33:16, 40:16
**query** [1] - 13:1
**questions** [2] - 12:7, 57:23
**qui** [1] - 32:16
**quick** [1] - 71:1
**quickly** [4] - 26:3, 68:15, 70:17, 71:3
**quite** [2] - 6:8, 8:18

## R

**Ragan** [2] - 11:17, 12:18
**raise** [1] - 66:13
**raised** [9] - 3:24, 4:8, 27:13, 36:25, 39:4, 39:13, 46:8, 65:14, 72:19
**raising** [2] - 30:10, 69:4
**range** [1] - 22:11
**rapid** [1] - 73:9
**rapidly** [1] - 73:23
**rare** [5] - 54:10, 54:11, 57:18, 65:22, 69:17
**rate** [6] - 7:21, 31:23, 32:2, 33:1, 35:13, 40:19
**rates** [4] - 6:16, 7:8, 32:23, 39:11
**rather** [2] - 26:7, 26:8
**re** [11] - 10:11, 12:4, 22:7, 25:18, 39:4, 54:3, 58:6, 63:18, 66:3, 69:14, 70:11
**re-plead** [2] - 66:3, 69:14
**re-pleading** [1] - 70:11
**re-pled** [1] - 25:18
**re-raised** [1] - 39:4
**reach** [1] - 57:19
**reached** [1] - 13:8
**read** [3] - 26:7, 37:22, 38:10
**reading** [4] - 25:1, 25:4, 56:23, 69:6
**ready** [1] - 3:23
**reaffirmed** [1] - 40:9
**real** [2] - 16:13, 64:14
**really** [24] - 13:3, 14:22, 15:14, 16:17, 25:24, 26:12, 29:25, 35:18, 36:2, 36:18, 38:8, 40:22, 48:20, 49:6, 50:7, 50:24, 54:16, 62:19, 64:5, 64:18, 65:20, 66:14, 69:5, 72:24
**realm** [1] - 43:6
**rear** [1] - 51:15
**reason** [5] - 18:4, 29:20, 58:24, 59:22, 63:8
**reasonable** [4] - 22:20, 31:14, 34:20, 56:7
**reasonably** [1] - 44:1
**reasons** [5] - 17:7, 42:13, 45:18, 51:15, 60:1
**REBECCA** [1] - 3:9
**Rebecca** [2] - 2:3, 3:9
**received** [2] - 26:15, 58:14, 66:19

**receiving** [1] - 63:20
**recently** [1] - 50:4
**recess** [1] - 68:18
**reckless** [2] - 23:9, 52:10, 55:16
**recklessly** [1] - 53:6
**recklessness** [3] - 20:22, 22:25, 30:24
**recognition** [1] - 10:9
**recognized** [3] - 15:20, 16:24, 55:8
**recognizes** [1] - 54:8
**recommendations** [1] - 32:24
**record** [5] - 3:8, 9:11, 12:2, 14:4, 39:4
**records** [2] - 11:22, 12:20
**recovery** [3] - 40:7, 40:11, 41:5
**reduce** [1] - 33:1
**refer** [4] - 4:2, 25:13, 34:9, 69:19
**references** [1] - 44:14
**referencing** [1] - 24:19
**referred** [5] - 23:18, 27:23, 43:13, 43:21, 43:23
**refers** [1] - 43:18
**refinancing** [1] - 59:7
**reflect** [2] - 12:22, 26:6
**reflected** [3] - 12:6, 39:19, 50:7
**regard** [1] - 42:19
**regarded** [1] - 10:5
**regarding** [1] - 70:18
**regards** [1] - 60:17
**regular** [4] - 64:6, 64:12, 64:18, 64:20
**rejected** [2] - 45:17, 46:5
**related** [3] - 4:4, 6:12, 25:5
**relates** [1] - 35:15
**relation** [1] - 31:8
**relationship** [6] - 24:22, 25:3, 31:13, 35:11, 50:1, 65:16
**relationships** [9] - 7:11, 8:16, 9:21, 9:22, 12:8, 12:25, 17:20, 25:8, 44:18
**relevant** [2] - 17:19, 62:9
**reliance** [40] - 21:1, 24:4, 31:3, 33:11, 33:19, 34:8, 36:2, 42:17, 49:11, 49:18, 49:24, 50:9, 50:15, 50:19, 51:16, 51:20, 51:25, 52:11, 53:7, 54:3, 54:10, 54:25, 55:24, 56:6, 56:8, 56:21, 57:1, 59:11, 59:15, 59:21, 60:11,

