# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SLIPPERY ROCK AREA SCHOOL DISTRICT** *individually and on behalf of those similarly situated,* | ) CIVIL ACTION NO. 15-1020 <br> ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| | ) |
| v. | ) <br> ) |
| **TREMCO, INC., WEATHERPROOFING TECHNOLOGIES, INC.,** *and* **RPM INTERNATIONAL, INC.** | ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) <br> ) |

## OPINION

CONTI, Chief District Judge

### I.    Introduction

Pending before the court in this diversity action initiated by plaintiff Slippery Rock Area School District ("Slippery Rock" or "plaintiff") individually and on behalf of those similarly situated is a partial motion to dismiss and motion to strike class allegations filed by defendants Tremco, Inc. ("Tremco"), Weatherproofing Technologies, Inc. ("Weatherproofing"), and RPM International, Inc. ("RPM" and collectively with Tremco and Weatherproofing, "defendants"). (ECF No. 69.) Defendants argue plaintiff failed to plausibly allege claims for fraudulent concealment and negligence and its class allegations are insufficient, and, therefore, should be stricken from the second amended complaint. (ECF No. 69.) The court held a hearing to address defendants' partial motion to dismiss and motion to strike class allegations. Upon consideration of the parties' submissions and the argument presented at that hearing, the court determined it would grant the

partial motion to dismiss and motion to strike class allegations for the reasons stated on the record and more fully stated in this opinion.

## II.    Procedural History

On August 4, 2015, plaintiff filed a class action complaint against defendants. (ECF No. 1.) On December 23, 2015, after defendants filed a motion to dismiss and motion to strike class allegations, plaintiff filed a motion for leave to file an amended complaint. (ECF No. 40.) Defendants did not oppose plaintiff's motion for leave to file an amended complaint. (ECF No. 42.)

On January 6, 2016, plaintiff filed a first amended class action complaint setting forth the following claims:

- count I: fraud under Pennsylvania common law;

- count II: misrepresentation under Pennsylvania common law;

- count III: fraudulent concealment under Pennsylvania common law;

- count IV: negligence under Pennsylvania common law;

- count V: unfair trade practices under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. 201-1 et seq.

(ECF No. 45.) Plaintiff in the first amended complaint alleged defendants engaged in civil conspiracy, joint venture, and concerted action. (Id. ¶¶ 90-103.)

On January 11, 2016, defendants filed a motion to dismiss the first amended complaint and motion to strike class allegations and a brief in support of the motions. (ECF Nos. 48, 49.) On January 19, 2016, plaintiff filed a response in opposition to defendants' motions, a brief in support thereof, and an appendix of exhibits. (ECF Nos. 51, 52, 53.) On January 26, 2016, defendants filed a reply brief in support of the motion to dismiss and motion to strike class allegations. (ECF Nos. 53, 54.)

On February 5, 2016, this court held a hearing on, among other things, the motion to dismiss the first amended complaint. The court's rulings are summarized as follows:

- **Personal Jurisdiction over RPM:** The court granted the motion to dismiss without prejudice with respect to defendants' arguments that this court does not have personal jurisdiction over RPM. The court held that plaintiff's claims of personal jurisdiction over RPM were not "clearly frivolous," and, therefore granted plaintiff discovery with respect to whether personal jurisdiction could be established over RPM based upon the alter ego theory or the co-conspirator theories of personal jurisdiction. The court determined that defendants could file a renewed motion to dismiss after the discovery period concluded and the court would set a hearing with respect to that renewed motion. (H.T. 2/5/16 (ECF No. 56) at 8-17).

- **Fraudulent Misrepresentation (counts one and two):** The court denied the motion to dismiss. Plaintiff set forth factual allegations sufficient to plausibly allege a claim for fraudulent misrepresentation, i.e., defendants' statements that certain products were "necessary" for plaintiff were sufficient misrepresentations to withstand a motion to dismiss, and the allegations "lumping" all defendants together were sufficient in light of plaintiff's allegations that the defendants engaged in a civil conspiracy. (H.T. 2/5/16 (ECF No. 56) at 20-26).

- **Fraudulent Concealment:** The court granted defendants' motion to dismiss this claim because the factual allegations were not sufficient to plausibly show that defendants' had a duty to speak with respect to the products needed for the plaintiff's roofs or the high rates of failure for defendants' products in certain conditions, i.e., there was no fiduciary relationship between the parties and defendants' conduct was not sufficiently "extreme" or "shocking" to impose a duty to speak upon defendants (H.T. 2/5/16 (ECF No. 56) at 30-36).

- **Fraudulent Misrepresentation and Concealment & Gist of the Action:** The court held that it could not determine whether the fraud claims were barred by the gist of the action because the contract between the parties was not attached to the complaint, and, therefore, the court could not determine whether the statements allegedly made by defendants to induce plaintiff to enter into the contract became a part of the contract (H.T. 2/5/16 (ECF No. 56) at 37-38).

- **Negligence (count three):** The court dismissed the negligence claim without prejudice because it was barred by the economic loss doctrine. The court explained that: (1) the only damages alleged in the complaint were damages caused by the loss of the benefit of the bargain, which are clearly barred by the economic loss doctrine; and (2) the Bilt-Rite exception does not apply to this case because there are no allegations that defendants were in the business of providing information. (H.T. 2/5/16 (ECF No. 56) at 39-41).

- **Pennsylvania Unfair Trade Practice Act claim (count four):** The court granted the motion to dismiss and dismissed this claim because there was no factual allegation

supporting a plausible inference that defendants purchased or leased goods or services primarily for personal, family, or household purposes, which is required to assert a claim under the act. (H.T. 2/5/16 (ECF No. 56) at 44-45).

– **<u>Class Action Allegations:</u>** The court dismissed the class action allegations for the remaining claim—fraudulent misrepresentation—because the individual inquiry with respect to each individual plaintiff proving justifiable reliance would predominate issues common to the class. The court gave plaintiff leave to file an amended complaint (H.T. 2/5/16 (ECF No. 56) at 48-72).

On January 6, 2016, plaintiff filed a second amended class action complaint setting forth the following claims:

– <u>count I</u>: fraudulent misrepresentation under Pennsylvania common law;

– <u>count II</u>: intentional and/or negligent misrepresentation under Pennsylvania common law;

– <u>count III</u>: fraudulent concealment under Pennsylvania common law; and

– <u>count IV</u>: negligence under Pennsylvania common law.

(<u>Id.</u>) On April 22, 2016, RPM filed a renewed motion to dismiss for lack of personal jurisdiction and a brief in support of the motion. (ECF No. 67.) On the same day, defendants filed the partial motion to dismiss and motion to strike class allegations and a brief in support of the motion. (ECF Nos. 69-70.) On May 6, 2016, plaintiff filed: a response to the motion to dismiss and motion to strike; a brief in support of its response; an appendix of exhibits to the brief in support of the response; a response to the renewed motion to dismiss for lack of personal jurisdiction a brief in support of the response; and an appendix of exhibits to the brief in support of the response. (ECF Nos. 71-76.) On May 12, 2006, plaintiff filed a supplement to its appendix to the brief in support of the response to the renewed motion to dismiss for lack of personal jurisdiction. (ECF No. 81.) On May 13, 2016, defendants filed a reply brief in support of its motion to dismiss and motion to strike class allegations. (ECF No. 82.) On May 17, 2016, RPM filed a reply brief with respect to the renewed motion to dismiss for lack of personal jurisdiction. (ECF No. 86.)