61:15, 61:16, 62:8, 62:16, 63:9, 63:13, 63:24, 66:6
**relied** [11] - 20:25, 22:18, 23:23, 31:2, 32:5, 38:11, 41:15, 44:1, 50:22, 51:10, 51:24
**relief** [2] - 4:17, 41:6
**rely** [2] - 29:16, 34:6
**relying** [4] - 20:24, 23:11, 31:1, 33:8
**remain** [1] - 56:22
**remained** [1] - 40:9
**remaining** [2] - 48:21, 48:25
**remedies** [1] - 66:12
**remedy** [5] - 12:3, 40:9, 41:4, 41:22, 42:3
**remove** [1] - 45:11
**rendered** [1] - 11:3
**renew** [1] - 18:20
**renewal** [1] - 14:15
**renewed** [1] - 70:20
**reordering** [1] - 51:3
**repackaged** [1] - 37:6
**repair** [2] - 6:4, 47:23
**repairs** [1] - 23:2
**repeated** [1] - 38:13
**replacements** [2] - 7:18, 21:13
**reply** [3] - 19:8, 27:14, 56:11
**report** [3] - 9:13, 58:3, 72:24
**Report** [1] - 17:22
**Reported** [1] - 1:20
**Reporter** [2] - 1:21, 10:12
**reporting** [1] - 13:12
**representation** [29] - 20:19, 20:20, 20:21, 20:23, 21:10, 22:5, 22:16, 22:23, 22:24, 26:13, 26:25, 27:19, 28:11, 28:21, 30:6, 34:11, 38:20, 50:12, 50:14, 55:14, 56:20, 57:17, 59:2, 64:12, 64:19, 64:23, 64:25, 65:3, 69:24
**representations** [43] - 7:17, 8:7, 22:19, 23:7, 23:9, 23:23, 23:25, 26:6, 26:18, 26:23, 28:19, 29:1, 32:6, 32:12, 34:8, 36:2, 37:15, 37:24, 38:8, 38:11, 38:12, 38:13, 44:1, 49:24, 52:4, 53:5, 53:7, 54:2, 55:17, 55:21, 58:19, 58:23, 58:25, 59:10, 60:11, 65:17, 65:18, 66:19, 67:12,

67:16, 68:7, 69:21, 69:22
**representative** [3] - 4:18, 45:23, 45:25
**representatives** [6] - 7:20, 8:11, 21:11, 29:15, 37:14, 65:19
**represented** [5] - 9:18, 21:12, 28:8, 30:2, 63:19
**representing** [2] - 27:10, 46:19
**REPRODUCTION** [1] - 1:24
**request** [4] - 18:7, 18:11, 24:20, 73:17
**require** [3] - 16:1, 25:18, 49:12
**required** [7] - 22:2, 26:9, 28:24, 31:14, 61:7, 63:13, 69:25
**requirement** [4] - 21:9, 37:25, 42:16, 58:7
**requirements** [3] - 15:11, 15:14, 15:16
**requires** [1] - 59:21
**requiring** [1] - 40:3
**requisites** [1] - 30:6
**resident** [3] - 8:20, 8:25, 9:1
**resolve** [1] - 71:17
**resolved** [2] - 19:21, 71:24
**respect** [30] - 5:13, 6:25, 9:9, 12:19, 12:23, 13:9, 13:17, 14:4, 14:10, 14:11, 20:16, 21:17, 21:18, 23:10, 24:10, 24:24, 25:9, 25:20, 32:23, 34:1, 35:13, 39:12, 39:18, 49:5, 49:20, 50:18, 58:21, 58:22, 62:7, 68:6
**respected** [1] - 10:3
**respond** [2] - 19:2, 71:1
**response** [13] - 19:13, 26:4, 26:15, 26:25, 28:23, 37:7, 52:21, 52:23, 53:1, 54:20, 54:22, 68:2, 73:16
**responses** [1] - 73:19
**responsibilities** [1] - 37:23
**rest** [1] - 73:12
**Restatement** [6] - 30:20, 34:16, 34:17, 55:25, 56:9, 56:22
**Restaurant** [1] - 31:10
**restoration** [1] - 6:3
**restrictions** [1] - 39:9
**result** [1] - 11:12
**resulted** [3] - 23:2, 23:14, 51:4