On May 24, 2016, the court held a hearing with respect to, among other things,[1] the motion to dismiss the second amended complaint. The court determined at the hearing that the partial motion to dismiss and motion to strike class allegations would be granted and it would issue an opinion setting forth its rationale, which was stated on the record before the parties.

### III. Allegations in the Second Amended Complaint, which include Factual Allegations that are Accepted as True for the Purpose of Resolving the Partial Motion to Dismiss[2]

#### A. Background

Slippery Rock is a "Class Three school district." (ECF No. 63 ¶ 6.) According to plaintiff, RPM is headquartered in Ohio and has done business in Pennsylvania "through its agents, employees, and alter ego subsidiaries." (Id. ¶ 9.) Tremco is an "Ohio-based company" that has done business in Pennsylvania and maintains a place of business in Pennsylvania. (Id. ¶ 7.) Weatherproofing is an "Ohio-based company" that on behalf of RPM has done business in Pennsylvania, i.e., roofing, construction, and providing general contracting services. (Id. ¶ 8.) Slippery Rock alleges this court has personal jurisdiction over defendants because "RPM, Tremco, and WTI's contacts with the forum are continuous and substantial and because the claims of Plaintiff and the Class arise out of the Defendants' joint contact with the forum[,]" (conclusion) i.e., defendants marketed, sold, and provided services in Pennsylvania. (Id. ¶ 12.)

According to plaintiff, RPM—through its alter ego subsidiaries—manufactures, markets, and sells various specialty chemical products, including paints, protective coatings, roofing systems, sealants and adhesives. Tremco is a major manufacturer and supplier of roofing materials, the

---

[1]    The court at the hearing also addressed RPM's renewed motion to dismiss for lack of personal jurisdiction. That motion will be addressed by the court at a later date and is not resolved by this opinion, which resolves only the partial motion to dismiss and motion to strike class allegations.

[2]    Plaintiff's class action allegations will be discussed in the section addressing defendants' motion to strike the class action allegations.

primary operating member of RPM's Building Solutions Group, and RPM's leading presence in the "industrial segment" of that business. Tremco supplies roofing and weatherproofing services such as roofing restoration and repair services to the government and private sectors. Plaintiff alleges that WTI is a service arm of RPM and contracting subsidiary of Tremco, which supplies roofing, construction, and general contracting services to building owners and facility managers in the United States. (ECF No. 63 ¶ 1.)

RPM—through Tremco and WTI—marketed, manufactured, sold, and serviced products with high failure rates, including, but not limited to, certain BURmastic roofing systems. RPM through Tremco and WTI advertised, marketed, and sold products that were upcharged from standard products despite those products being unnecessary under industry conditions or essentially identical to the standard products. RPM took actions to ensure that its subsidiaries did not advise its customers, shareholders, or governmental entities of the conditional inferiority these products, and implemented, approved and oversaw improper bidding, pricing, and purchasing procedures to actually encourage ongoing sales of BURmastic systems and the upcharged "premium" products. (ECF No. 63 ¶ 2.) Plaintiff alleges that RPM directed Tremco and Weatherproofing with respect to the foregoing activities. (Id. ¶ 3.)

Plaintiff alleges that RPM, Tremco, and Weatherproofing individually and jointly engaged in the following acts and omissions:

− sold to Slippery Rock and the members of the below-proposed Class expensive roofing materials marketed as "superior" or "premium" that were actually equal in composition to Tremco's economy or generic products sold;

− sold to Slippery Rock and the members of the Class expensive roofing materials marketed as of a higher "superior" or "premium" grade that were actually equal in composition to industry standard or generic products;

− specified, sold and installed or caused to be installed expensive roofing materials, or otherwise unneeded materials, that failed to make roofs safer or of measurably higher quality than Tremco's generic counterparts;

- specified or otherwise represented and advertised as statements of fact that Tremco and WTI goods and services were necessary to, and indeed resulted in, safer and more long-lasting roofing systems;

- sold and installed or caused to be installed on buildings owned by Slippery Rock and the members of the below-proposed Class, roofing products and systems with known high rates of failure;

- over-specified roofing materials beyond what was required to fulfill purchasing objectives, resulting in substantial overcharges for roofing materials and incurrence of re-stocking fees;

- improperly utilized a subsidiary as general contractor and for construction management and acted to inflate costs and lock-out competition;

- improperly controlled the bid process with over-detailed and proprietary bid specifications, thereby excluding competitors to successfully bid on proposed work; and

- used captive or conflicted third parties in supplying, bidding, supervising, and constructing the contracted-for work.

(ECF No. 63 ¶ 5.)

Tremco is RPM's building solutions group. Tremco uses WTI for execution of roofing and general contracting services to building owners and facility managers. (ECF No. 63 ¶ 16.) Tremco and WTI "are openly promoted as designated 'departments' of RPM" in RPM's annual shareholder report and SEC filings dated 2015. (Id. ¶ 17.) RPM owns all or most of Tremco's stock. (Id.) Tremco owns all WTI's stock. (Id.) All defendants share: intellectual property rights, common marketing images, and use of trademarks and logos. (Id.) Corporate officers, e.g., the president of Tremco and global president of the solutions group, are mingled and interchanged between RPM and Tremco. Defendants jointly represent that employees of each defendant are agents for the other two defendants. (Id.)

**B. Defendants' Pricing Scheme**

RPM and Tremco collectively promote, market, sell, and provide services and goods they proclaim are "superior" within the roofing industry and "superior" in comparison to its own internal products for purposes of inflating pricing on standard products. (ECF No. 63 ¶ 24.) RPM and Tremco advertise and sell products at a higher price although the products are "essentially identical" to its own lower-cost products in composition, manufacturing process and location, durability, and in all other significant respects. (Id.)

**C. Sale of Known Inferior Products**

RPM and Tremco manufacture and sell products known to be inferior under certain installation and climate conditions. (ECF No. 63 ¶ 29.) Since at least June 2005, Tremco knew that its BURmastic roofing systems installed over insulation board had the potential to fail and that many of these roofs had failed or were failing. The following are the Tremco roofing systems that contain inferior components: BURmastic 200 roof systems; BURmastic 400 roof systems; and BURmastic 500 roof systems. (Id.)

In memorandum dated June 17, 2005, Gregory Rudolph, Jr. ("Rudolph"), Tremco's product manager at that time, described to Tremco and RPM executives how cost-cutting measures with respect to these product had compromised quality. (ECF No. 63 ¶ 30.) Rudolph recommended that specific changes be made to the product to improve quality and reduce the failure rate. Plaintiff alleges that RPM and Tremco were aware that repairs being made to these composite ply roofing systems by Tremco and later by WTI were inadequate. RPM and Tremco continued the sale of these inferior products and opted to handle matters through the limitations of a warranty system, which was costly to the consumer. (Id.)

According to plaintiff, RPM, Tremco, and WTI were aware that thermal expansion and contraction of the composite ply roofing systems caused the composite ply to ridge over the insulation joints. (ECF No. 63 ¶ 31.) The ridges split, which allowed water to enter the roofing

system and the building. In internal documents, it was estimated that the failure rates could be as high as 80% in some regions. RPM, Tremco, and WTI, however, opted to continue to market and sell these products to consumers, determining that it was more profitable to address the failures through limited warranties, rather than prevent the anticipated failures through quality product production and installation warnings. (Id.)