**resulting** [4] - 7:9, 21:1, 24:3, 31:2
**results** [2] - 22:4, 35:18
**resumed** [1] - 68:19
**review** [3] - 4:23, 9:8, 66:12
**reviewed** [2] - 9:20, 39:18, 57:20
**reviewing** [1] - 42:25
**revisit** [1] - 26:20
**ridges** [1] - 33:3
**rights** [2] - 9:16, 11:2
**rigorous** [1] - 61:7
**RIHN** [1] - 74:10
**Rihn** [2] - 2:8, 3:10
**rise** [2] - 34:19, 35:19
**risk** [1] - 31:23
**Rite** [12] - 41:9, 41:10, 41:12, 41:20, 42:2, 42:11, 43:12, 43:19, 43:24, 44:5, 52:16, 54:24
**River** [3] - 39:24, 40:8, 43:15
**road** [1] - 24:21
**robust** [1] - 14:2
**ROCK** [1] - 1:3
**Rock** [12] - 3:5, 3:11, 4:2, 7:1, 7:2, 21:12, 28:2, 28:5, 28:14, 42:22, 58:20, 68:6
**Rock's** [1] - 63:3
**roles** [1] - 25:21
**rolled** [1] - 42:25
**Ron** [1] - 45:20
**Ron-Ike** [1] - 45:20
**roof** [10] - 7:6, 7:19, 7:25, 8:5, 8:7, 21:14, 40:18, 43:7, 47:21, 47:23
**roofing** [19] - 5:7, 5:22, 5:24, 6:2, 6:3, 6:6, 6:11, 6:17, 7:2, 7:9, 7:10, 7:16, 7:21, 8:1, 8:2, 8:8, 31:24, 33:4, 35:16
**Room** [1] - 1:10
**room** [1] - 68:16
**RPM** [20] - 4:4, 5:2, 5:9, 5:11, 6:1, 6:14, 6:17, 6:21, 6:24, 7:14, 8:12, 9:9, 9:13, 9:14, 13:11, 13:21, 15:17, 15:18, 18:25, 25:1
**RPM's** [2] - 5:25, 9:13
**rub** [1] - 49:6
**Rule** [8] - 8:21, 10:21, 17:22, 26:24, 49:5, 49:19, 53:23, 61:8, 61:18
**rule** [1] - 34:22
**Rules** [2] - 20:10, 49:16, 66:4, 73:15
**ruling** [5] - 17:7, 36:6,

39:2, 48:4, 53:23
**rulings** [3] - 59:20, 66:9, 71:14
**run** [1] - 53:8
**running** [2] - 74:11, 74:17

## S

**s/Lina** [1] - 76:14
**safe** [2] - 21:14, 37:24
**safer** [6] - 7:7, 7:19, 8:5, 8:6, 26:9, 26:21
**safety** [1] - 32:9
**sales** [3] - 12:12, 21:11, 39:12
**Santana** [1] - 15:24
**satisfied** [1] - 15:12
**satisfy** [2] - 9:2, 15:16
**saved** [1] - 33:22
**Savings** [2] - 50:22, 51:1
**scenario** [1] - 43:19
**schedule** [5] - 14:11, 14:17, 14:18, 57:25, 63:16
**scheduled** [1] - 19:21
**schedules** [2] - 17:5, 58:4
**scheduling** [1] - 3:4
**SCHEDULING** [1] - 1:17
**schemes** [1] - 50:20
**School** [16] - 3:5, 4:2, 4:3, 5:8, 5:9, 7:17, 7:20, 13:3, 16:20, 21:12, 21:13, 29:14, 35:17, 45:2, 45:8, 58:22
**SCHOOL** [1] - 1:4
**school** [22] - 5:9, 21:17, 21:18, 21:19, 45:10, 45:12, 45:15, 45:17, 45:18, 45:23, 46:3, 46:6, 46:17, 47:19, 58:20, 58:21, 59:1, 59:18, 60:7
**Schumacher** [2] - 2:3, 2:6
**scope** [3] - 34:7, 44:6, 60:22
**Scott** [2] - 2:5, 3:10
**SEA** [1] - 9:13
**seat** [1] - 51:14
**Second** [2] - 30:21, 34:16
**second** [4] - 9:1, 32:4, 46:1, 51:10
**secondary** [1] - 53:11
**secondly** [1] - 20:12
**section** [1] - 56:9
**Section** [3] - 30:20, 34:16, 56:22
**sectors** [1] - 6:4
**Securities** [1] - 22:8