RPM and Tremco made an intentional and conscious decision not to disclose the limitations in its products to avoid making its customers and shareholders aware of the extent of the issues in these roofs and to avoid the cost of proactive repairs or treatment. (ECF No. 63 ¶ 33.) RPM and Tremco promoted the use of its internal maintenance and contracting services arm, i.e., WTI, to keep the secrets in-house, leaving consumers to incur the costs for the failures. The installation of the suspect roofing systems harms the value of the overall structures in light of the higher than normal failure rate. (Id.)

### D. Slippery Rock High School and Moraine Elementary School Projects

Slippery Rock is a consumer of roofing products, systems, and personal services. (Id. ¶ 23.) In 2004, a roofing project occurred at Slippery Rock High School. (ECF No. 63 ¶ 33.) Sales and field representatives Rich Kosuda ("Kosuda"), Larry Jones ("Jones"), and Mike Manganello ("Manganello"), i.e., "agents and employees of RPM an RPM's Building Solutions Group," "misrepresented" that Slippery Rock High School "needed particular replacements or upgrades or that certain features and products would create a safer roof, when in fact many of the designated features were unnecessary and the increased specifications would not ensure a safer or higher-functioning roof." (ECF No. 63 ¶ 33.) Kosuda, Jones, and Maganello did not tell plaintiff any information regarding the "high-end failure rate" of the BURmastic roofing system. (Id.)

Kosuda, Jones, and Manganello promoted the purchase of "superior" products and costly warranties on the representation that such products were more suitable, of higher-grade, and longer-

lasting, i.e., more economical, for the roofing project. Slippery Rock officials, including Paul Cessar ("Cessar"), plaintiff's business manager and board secretary, relied upon what was believed to be superior knowledge regarding the quality and condition of the products and roofing system, and purchased the "superior" products that were actually either the same as the more economical counter-parts or wholly unnecessary upgrades under industry standards. (ECF No. 63 ¶ 34.) The project drawings for Slippery Rock High School provided that the "sole acceptable manufacturer for the roof system" was Tremco and "mandated use of Tremco materials." (ECF No. 63 ¶ 38.)

With respect to the Moraine Elementary School roofing projects in 2010 and 2013, Kosuda, Manganello, Ryan Fennick ("Fennick"), and Al Young ("Young"), RPM's Building Solutions Group sales and field representatives, "misrepresented" that particular upgrades or certain features and products, e.g., Tremco's " 'Premium' III Asphalt, Type IV Fiberglass felt, Fas-N-Free Adhesive, ELS Roof Cement, Tremprime WB, and BURmastic Modified Supreme Composite Ply," would create a safer roof. (ECF No. 63 ¶ 39.) The costly upgrades, features, and increased specifications presented by Kosuda, Manganello, Fennick and Young, however, would not create a safer or higher-functioning roof. (Id.)

Neither RPM nor its Building Solutions Group informed plaintiff about the limitations in its products, the likelihood of failure, or the equality of more economical products. (ECF No. 63 ¶ 40.) The representations were made for the purpose of upselling higher-priced goods that simply would not have been purchased otherwise. (Id.) Defendants—as a result of "over-specifying the roofing material requirements for the project"—billed plaintiffs for unnecessary higher-cost products presumably required to meet unneeded higher quality standards. (ECF No. 45 ¶ 38.)

### E. Marketing Strategies, Services, and Control of the Bidding Process

Defendants "train [their] sales and field representatives in the promotion of goods and services through the Association of Educational Purchasing Agencies (AEPA) in roof asset

management programs, field inspection services, roof asset management services, patch-and-repair services, and roofing supplies and products." (ECF No. 63 ¶ 42.) According to plaintiff, "[t]his purchasing cooperative…is simply another mechanism for insuring that only products and services offered by RPM, Tremco, or WTI are available for contractor use on the roofing project." (Id.)

Tremco and WTI further inflated prices to consumers, including plaintiff and class members, by utilizing partnerships with certain subcontractors and purchasing cooperatives to effectively eliminate competition and increase cost. (ECF No. 63 ¶ 43.) The use of proprietary specifications and purchasing cooperatives created an environment of unfair bidding practices that favored contractors and third parties with whom Tremco and WTI already negotiated certain deals for products and services. Defendants did not inform plaintiff about the true nature of the third-party arrangements. (Id.)

Tremco and WTI drafted, designed, created, and provided the bidding specifications to Slippery Rock for the noted roofing projects, and those specifications favored contractors with whom RPM negotiated priority deals despite. (ECF No. 63 ¶ 44.) The proprietary specifications impeded the likelihood of successful bids by otherwise qualified competitors, even though the proprietary specifications would not improve the quality of the roof or reduce the cost. The proprietary bid specifications forced the use of defendants' products and services, and only limited subcontractors could survive the bid approval process. The bidding specifications required products in excess of acceptable industry requirements, in an amount in excess of what was needed, and mandated the use of Tremco's higher priced products as if those products were necessary for a safer roofing system. (Id.) By dictating the terms of the bidding documents and further mandating the use of the cooperative purchasing program, RPM Building Group cut independent design professionals out of the design and material selection process, replacing them with individuals from Tremco and WTI. In promotion of RPM Building Group's self-interests, the individuals named above specified the use of

products and the manner of purchasing those products at a rate nearly double the market rate of similar asphaltic roofing systems. (Id. ¶ 46.)

Tremco implied that a competitive and fair bidding process was being employed for the Slippery Rock roofing projects, but mandated the use of a specific purchasing cooperative for the purchase of the specified products, deceptively hiding the mark-up of goods and services while misrepresenting that those products and services were not only competitive, but actually further discounted, from market rates. (ECF No. 63 ¶ 47.) The requirement to use the AEPA impeded the procurement process since its does not allow for the necessary transparency in the bidding process. Although RPM's Building Solutions Group represented to Slippery Rock that the use of the purchasing cooperative would inure to the benefit of the Slippery Rock through financial savings, the loss of pricing benefits to prospective contractors was counterproductive to receiving those benefits. (Id.)

IV.     **Standard of Review with respect to the Motion to Dismiss**

A motion to dismiss tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id. "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662,

678 (2009) (citing Twombly, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks
> for more than a sheer possibility that a defendant has acted unlawfully.. . . Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556) (internal citations omitted).

The Court of Appeals for the Third Circuit has instructed that "a court reviewing the

sufficiency of a complaint must take three steps." Connelly v. Lane Construction Corp., 809 F.3d

780, 787 (3d Cir. 2016). The court of appeals explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a
> claim." Iqbal, 556 U.S. at 675. Second, it should identify allegations that, "because
> they are no more than conclusions, are not entitled to the assumption of truth."Id. at
> 679. See also Burtch v. Milberg Factors, Inc. ., [sic] 662 F.3d 212, 224 (3d Cir.2011)
> ("Mere restatements of the elements of a claim are not entitled to the assumption of
> truth."(citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded
> factual allegations, [the] court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement to relief."Iqbal, 556 U.S. at 679.