**see** [20] - 3:22, 9:6, 15:3, 18:4, 18:11, 18:13, 21:4, 28:4, 28:7, 28:13, 29:2, 36:22, 44:17, 47:11, 52:5, 62:12, 65:5, 65:14, 68:5, 72:24
**seek** [1] - 66:2
**segment** [1] - 6:2
**seldom** [1] - 49:18
**seller** [5] - 25:6, 31:14, 31:16, 31:18, 36:18
**selling** [1] - 41:18
**send** [1] - 61:24
**sense** [4] - 17:14, 28:21, 34:25, 74:23
**sent** [1] - 37:14
**separate** [6] - 10:2, 10:25, 11:8, 42:24, 52:16, 70:9
**separately** [2] - 6:9, 30:16
**September** [2] - 10:18, 50:6
**serious** [2] - 31:15, 51:12
**served** [1] - 73:17
**service** [2] - 6:5, 13:11
**serviced** [1] - 6:16
**Services** [1] - 45:9
**services** [12] - 5:23, 6:3, 6:4, 6:7, 6:12, 42:21, 43:1, 43:9, 44:25, 45:3, 46:3, 67:19
**set** [13] - 9:23, 14:10, 14:17, 14:19, 16:5, 19:5, 19:23, 69:6, 71:2, 71:8, 72:7, 72:8, 74:18
**setting** [2] - 17:4, 29:1
**several** [2] - 49:1, 52:7
**severe** [1] - 37:18
**severity** [1] - 51:17
**Shanks** [1] - 10:16
**share** [1] - 9:16
**shareholder** [1] - 9:13
**shareholders** [1] - 13:12
**sharing** [4] - 12:11, 12:12, 13:15, 13:16
**shield** [1] - 10:11
**shocking** [5] - 34:24, 35:9, 35:20, 35:25, 36:10
**shoes** [2] - 46:18, 47:9
**short** [1] - 68:18
**show** [8] - 22:22, 35:16, 35:24, 49:5, 50:15, 56:25, 67:9, 67:24
**showed** [1] - 50:9
**showing** [1] - 15:21
**shown** [2] - 50:9, 65:16

**side** [1] - 36:19
**sideways** [1] - 56:23
**similar** [3] - 31:8, 33:20, 45:24
**simplistic** [2] - 59:6, 59:8
**single** [4] - 57:17, 58:14, 60:5
**sits** [1] - 8:20
**situation** [10] - 34:14, 39:25, 43:11, 46:13, 47:5, 51:8, 51:13, 63:18, 65:16, 71:17
**situations** [1] - 25:15
**six** [4] - 20:19, 20:25, 30:21, 31:2
**Slapikas** [3] - 49:15, 59:5, 60:7
**Slippery** [12] - 3:5, 3:11, 4:2, 7:1, 7:2, 21:12, 28:2, 28:5, 28:13, 42:22, 58:20, 68:6
**slippery** [1] - 63:3
**SLIPPERY** [1] - 1:3
**small** [1] - 61:5
**so-called** [2] - 7:5, 23:5
**social** [1] - 47:4
**sold** [6] - 6:15, 6:18, 7:2, 7:4, 7:22, 31:24
**sole** [2] - 7:24, 41:3
**solutions** [2] - 6:1, 8:4
**someone** [2] - 10:11, 27:5
**someplace** [1] - 67:21
**sometimes** [1] - 72:18
**somewhat** [2] - 14:21, 44:11
**sooner** [2] - 70:24, 70:25
**sophistication** [1] - 29:13
**sorry** [3] - 71:8, 72:2, 74:4
**sort** [3] - 13:11, 40:13, 64:6
**sought** [4] - 4:17, 33:23, 40:18, 41:23
**sound** [2] - 18:17, 53:21
**sounds** [1] - 19:7
**South** [1] - 45:19
**spademan** [1] - 10:15
**spec** [1] - 27:24
**special** [1] - 65:5
**specialty** [1] - 41:18
**specific** [24] - 7:14, 8:10, 18:3, 22:11, 22:22, 24:10, 26:23, 27:5, 27:12, 28:4, 28:20, 32:24, 34:12, 34:19, 35:15, 41:17, 48:2, 48:5, 50:16, 65:19, 69:8, 69:12, 69:20, 74:13