Id. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal,

556 U.S. at 679 (citing Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)).

**V.    Analysis**

**A.  Fraudulent Concealment (count three)**

Defendants argue that plaintiff did not plausibly allege a claim for fraudulent concealment

because there are no allegations that the roofing systems allegedly provided by plaintiff were

defective, i.e., "there [are] no allegations regarding a rate of failure, the 'frequency of the [alleged]

failures,' or the specific conditions present that caused the alleged failures." (ECF No. 70 at 5 (quoting H.T. 2/5/16 (ECF No. 56) at 35).)

## 1. Applicable Law

In Pennsylvania, a claim of fraudulent concealment, which "is grounded in Section 551 of the Restatement (Second) of Torts,"[3] consists of six elements: (1) an omission; (2) the omission was material to the transaction at hand; (3) the omission was made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) the omission was made with the intent of misleading another into relying on it; (5) the plaintiff justifiably relied on the omission; and (6) the resulting injury was proximately caused by the reliance. Gaines v. Krawczyk, 354 F.Supp.2d 573, 587 (W.D. Pa. 2004) (citing Gibbs v. Ernst, 647 A.2d 882, 207 n.12 (Pa. Super. Ct. 1994) ("The tort

---

[3] Section 551 of the RESTATEMENT (SECOND) OF TORTS provides:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

   a. matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

   b. matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

   c. subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

   d. the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

   e. facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

RESTATEMENT (SECOND) OF TORTS § 551 (Oct. 2015).

of intentional non-disclosure has the same elements as the tort of intentional misrepresentation except that in a case of intentional non-disclosure the party intentionally conceals a material fact rather than making an affirmative misrepresentation.")); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 612 (3d Cir. 1995).

With respect to an omission, a plaintiff must also prove the defendant had a duty to speak, which arises when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Chiarella v. United States, 445 U.S. 222, 227-28, 235 (1980) (Rule 10b-5 case, but discussing common law fraud; quoting RESTATEMENT (SECOND) OF TORTS § 551(2)(a)). The court in Morton's Restaurant Group, Inc. v. Charest, Civ. Action No. 91-7013, 1998 WL 767444, at *4 (E.D. Pa. Nov. 4, 1998), explained:

> In Pennsylvania, whether a party has an affirmative duty to disclose information to another party to a transaction, which is called a "duty to speak," depends "on the nature of the contract between the parties and the scope of one party's reliance on the other's representations." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 612 (3d Cir.1995) (applying Pennsylvania law). If no duty to speak exists, an omission will not be actionable as fraud. See id. A duty to speak would arise if there was a fiduciary relationship between the parties. See id. A duty to speak could also arise in a non-fiduciary relationship under reliance principles due to a special relationship. See id. **Where there is no fiduciary relationship, disclosure by a seller is also required when it is the only reasonable way a buyer could find out about a serious latent defect (not at issue here).** See id. In an arm's length transaction between experienced business entities, however, it is extremely unlikely that such a duty will arise. See id. **The seller has a duty to disclose "[i]n those circumstances [in which] it cannot be said fairly that by failing to disclose the seller is legitimately enhancing his or her bargain."** Duquesne, 66 F.3d at 612. The seller can, however, use any legitimate advantages, such as extensive business knowledge or effective due diligence, without any liability. Id. Further, the cases in Pennsylvania imposing a duty to speak almost never deal with cases where both parties were "sophisticated business entities, entrusted with equal knowledge of the facts." Id.

Morton's, 1998 WL 767444, at *4 (emphasis added).

"Pennsylvania's fraudulent concealment law is grounded in Section 551 of the Restatement (Second) of Torts, which defines the limited circumstances under which the duty to speak arises between parties to a particular transaction." Gaines v. Krawcyzk, 354 F.Supp.2d 573, 586 (W.D. Pa. 2004) (citing Duquesne Light, 66 F.3d at 611-12; Jeter v. Brown & Williamson Tobacco Corp., 294 F.Supp.2d 681, 688 (W.D. Pa. 2003)). Section 551 of the RESTATEMENT (SECOND) OF TORTS, entitled "Liability for Nondisclosure" provides:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
    a. matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
    b. matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
    c. subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
    d. the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
    e. facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

RESTATEMENT (SECOND) OF TORTS § 551 (Oct. 2015). The commentary to § 551 of the Restatement provides:

It is extremely difficult to be specific as to the factors that give rise to this known, and reasonable, expectation of disclosure. In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is ***so shocking*** to the ethical sense of the community, and is ***so extreme and unfair***, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware. In such a case, even in a tort action for deceit, the plaintiff is

entitled to be compensated for the loss that he has sustained. Thus a seller who knows that his cattle are infected with tick fever or contagious abortion is not free to unload them on the buyer and take his money, when he knows that the buyer is unaware of the fact, could not easily discover it, would not dream of entering into the bargain if he knew and is relying upon the seller's good faith and common honesty to disclose any such fact if it is true.

(<u>Id.</u> cmt. l (emphasis added).)

**2.  Analysis**

This court at the hearing on the motion to dismiss the first amended complaint held that plaintiff plausibly alleged six of the seven elements of a claim for fraudulent concealment. (H.T. 2/5/16 (ECF No. 56) at 30-36). The court explained:

First is the **<u>omission</u>** issue. The Plaintiff alleges Defendants concealed the inherent inferiority in their products when installed under certain known conditions and the rate and risk of failure inherent in the roofing systems being sold specifically identified in the Complaint. In other words, the Plaintiff is alleging that the products were not superior or premium to the generic, and that there was a high failure rate. So these are the omissions, and this arguably would be sufficient.

Second, the **<u>omission was material to the transaction at hand</u>**. The Plaintiff alleges it relied upon Defendants' representations to purchase unnecessary goods. Actually they are arguing that the omitted and concealed facts were material because they impacted the usefulness, quality, and safety of the products that were installed.
This is a little closer call here because the omissions are contrary to what the Plaintiff was saying were the direct representations, but to the extent this is pled in the alternative, it arguably would be sufficient.

Next is **<u>whether the information was intentionally withheld</u>**. The Plaintiff for the omission of the knowledge that the products were not superior point to the qui tam action that was pursued by the United States that brought this information to light, that there are internal documents that demonstrated that these chemical compositions of the products were essentially the same, and that these were excessive costs that the Plaintiff should not have borne. This arguably could be sufficient.
Then with respect to the high failure rates, the Plaintiff is arguing that there were specific recommendations made to the Defendants to change their products to improve quality and reduce the failure rate, that there was knowledge in the possession of the Defendants about the thermal expansion and contraction that could cause ridges splitting and water to enter the roofing systems, and other matters such as that. So I think it's sufficient allegations to infer that the Defendants were aware of both of these matters.

The next is t**he omission was made with the intent of misleading another into relying on it**. Here, again, you know, the Court could plausibly infer that it would be withheld in order to generate higher prices and more profits.

The **justifiable reliance** is the next aspect. So the question is if the Plaintiff had known the materials that were provided, would they have made a different decision, and they do argue that they would have. They would not have purchased the "superior," "premium" products; and if they had known the limitations about the quality of the product, they would have made different decisions as well.

And the final one is that -- then the next one is whether there was a **proximate injury caused by the reliance**. And, again, this would be similar to the other fraud actions where the Court could find that if the Plaintiff had known them, they would have saved the money, because the damages being sought are the economic.