**specifically** [4] - 7:1, 20:10, 27:11, 31:24
**specification** [2] - 29:20, 43:17
**specifications** [13] - 7:13, 23:14, 27:18, 27:21, 27:22, 27:23, 42:22, 42:23, 43:2, 43:10, 44:6, 64:13, 69:4
**specifics** [1] - 25:20
**specified** [6] - 7:9, 8:8, 28:2, 28:14, 29:23, 30:1
**specifying** [1] - 20:11
**speculation** [1] - 58:9
**splitting** [1] - 33:3
**spoken** [1] - 59:16
**stage** [30] - 12:17, 12:22, 13:19, 14:12, 15:21, 16:17, 17:2, 17:5, 18:20, 24:15, 24:17, 25:25, 30:8, 30:9, 35:22, 36:5, 38:15, 41:23, 58:15, 62:5, 63:9, 64:10, 65:20, 65:22, 65:23, 68:21, 69:10, 69:17, 69:25, 72:23
**staged** [1] - 62:7
**stages** [2] - 62:19, 66:16
**stand** [1] - 47:9
**standard** [7] - 4:24, 6:19, 6:21, 10:20, 52:1, 55:21, 69:4
**standards** [2] - 20:13, 30:16
**stands** [2] - 46:17, 74:20
**Stanton** [3] - 2:3, 3:10, 3:12
**STANTON** [53] - 3:9, 3:14, 17:21, 18:18, 19:4, 19:7, 20:1, 27:2, 36:8, 36:21, 41:25, 42:19, 44:3, 44:20, 46:11, 46:21, 48:1, 48:9, 48:18, 52:6, 52:15, 52:18, 53:1, 53:11, 54:14, 54:20, 57:5, 60:17, 61:19, 63:15, 63:23, 64:2, 65:9, 66:7, 66:11, 66:21, 66:25, 67:4, 70:2, 70:15, 70:23, 71:5, 71:16, 71:20, 72:2, 72:11, 73:4, 73:6, 73:23, 74:2, 74:4, 74:15, 74:24
**start** [2] - 66:22, 67:21
**started** [3] - 70:5, 70:11, 72:15
**state** [9] - 5:4, 8:20, 8:21, 8:25, 11:5,

14:22, 17:11, 19:24, 46:25
**statement** [1] - 24:24
**statements** [1] - 29:12
**states** [2] - 21:24, 59:1
**States** [3] - 31:9, 32:17, 39:23
**STATES** [1] - 1:1
**status** [1] - 74:7
**statute** [1] - 47:7
**statutory** [2] - 8:24, 55:2
**stay** [2] - 20:9, 37:24
**staying** [1] - 75:1
**Steamship** [1] - 39:24
**stenographic** [1] - 76:7
**step** [2] - 57:11, 57:14
**steps** [1] - 6:21
**sticker** [1] - 27:8
**still** [5] - 15:13, 15:23, 38:22, 54:2, 59:10
**stock** [6] - 9:14, 9:15, 12:9, 13:11, 13:15, 34:12
**straight** [1] - 54:24
**Street** [5] - 1:11, 2:9, 2:13, 2:15, 2:18
**stretch** [1] - 46:2
**stricken** [3] - 48:25, 55:2, 72:6
**strike** [5] - 4:20, 35:7, 62:5, 63:3, 63:8
**strikes** [1] - 29:10
**stringently** [1] - 10:14
**structure** [2] - 12:24, 40:19
**struggling** [1] - 65:20
**Stuart** [1] - 10:15
**students** [4] - 45:6, 45:15, 45:25, 46:18
**stuff** [1] - 27:4
**subclasses** [1] - 60:25
**subject** [4] - 16:18, 17:25, 50:25, 56:4
**submitted** [1] - 57:15
**subsidiaries** [1] - 5:12
**subsidiary** [4] - 7:11, 9:21, 12:8, 12:14
**substance** [1] - 35:3
**substantial** [1] - 16:1
**successful** [1] - 7:15
**sued** [1] - 45:12
**sufficient** [25] - 6:10, 9:1, 9:7, 11:25, 16:17, 17:15, 20:13, 21:6, 22:13, 22:22, 23:20, 24:2, 24:11, 24:17, 26:1, 26:24, 30:10, 32:3, 32:13, 32:22, 33:5, 41:5, 54:10, 64:18, 74:1
**sufficiently** [1] - 30:8
**Sugartown** [2] - 10:16, 10:18