(Id. (emphasis added).)[4]

---

[4]     Defendants also argue that with respect to plaintiff's claim for fraudulent concealment, plaintiff did not comply with Federal Rule of Civil Procedure 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and plausibly allege the "'who, what, where, when and how of the events at issue.'" (ECF No. 70 at 2 (quoting Sims v. Viacom, Inc., Civ. Action No. 09-3521, 2009 WL 3856667, at *2 (E.D. Pa. Nov. 17, 2009)). Because plaintiff did not plausibly allege all elements of a claim for fraudulent concealment, it is not necessary for the court to determine whether plaintiff satisfied the heightened Rule 9(b) pleading standards.

It is a close call whether plaintiff satisfied Rule 9(b) pleading standards for six of the seven elements of fraudulent concealment discussed by the court during the hearing on the motion to dismiss the first amended complaint. Plaintiff, however, satisfied the Rule 9(b) pleading standards by "inject[ing] precision or some measure of substantiation into a fraud allegation." Frederico, 507 F.3d at 200 (citing Lum, 361 F.3d at 224). Plaintiff in the second amended complaint alleged that in 2004, Kosuda, Jones, and Manganello, sales and field representatives for defendants, "omitted any information regarding the high-failure rate of the identified roofing systems" that they claimed were "necessary" for the Slippery Rock High School roofing project, and Cessar, business manager and board secretary for plaintiff, relied upon the knowledge of Kosuda, Jones, and Manganello to purchase the roofing systems for Slippery Rock High School. (ECF No. 63 ¶¶ 36-37.) Plaintiff alleged that with respect to the Moraine Elementary School roofing projects that took place in 2010 and 2013, Kosuda, Fennick, Young, and Maganello informed plaintiff "of the limitations in its products, the likelihood of failure, or the equality of more economical products equivalent to the higher-priced products in composition." (Id. ¶¶ 39-40.) There are no allegations in the second amended complaint that specifically describe a) the communications between Kosuda, Jones, Manganello, and Fennick and Cessar or any other employee of plaintiff during which defendants' employees omitted material information about the Slippery Rock High School and Moraine Elementary School roofing projects, b) how the discussions took place, e.g., via email, verbal, or otherwise, or c) *when* those communications took place. See Frederico, 507 F.3d at 200 ("None of these broad

The court explained, however, that:

> [I]n this case, the most problematic matter for the Plaintiff is the final one, and that's **whether there was a duty to speak** with respect to the omitted information. The Court of Appeals for the Third Circuit in a decision, <u>Duquesne Light</u>…noted that Pennsylvania Courts analyzing whether there was a duty to speak rely almost exclusively on the nature of the contract between the parties and the scope of one party's reliance on the other's representations.

> They refer to -- Court looked at the termite infestation cases which were latent defect problems that could not be assessed otherwise. There is a bank's representation about one party offering a specific amount for the stock so that parties could find that there was a duty to speak in that situation.

> When you look at this, you know, coming from the Restatement (Second) of Tort Section 551, what the Court most tellingly found is in the Comment 1, wherein the Restatement the commentators noted: It is extremely difficult to be specific as to the factors that give rise to this known and reasonable expectation of disclosure, in other words, the duty to speak.

> In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair as to amount to a form of swindling in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware.

> Here, you know, when there are the failure to disclose that the products were not, in fact, "superior" or "premium" which, in many instances, can be viewed as puffery, or whether they are needed or not needed, that doesn't strike the Court as being the level of something that would be so shocking that it could fall within a duty to disclose, particularly when you are talking about arm's-length bargaining. There's no fiduciary relationship in this particular matter.

> With respect to the high rate of failure here, you know, talking about the cold conditions, freezing and thawing, there's nothing in particular that relates to this specific roofing system at issue here to show that these conditions, in fact, occurred in the School District. There's nothing about the frequency of the failures or the results, so it's really hard to tell that this could rise to the level of something that would be so shocking that they could be held liable for the admissions.

---

statements disclose the particular argument made on appeal as to the substance of the misrepresentation, namely, that Home Depot misrepresented "the actual hours during which vehicles could be returned so as to avoid or halt the accumulation of late fees.""). As explained above, however, the court need not decide whether the allegations in the second amended complaint satisfy Rule 9(b) because plaintiff did not plausibly allege that defendants had a duty to speak about the *true* quality of their products or the high failure rates of their roofing systems.

So, at this stage, you know, the Court's view would be that this would be dismissed without prejudice. If there was something that arises to show that, oh, this would be so shocking; that the Plaintiff's could be so ignorant; you know, the nature of the people that were dealing with it, the total reliance on these representations, you know, it really would have to be something more for the Court to push it into this fraudulent concealment level.

(Id. (emphasis added).)

Plaintiff in the second amended complaint does not plausibly allege that plaintiff and defendants had a *fiduciary relationship* or any additional facts that plausibly show defendants' alleged omissions with respect to the quality of their products was "extreme" or "shocking" and gave rise to a duty to disclose to plaintiff that the products were not superior or premium.

With respect to the alleged high failure rates of defendants' roofing products, the allegations in the second amended complaint are not substantively different from the allegations in the first amended complaint. Plaintiff in the second amended complaint does not allege any facts about the frequency of the failure of the roof systems or whether the roofs installed at Slippery Rock High School and Moraine Elementary school were exposed to cycles of freezing and thawing, which caused the roofs to be subject to a high rate of failure. (See ECF No. 63 ¶ 32.) Plaintiff alleges: "it was estimated that the failure rates could be as high as 80% in some regions." (Id. ¶ 31.) Plaintiff does not allege the failure rate for the roofing systems installed at Slippery Rock High School or Moraine Elementary School or the climate conditions at those locations.

Under those circumstances, the court's reasoning for dismissing the fraudulent concealment claim from the first amended complaint, i.e., plaintiff did not plausibly allege that defendants had a duty to inform it that their "premium products" were not superior than their less expensive counterparts or that the high failure rates of their products gave rise to a duty to speak, is applicable to the claim for fraudulent concealment set forth in the second amended complaint. Defendants'

20

motion to dismiss the fraudulent concealment claim will, therefore, be granted and the fraudulent concealment claim will be dismissed from the second amended complaint.

### B. Negligent Misrepresentation (count two) and Negligence (count four)

### 1. Economic Loss Doctrine

Plaintiff's negligence claims are barred by the economic loss doctrine, which may apply whether or not a contract exists between the parties. <u>Bilt-Rite Contractors v. The Architectural Studio</u>, 866 A.2d 270 (Pa. 2005) The Third Circuit Court of Appeals has explained:

> As it originally developed, the economic loss doctrine provided that no cause of action could be maintained in tort for negligence or strict liability where the only injury was "economic loss"—that is, loss that is neither physical injury nor damage to tangible property. <u>See, e.g.</u>, <u>Aikens v. Baltimore & Ohio R.R. Co.</u>, 348 Pa.Super. 17, 501 A.2d 277, 279 (1985); <u>see also</u> J.G. <u>Kassab v. Central Soya</u>, 432 Pa. 217, 246 A.2d 848, 854 n. 7 (1968), overruled on other grounds, <u>AM/PM Franchise Ass'n v. Atlantic Richfield Co.</u>, 526 Pa. 110, 584 A.2d 915 (1990). *542 The quintessential economic loss was lost profits. When a product purchased by a commercial entity failed to perform, that entity's business could be disrupted, resulting in loss of customers, sales, and profits. The economic loss doctrine precluded recovery in tort from the product's manufacturer for these purely economic damages.