**suggesting** [1] - 18:9
**suit** [2] - 46:23, 47:3
**suitable** [2] - 21:15, 60:2
**Suite** [5] - 2:4, 2:6, 2:13, 2:15, 2:18
**suited** [1] - 49:14
**sum** [1] - 60:15
**summarize** [1] - 26:6
**summary** [5] - 29:18, 56:18, 57:3, 58:12, 72:17
**superior** [1] - 7:3, 7:5, 7:23, 21:14, 21:22, 21:25, 22:7, 23:5, 27:4, 27:5, 32:1, 32:16, 33:15, 35:5, 40:15, 40:20
**Superior** [5] - 21:3, 45:10, 45:21, 46:12, 50:3
**superiority** [2] - 60:12, 60:18
**Supp** [3] - 15:25, 16:21, 31:4
**supplied** [1] - 42:18
**supplier** [1] - 5:24
**supplies** [2] - 6:2, 56:3
**supplying** [4] - 6:6, 6:11, 41:11, 41:14
**supports** [1] - 44:4
**supposed** [2] - 54:11, 68:13
**Supreme** [7] - 10:24, 11:5, 15:6, 37:20, 39:23, 39:25, 46:13
**surprisingly** [1] - 13:5
**surrounding** [1] - 49:13
**surveyors** [2] - 42:13, 43:6
**SWEPI** [1] - 50:4
**swindle** [1] - 36:19
**swindling** [1] - 35:1
**system** [3] - 7:21, 7:25, 35:16
**systems** [4] - 6:17, 12:12, 31:24, 33:4

**T**

**tam** [1] - 32:16
**tangible** [1] - 39:22
**TAP** [2] - 46:24, 47:11
**taxes** [1] - 47:19
**taxpayers** [6] - 45:15, 45:25, 46:5, 47:19, 48:6, 48:7
**Technologies** [3] - 4:5, 4:6, 5:3
**teed** [1] - 62:12
**tellingly** [1] - 34:17
**ten** [2] - 12:6, 17:24
**tenants** [1] - 45:23,

46:20, 47:16
**termite** [1] - 34:9
**terms** [16] - 7:11, 15:15, 15:21, 23:7, 29:11, 30:16, 36:25, 38:8, 40:17, 42:7, 42:20, 47:15, 56:24, 64:8, 70:16
**test** [2] - 10:13, 10:15
**tests** [1] - 11:10
**text** [1] - 74:16
**thawing** [1] - 35:14
**THE** [77] - 1:1, 1:11, 1:25, 3:12, 3:15, 3:19, 3:21, 17:13, 18:8, 18:12, 18:19, 18:22, 18:24, 19:5, 19:10, 19:12, 19:14, 19:16, 19:19, 20:3, 26:10, 26:12, 28:18, 29:2, 29:4, 29:7, 29:24, 36:13, 36:24, 39:3, 42:14, 44:9, 44:21, 46:15, 47:11, 48:7, 48:10, 48:19, 52:13, 52:17, 52:25, 53:10, 54:13, 54:16, 56:24, 62:1, 62:23, 63:1, 63:5, 63:8, 63:21, 63:25, 64:3, 65:11, 66:10, 66:15, 66:24, 68:9, 68:20, 70:5, 70:19, 70:24, 71:6, 71:15, 71:19, 71:22, 72:5, 72:13, 73:5, 73:7, 73:11, 73:25, 74:3, 74:7, 74:12, 74:16, 75:2
**themselves** [3] - 40:2, 40:5, 56:20
**theory** [4] - 11:3, 14:24, 15:4, 16:12
**therefore** [3] - 17:7, 44:2, 61:10
**thermal** [1] - 33:2
**thinking** [1] - 70:16
**third** [4] - 8:16, 20:6, 44:2
**Third** [18] - 11:15, 11:18, 15:2, 15:8, 15:9, 16:8, 16:25, 22:9, 34:2, 34:5, 39:16, 39:17, 41:1, 51:18, 51:19, 53:20, 55:8, 58:8
**third-party** [1] - 8:16
**THIS** [1] - 1:24
**three** [9] - 4:4, 5:9, 16:13, 20:14, 20:20, 24:19, 25:13, 30:23
**Three** [1] - 39:6
**threshold** [1] - 5:1
**throughout** [1] - 27:22
**throw** [1] - 61:9
**Tice** [1] - 39:17
**timing** [1] - 70:16