> In <u>East River Steamship Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Supreme Court interpreted the economic loss doctrine in the context of federal admiralty law as barring recovery in tort to a commercial buyer for damage a product does to itself. The plaintiff, a time-charterer of a supertanker, sued the manufacturer of the supertanker's turbines in tort to recover for damages suffered as a result of the turbines' malfunctioning. The only damage alleged was to the turbines themselves. The Court viewed the case as requiring it to determine whether a duty should be imposed on manufacturers to protect against commercial products injuring themselves, or whether, instead, this was a matter best left to the parties' agreements and the realm of contract. The Court decided that tort recovery should not be available for harm a product causes to itself. "Obviously, damage to a product itself has certain attributes of a products-liability claim. But the injury suffered—the failure of the product to function properly—is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." <u>Id.</u> at 867–68, 106 S.Ct. at 2300. In the course of reaching this conclusion, the <u>East River</u> Court reaffirmed that a tort remedy remained available for damage to all "other property." <u>Id.</u> at 870, 106 S.Ct. at 2301–02.

East River constitutes an expansion of the economic loss doctrine because it precludes recovery for what is clearly physical damage to property, i.e., damage to the product itself. See Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, ——, 117 S.Ct. 1783, 1786, 138 L.Ed.2d 76 (1997). The damage to the product is conceptually distinct from the lost profits that may follow as a consequence of the product's failure. However, the majority of jurisdictions that have considered the question have adopted the reasoning of East River and now deem damage a product causes to itself to be economic loss, non-recoverable in tort. See generally Christopher S. D'Angelo, The Economic Loss Doctrine, 26 U. Tol. L.Rev. 591, 595 (1995).

…

We have previously predicted that the Pennsylvania Supreme Court would follow the East River approach to the economic loss doctrine. See, e.g., Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618–21 (3d Cir.1995); King v. Hilton–Davis, 855 F.2d 1047, 1051 (3d Cir.1988). The Pennsylvania Superior Court has made the same prediction. See, e.g., REM Coal Co. v. Clark Equip. Co., 386 Pa.Super. 401, 563 A.2d 128, 132 (1989).

2-J Corp. v. Tice, 126 F.3d 539, 542-43 (3d Cir. 1997).

In the second amended complaint—like in the first amended complaint—plaintiff does not plausibly allege that it suffered any damages that are not economic in nature, e.g., damage to property other than the roofing system installed by defendants. Plaintiff alleges that defendants had knowledge that the defects in the roofing systems they manufactured and sold could cause costly leaks into the buildings on which the roofing systems were installed, but plaintiff does not plausibly allege that the roofing systems it purchased from defendants failed or caused damage to property other than the roofing system itself. Plaintiff in the second amended complaint requests damages "reflecting the diminished value of the roof and structure due to the known failure rate of systems and designated products or otherwise damages calculated as the difference in the benefit of the bargain ultimately received." (ECF No. 63 at 36.) This kind of damage, however, is barred by the economic loss doctrine. The court of appeals has explained that " '[w]hen loss of the benefit of a bargain is the plaintiff's sole loss, ... the undesirable consequences of affording a tort remedy in

22

addition to a contract-based recovery [are] sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims.' " <u>Duquesne Light</u>, 66 F.3d at 618-19 (quoting <u>King v. Hilton–Davis</u>, 855 F.2d 1047, 1051 (3d Cir.1988)).

Plaintiff in the second amended complaint seeks to recover damages measured by the difference between the value of the products it purchased as described and misrepresented by defendants and the value of the products it actually received, i.e., it seeks to recover the loss of the benefit of its bargain. The economic loss doctrine bars negligence claims based upon that measure of damages. Plaintiff cannot recover solely economic loss sustained as a result of defendants' alleged negligence. Defendants' motion to dismiss will, therefore, be granted with respect to the negligence claims and the negligence claims will be dismissed from the second amended complaint.

**2. The Bilt-Rite exception to the economic loss doctrine and plaintiff's negligent misrepresentation claim (count two)**

Plaintiff argues the exception to the economic loss doctrine set forth in <u>Bilt-Rite Contractors v. The Architectural Studio</u>, 866 A.2d 270 (Pa. 2005), applies in this case, and, therefore, its negligence misrepresentation claim is not barred by the economic loss doctrine. Specifically, plaintiff argues: "RPM and its Building Solutions Group provided professional services and information intended to be relied on by Plaintiff and subsequent bidding contractors prior to and during construction of roofing projects." (ECF No. 72 at 10.) Under the exception to the economic loss doctrine set forth in <u>Bilt-Rite</u>, a plaintiff may sue an entity for negligent misrepresentation and recover solely economic damages if that entity is in the *business of providing information*. The Pennsylvania Supreme Court in <u>Bilt-Rite</u> explained:

> Accordingly, we hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information. In so doing, we emphasize that we do not view Section 552 as supplanting the common

law tort of negligent misrepresentation, but rather, as clarifying the contours of the tort as it applies to those in the business of providing information to others.

Id.

The plaintiff in Bilt-Rite was a contractor that relied upon information supplied by an architect to submit a winning bid for a construction project. The architect's information was wrong, however, and the construction project cost the contractor more money than its client agreed to pay for the project. The contractor sued the architect for, among other things, negligent misrepresentation. The court held the architect was in the business of supplying information, and, therefore, could be held liable for the economic losses sustained by the contractor. Id.

Bilt-Rite is distinguishable from this case because defendants—based upon the allegations in the second amended complaint—are not in the business of supplying information; rather, they are in the business of "manufactur[ing], market[ing], and sell[ing] various specialty chemical **products**, including paints, protective coatings, roofing systems, sealants and adhesives" and providing general contracting services. (ECF No. 63 ¶ 1 (emphasis added).) Plaintiff throughout the second amended complaint alleges that because of the alleged negligent misrepresentations made by defendants about defendants' **products** and **general contracting services**, it was induced to purchase **products** manufactured by defendants at an increased cost for those **products**. (ECF No. 63 ¶¶ 37, 73, 79.) Plaintiff alleges:

> Tremco and WTI drafted, designed, created, and provided the bidding specifications to Slippery Rock for the noted roofing projects, and such specifications favored contractors with whom RPM Building Solutions Group had negotiated priority deals despite Slipper Rock's efforts to prevent collusion. The proprietary specifications themselves impeded the likelihood of successful bids by otherwise-qualified competitors, even though the proprietary specifications would not improve the quality of the roof nor reduce the cost. **Ultimately, the proprietary bid specifications forced the use of the joint Defendants' products and services, and only limited subcontractors could survive the bid approval process. These specifications required products in excess of acceptable industry requirements, in an amount in excess of what was needed, and further mandated the use of**

**<u>Tremco's higher priced products as if same were necessary for a safer roofing
system.</u>**

(ECF No. 63 ¶ 44 (emphasis added).) Based upon the foregoing, the information allegedly provided

by defendants to plaintiff, i.e., the bidding specifications, resulted in plaintiff paying defendants more

for defendants' products and services. In other words, the information supplied was *incidental* to

defendants selling to plaintiff its products at an increased cost. Because defendants were in the

business of marketing and manufacturing products and providing general contracting services—and

not providing information—the <u>Bilt-Rite</u> exception does not apply to plaintiff's negligent

misrepresentation claim.