**Title** [1] - 49:15
**TO** [1] - 1:17
**Tobacco** [1] - 51:19
**today** [4] - 3:23, 4:19, 18:16, 71:14
**today's** [1] - 59:20
**together** [5] - 24:15, 25:13, 25:25, 43:1, 72:16
**took** [1] - 6:21
**Tort** [1] - 34:16
**tort** [4] - 16:9, 40:7, 40:9, 41:4
**Torts** [1] - 30:21
**total** [1] - 36:1
**totality** [1] - 14:6
**Toth** [3] - 50:22, 50:24, 50:25
**towards** [2] - 73:10, 73:12
**Tower** [1] - 2:9
**Towers** [1] - 45:19
**trade** [1] - 4:13
**Trade** [4] - 4:13, 44:23, 45:13, 51:21
**trademarks** [3] - 9:17, 12:11, 13:15
**train** [1] - 39:11
**training** [2] - 8:11, 42:7
**transaction** [9] - 13:3, 20:20, 22:17, 22:23, 25:21, 30:22, 32:5, 43:21, 56:2
**transactions** [5] - 11:23, 12:23, 25:2, 49:13, 56:4
**Transamerica** [1] - 39:24
**TRANSCRIPT** [2] - 1:18, 1:24
**transcript** [1] - 76:10
**trap** [1] - 35:2
**Treat** [1] - 54:3
**treat** [1] - 54:6
**treatment** [3] - 49:14, 49:22, 60:2
**TREMCO** [24] - 1:7, 3:5, 4:5, 5:17, 5:20, 5:24, 6:2, 6:6, 6:9, 6:15, 6:17, 6:24, 7:25, 8:12, 9:11, 9:14, 12:25, 13:2, 25:3, 25:6, 28:5, 42:23, 43:1
**TREMCO's** [1] - 9:14
**trend** [1] - 47:9
**Tri** [1] - 11:17
**Tri-County** [1] - 11:17
**trial** [2] - 19:20, 19:21
**troubled** [1] - 24:18
**troublesome** [1] - 25:17
**true** [9] - 4:22, 9:6, 20:22, 23:1, 23:18,

30:24, 39:8, 54:13,
61:1
**truly** [2] - 27:6, 57:24
**trust** [1] - 31:8
**try** [2] - 71:3, 73:19
**trying** [3] - 36:18,
60:14, 70:2
**Tuesday** [1] - 19:20
**turbines** [2] - 40:1,
40:2
**two** [15] - 5:10, 8:23,
9:19, 11:10, 11:12,
16:11, 16:12, 19:2,
20:19, 25:9, 28:11,
30:7, 30:22, 45:18,
58:19
**Two** [2] - 20:4, 20:17
**two-part** [1] - 8:23
**TX** [2] - 2:4, 2:7
**type** [8] - 5:15, 17:19,
25:6, 37:9, 52:3,
56:25, 64:7
**types** [3] - 6:25, 13:12,
46:18
**typically** [6] - 12:7,
17:17, 29:1, 53:16,
57:18, 72:10

### U

**U.S** [3] - 31:9, 39:25,
51:19
**u.S.P.O** [1] - 1:10
**unaware** [1] - 35:3
**uncertainty** [1] - 44:4
**under** [26] - 4:9, 4:10,
4:11, 4:12, 4:13,
6:20, 10:20, 11:21,
12:20, 13:6, 16:10,
26:24, 29:16, 30:19,
31:22, 38:5, 38:21,
39:16, 41:19, 42:4,
43:11, 45:13, 49:8,
51:20, 51:24, 56:15
**under-capitalization**
[2] - 11:21, 12:20
**understandable** [1] -
48:17
**understood** [4] -
36:21, 44:20, 48:18,
71:14
**undesirable** [1] - 41:3
**unfair** [2] - 4:12, 35:1
**Unfair** [4] - 4:13,
44:23, 45:13, 51:21
**unfortunately** [3] -
30:15, 37:18, 68:12
**uniform** [13] - 12:11,
53:14, 55:21, 56:20,
57:8, 57:9, 57:17,
57:21, 57:24, 58:1,
58:23, 59:17, 63:17
**uniformity** [3] - 57:12,
59:2, 67:25
**uniformly** [1] - 64:23