In <u>Elliot-Lewis Corporation v. Skanska USA Building, Inc.</u>, Civ. Action. 14-3865, 2015 WL

4545362 (E.D. Pa. July 28, 2015), the court described the facts of the case as follows:

> This litigation involves a dispute regarding the installation of a new air
> conditioning system at the Franklin Institute in Philadelphia. Elliott–Lewis
> Corporation ("ELCo"), a subcontractor on the project, sued Skanska USA Building,
> Inc. ("Skanska"), the general contractor on the project, for unpaid work. Skanska then
> sued the project architects and engineers. The architects and engineers then sued a
> number of entities that had manufactured and supplied components for the project.
> Two of those entities, Patterson Pump Company ("Patterson") and Clapp Associates,
> Inc. ("Clapp") move to dismiss the claims against them, arguing that they are barred
> by the economic loss doctrine. The Court agrees and grants the motions.

<u>Id.</u> at *1. Based upon the allegations in the third-party complaint in issue, "condenser pumps"

manufactured by Patterson were used by a subcontractor to install the air conditioning system, and

"Clapp was the manufacturer's representative for Patterson on the project." <u>Id.</u> at *2. It was alleged

that:

> In troubleshooting the problem with the HVAC system, Marvin Waxman
> used data provided by Patterson….It was ultimately determined that there were
> problems "intrinsic to the pumps supplied."…However, it was several weeks before
> Patterson admitted this, resulting in delay before the problem could be corrected.

<u>Id.</u>

The claimants who filed negligent misrepresentation claims against defendants Patterson and Clapp argued "that in drafting the design documents [those claimants] reasonably relied on information provided by Patterson and Clapp and that this information was inaccurate." Id. at *2. The claimants who filed negligent misrepresentation claims against defendants Patterson and Clapp argued the economic loss doctrine did not apply to their claims because "Clapp and Patterson provided specific information about the performance capabilities of Patterson's pumps—information upon which they know that the [claimants] would rely," and Patterson and Clapp had a pecuniary interest in the project in issue. Id. at *4. The court agreed with the claimants that the Bilt-Rite exception was not limited to design professionals. Id. at *5. The court explained:

> The Court recognizes that Section 552 liability is not limited to design professionals. See, e.g., Precision Pipeline, LLC v. Trico Surveying & Mapping, Inc., No. 13–cv–1823, 2014 WL 4415378, at *2 (W.D.Pa. Sept.8, 2014) (applying Section 552 liability to surveying company). Nevertheless, the Court cannot ignore that the Pennsylvania Supreme Court cited architects and design professionals as the prototypical examples of those who qualify as professionals who engage in supplying information to others for pecuniary gain. See Bilt–Rite, 866 A.2d at 285–86. Nor can the Court overlook that in doing so, the Pennsylvania Supreme Court noted that Pennsylvania common law allows the recovery in tort for economic losses for legal and accountant malpractice. Id. at 288.

Id.

The court found it determinative that Patterson and Clapp were not in the business of supplying information; rather, they were in the business of marketing and manufacturing **products**. Id. The court explained:

> With this in mind, it is clear that Patterson and Clapp are not in the business of supplying information, a necessary predicate to be subject to liability under Section 552. In the context of the project, Patterson manufactured a product, and Clapp facilitated the sale of that product. (Saylor Gregg Compl. ¶¶ 19, 20.) A manufacturer and a manufacturer's representative are very different from the accountants, lawyers, and architects noted in Bilt–Rite. The sale of a product is fundamentally different than the sale of information, **even if the seller provides information about the product to consummate the sale**. See, e.g., Pannetta v. Milford Chrysler Sales, Inc., No. 14–cv–05680, 2015 WL 1296736, at *7 (E.D.Pa. Mar.23, 2015) ("[Allegations that defendant provided information to plaintiff

attendant to the sale of a car] are insufficient to bring [plaintiff's] claims within the narrow exception to the economic loss doctrine.") (quotation omitted); <u>Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co.</u>, 700 F.Supp.2d 720, 735 (W.D.Pa.2010) ("[I]t is abundantly clear from all the pleadings filed to date that Partners was not in the business of supplying information, but rather in the business of roasting and selling coffee."); <u>see also</u>, <u>e.g.</u>, <u>RLI Ins. Co. v. Indian River Sch. Dist.</u>, 556 F.Supp.2d 356, 362 (D.Del.2008) ("[Under Delaware law] where the information supplied is merely ancillary to the sale of a product or service in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings.") (quotation omitted).

> The Design Defendants' argument that Clapp and Patterson are subject to Section 552 liability would turn the exception into the rule. Many commercial transactions would fall under Section 552 and the <u>Bilt–Rite</u> exception and eviscerate the economic loss doctrine. The sale and purchase of a product often involves at least some conveyance of information from the seller. Under the Design Defendants' articulation, if a third-party reasonably relied on that information, the seller would be liable in tort for purely economic damages.

<u>Id.</u> at *5.

The court recognized that the claimants' broad interpretation of the <u>Bilt-Rite</u> exception, i.e., arguing the exception applies in a case where marketers and manufacturers of products provide information with respect to those products, was "inconsistent with authoritative case law referring to the <u>Bilt–Rite</u> exception as narrowly tailored." <u>Id.</u> (citing <u>Azur v. Chase Bank, USA, Nat'l Ass'n</u>, 601 F.3d 212, 223 (3d Cir. 2010); <u>Sovereign Bank v. BJ's Wholesale Club, Inc.</u>, 533 F.3d 162, 178 (3d Cir. 2008)). The court dismissed the negligent misrepresentation claims asserted against defendants Clapp and Patterson on that basis. <u>Elliot-Lewis</u>, 2015 WL 4545362, at *7; <u>see also</u> <u>E.J. Deseta, Inc. v. Goldner/Accord Ballpark, L.P.</u>, Civ. Action No. 2017, 2006 WL 51207 (Pa. Ct. Com. Pl. Jan. 10, 2006).[5]

---

[5]     The court in <u>E.J. Deseta</u>, explained:

> The only exception to the economic loss doctrine is for claims brought against "a design professional" or someone else who is "in the business of providing information to others." <u>Bilt-Rite Contractors, Inc. v. The Architectural Studio</u>, 581 Pa. 454, 480-2, 866 A.2d 270, 286-7 (2005). However, RCD was

Based upon the allegations in the second amended complaint, defendants in this case were in the business of marketing and manufacturing its products and providing general contracting services. Any information provided by defendants to plaintiff was ancillary to the sale of defendants' products. The exception set forth in <u>Bilt-Rite</u> does not, therefore, apply to plaintiff's negligent misrepresentation claim. The economic loss doctrine bars plaintiff's claims for negligence *and* negligent misrepresentation. Defendants' motion to dismiss plaintiff's negligence and negligent misrepresentation claims will be granted and the negligence and negligent misrepresentation claims will be dismissed from the second amended complaint.