**unilateral** [1] - 51:3
**unique** [1] - 61:11
**UNITED** [1] - 1:1
**United** [3] - 31:9,
32:17, 39:23
**unity** [1] - 11:13
**unlawful** [2] - 16:14,
16:15
**unless** [3] - 18:10,
19:25, 41:22
**unlike** [1] - 41:9
**unnecessary** [6] -
6:20, 8:9, 22:19,
22:20, 23:16, 32:6
**unneeded** [1] - 7:6
**unrelated** [1] - 25:15
**unsuited** [1] - 49:22
**up** [16] - 5:5, 8:17,
14:17, 19:12, 19:22,
24:20, 38:18, 49:6,
58:10, 60:15, 61:9,
62:12, 67:14, 70:21,
71:2, 72:14
**upcharged** [1] - 6:18
**update** [1] - 74:19
**upgrades** [4] - 7:18,
8:5, 21:14, 21:20
**usefulness** [1] - 32:8
**useless** [1] - 11:4
**uses** [3] - 4:25, 11:6,
11:7
**utterly** [1] - 14:8

### V

**vague** [1] - 22:11
**Valley** [3] - 45:8,
45:19, 45:21
**value** [5] - 40:18, 60:6,
60:7, 60:16, 60:17
**variation** [1] - 49:23
**variety** [2] - 11:17,
36:13
**various** [3] - 23:16,
41:18, 64:13
**varying** [2] - 59:17,
60:10
**vehicles** [1] - 51:13
**veil** [2] - 10:8, 10:22
**venture** [1] - 4:16
**version** [1] - 55:25
**versus** [6] - 3:5, 40:20,
61:2, 61:4, 64:18,
64:20
**viable** [1] - 65:21
**view** [6] - 22:21,
35:22, 36:9, 40:17,
47:8, 64:4
**viewed** [4] - 10:14,
28:18, 35:6, 40:3
**violation** [2] - 20:10,
55:8
**vs** [1] - 1:6

### W

**wait** [1] - 72:4
**waiting** [1] - 68:16
**Walney** [3] - 50:4,
59:5, 60:6
**wants** [1] - 67:17
**warn** [1] - 55:19
**warranted** [1] - 64:8
**warranties** [2] - 43:18,
43:21
**warranty** [3] - 37:5,
41:7, 64:9
**Washroom** [1] - 15:24
**wasteful** [1] - 62:13
**water** [1] - 33:4
**weatherproofing** [2] -
5:21, 6:3
**Weatherproofing** [11]
- 4:5, 6:5, 6:10,
6:15, 6:17, 6:25,
8:12, 9:12, 13:2,
25:3, 25:5
**Weatherproofing's** [1]
- 9:15
**website** [3] - 67:1,
67:3, 67:5
**Website** [1] - 67:3
**week** [1] - 19:11
**weekend** [1] - 75:2
**weeks** [2] - 19:2,
73:19
**weighed** [1] - 15:8
**WESTERN** [1] - 1:1
**Western** [6] - 10:1,
31:4, 49:16, 50:5,
54:4, 54:8
**Westinghouse** [1] -
40:25
**Westlaw** [5] - 10:1,
10:17, 31:11, 50:5,
50:23
**Wexford** [2] - 53:15,
66:8
**wherein** [1] - 34:17
**winnowed** [1] - 48:21
**wishes** [1] - 19:25
**withdrawals** [1] - 51:3
**withheld** [2] - 32:15,
33:10
**WITHOUT** [1] - 1:24
**word** [3] - 55:16,
64:17, 66:8
**worded** [2] - 68:23,
69:8
**words** [5] - 21:7,
26:21, 28:23, 31:25,
34:20
**Worldwide** [2] - 10:16,
10:18
**writing** [2] - 65:6,
67:17
**written** [5] - 65:4,
67:1, 67:11, 67:15
**WTI** [2] - 42:23, 43:1

### Y

**year** [2] - 53:15, 55:9
**years** [1] - 47:5
**Youndt** [1] - 21:2
**yourself** [2] - 61:24,
61:25

### Z

**Zwiercan** [1] - 51:10