### 3. Negligence claim (count four)

Plaintiff in the second amended complaint asserts a claim of negligence and alleges:

> As asserted above, Plaintiff asserts that the acts and omissions of the Defendants were either intentionally or recklessly made as to its pricing schemes, proprietary specifications, products specified, amount of products specified, and misrepresentations regarding the value of "pre-competed" pricing and discounts and the mandated use of same. **Alternatively, however**, Plaintiff alleges that RPM, Tremco, and WTI negligently hired, trained, and supervised its employees and agents in the sale of products and services. Such negligence in the training and oversight of employees and agents in the manner in which roofing projects were analyzed, evaluated, and subsequently designed and bid, proximately caused increased costs and the installation of roofing systems with known high failure rates[.]

(ECF No. 63 ¶ 81.) Plaintiff asserts a claim of negligence against defendants based upon their actions in "negligently hir[ing], train[ing], and supervis[ing] its employees and agents in the sale of products and services." (ECF No. 63 ¶ 81.) Defendants argue that claim should be dismissed because plaintiff

---

> simply the sub-contractor who "provide[d] the structural concrete services and related work for the Project." GFAJC, ¶ 13. **It was in the business of building things, not in the business of supplying information for use by others**. Therefore, even if RCD did supply schedules as part of its contract with DH, and even if other parties relied upon those schedules, those parties may not bring a negligent misrepresentation claim against RCD if they suffered solely economic loss.

<u>E.J. Deseta</u>, 2006 WL 51207, at *2 (emphasis added).

"has not sufficiently alleged any underlying tortious conduct that could warrant the imposition of vicarious liability." (ECF No. 70 at 5-6.) This court previously held, however, that plaintiff set forth a plausible claim for fraud in the amended complaint and defendants in their motion to dismiss do not argue that claim should be dismissed. In any event, plaintiff's claim for negligence for the failure to train its employees is barred by the economic loss doctrine because the only damages plaintiff seeks are the loss of the benefit of its bargain and the <u>Bilt-Rite</u> exception does not apply to the negligent failure to train claim.

### C.  Class Allegations

Based upon the foregoing, the surviving claim in the second amended complaint is plaintiff's claim for fraudulent misrepresentation. The court at the hearing with respect to the motion to dismiss the first amended complaint granted the motion to strike the class allegations because the remaining claim was fraudulent misrepresentation, which requires a plaintiff to prove justifiable reliance and would involve an individualized inquiry of each class member. (H.T. 2/5/2016 (ECF No. 56) at 51-52.) Plaintiff in its brief in opposition to the motion to dismiss the second amended complaint argues:

> The Second Amended Complaint asserts that justifiable reliance can be presumed in pricing schemes and uniform marketing representations, where the fraud at issue involves omissions or fabrications of objectively material information. <u>See, e.g.</u>, <u>Toth v. Nw. Sav. Bank</u>, No. GD-12-008014, 2013 WL 8538695, at *8 (Pa. Com. Pl. Mar. 1, 2013); <u>Zwiercan v. Gen. Motors Corp.</u>, No. 3235 JUNE.TERM 1999, 2003 WL 1848571, at *1-2 (Pa. Com. Pl. Mar. 18, 2003). It is possible to meet the reliance elements of fraud by examining whether a company has made uniform representations regarding a product's characteristics for the purposes of inducing consumer reliance or one that is a quantifiable statement of fact that has a tendency to deceiver the reader. <u>See, e.g.</u>, <u>In re Milo's Dog Treats Consol. Cases</u>, 9 F. Supp. 3d 523, 531 (W.D. Pa. 2014). A plaintiff is entitled to a presumption of reliance when the alleged misrepresentation is "material." Stated in terms 15 of reliance, materiality means that the misrepresentations spurred the conduct. <u>Id.</u> at 534. Plaintiff believes upon information and belief that the requested discovery will demonstrate that advertisements and market-place representations were materials [sic] and uniformly designed to induce Plaintiff and the proposed class as pleaded. <u>Id.</u> at 533. At this stage in the process, Plaintiff should be entitled to obtain such discovery; this Court will have the opportunity to determine certification upon the filing of the appropriate motion.

(ECF No. 72 at 16-17.)

Plaintiff raised a similar argument at the hearing with respect to the motion to dismiss the first amended complaint, i.e., it argued that the court should permit class discovery despite the court's holding that plaintiff could not satisfy Rule 23 because the only remaining claim was fraudulent misrepresentation. The court rejected plaintiff's argument, explaining:

> We have to be mindful as Courts that we cannot have litigation that just opens the door to huge expenses for defendants. It has to be limited to the claims and defenses that are raised. And if I can't see a basis for a class action for fraud claims where there isn't any fiduciary relationship shown, it's not a passive situation, if there's actually representations that the fraud occurred because of oral representations that were being made by specific representatives, you know, it's just so farfetched at this stage I'm really struggling.

(H.T. 2/5/16 (ECF No. 56) at 65.) As defendants point out, plaintiff in the second amended complaint alleges: "the business practices at issue surrounding the use of proprietary specifications and mandating purchase through cooperative purchasing agencies are matters of concern beyond individual recoveries and separate suits." (ECF 63 at 20.)

Plaintiff did not set forth any additional allegations to plausibly show that its fraudulent misrepresentation claim, which requires proof of justifiable reliance, is capable of satisfying the predominance requirements of Rule 23(b)(3); rather, plaintiff's fraudulent misrepresentation claim as stated in the second amended complaint requires individualized proof to show that defendants made a fraudulent misrepresentation to each member of the class, which each member of the class relied upon to purchase defendants' products to each class members' detriment. Plaintiff's claim for fraudulent misrepresentation under those circumstances is not suitable for classwide treatment. In re St. Jude Med., Inc., 522 F.3d 836, 838 (8th Cir.2008) ("Because proof often varies among individuals concerning what representations were received, and the degree to which individual persons relied on the representations, fraud cases are often unsuitable for class treatment."); Slapikas v. First Am. Title

Ins. Co., 250 F.R.D. 232, 247 (W.D.Pa.2008) ("fraud, in general, because of the issue of reliance, is seldom amenable to class certification"); see Rule 23 Advisory Committee Notes to the 1966 Amendments (stating, in pertinent part, that a fraud case, "although having some common core, ... may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed."); Walney v. SWEPI LP, Civ. Action No. 13-102, 2015 WL 5333541, at *17 (W.D. Pa. Sept. 14, 2015); Debbs v. Chrysler Corp., 810 A.2d 137, 155 (Pa.Super.Ct.2002) (citing Klemow v. Time, Inc., 466 Pa. 189, 352 A.2d 12, 16 n. 17 (1976)). Plaintiff's class allegations should, therefore, be stricken from the second amended complaint.

## VI.    Conclusion

For the foregoing reasons, the court will grant defendants' partial motion to dismiss (ECF No. 69) and dismiss plaintiff's fraudulent concealment, negligence, and negligent misrepresentation claims from the second amended complaint. The court will grant defendants' motion to strike class allegations (ECF No. 69) and plaintiff's class allegations will be stricken from the second amended complaint.

The dismissal of plaintiff's claims for fraudulent concealment, negligence, and negligent misrepresentation and the striking of the class allegations are without prejudice. Plaintiff may seek leave of court to file a third amended complaint that is consistent with the rules of law discussed in this opinion.

An appropriate order will issue.

By the court,

Dated: June 9, 2016                          /s/ JOY FLOWERS CONTI
                                             Joy Flowers Conti
                                             Chief United States District Judge